# EXHIBIT A



## IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>PATRICK WILLIAM CAMPBELL | **Case Number: 2216-CV06520** |
| Plaintiff/Petitioner:<br>THE ONE GROUP HOSPITALITY, INC.<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JEREMY MARTIN SUHR<br>1600 GENESSEE SUITE 416<br>KANSAS CITY, MO 64102 |
| Defendant/Respondent:<br>EMPLOYERS INSURANCE COMPANY OF<br>WAUSAU | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Declaratory Judgment | |

(Date File Stamp)

## Summons in Civil Case

The State of Missouri to: **EMPLOYERS INSURANCE COMPANY OF WAUSAU**
**Alias:**

RA: CSC-LAWYERS INCORPORATING
SERVICE COMPANY
221 BOLIVAR ST
JEFFERSON CITY, MO 65101

# PRIVATE PROCESS SERVER

*COURT SEAL OF*

**JACKSON COUNTY**

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

01-APR-2022
Date

Clerk

Further Information:

---

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

*(Seal)* **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

---

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $    10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see
Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCC) *For Court Use Only* Document Id # 22-SMCC-2413 1 of 1 Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 2 of 166

## SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County

6/2020



IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>PATRICK WILLIAM CAMPBELL | Case Number: 2216-CV06520 |
|---|---|
| Plaintiff/Petitioner:<br>THE ONE GROUP HOSPITALITY, INC.<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JEREMY MARTIN SUHR<br>1600 GENESSEE SUITE 416<br>KANSAS CITY, MO 64102 |
| Defendant/Respondent:<br>EMPLOYERS INSURANCE COMPANY OF<br>WAUSAU | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Declaratory Judgment | |

(Date File Stamp)

## Summons in Civil Case

The State of Missouri to:  **EMPLOYERS INSURANCE COMPANY OF WAUSAU**
Alias:
RA:  CSC-LAWYERS INCORPORATING
SERVICE COMPANY
221 BOLIVAR ST
JEFFERSON CITY, MO 65101

# PRIVATE PROCESS SERVER



*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

<u>01-APR-2022</u>
Date

Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within 30 days after the date of issue.
I certify that I have served the above Summons by:  (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.
☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.
☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

*(Seal)*      **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____      _____
                          Date                          Notary Public

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $    10.00 |
| Mileage | $_____ (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCC) *For Court Use Only*: Document 1-1 #22-SMCC-2413  1  of 1 Civil Procedure Form No. 1, Rules 54.01 – 54.05,
Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 3 of 166
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

## SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

**THE ONE GROUP HOSPITALITY, INC.,**

| | |
|---|---|
| **PLAINTIFF(S),** | **CASE NO. 2216-CV06520** |
| **VS.** | **DIVISION 10** |

**EMPLOYERS INSURANCE COMPANY OF WAUSAU,**

**DEFENDANT(S).**

## NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE
## AND ORDER FOR MEDIATION

NOTICE IS HEREBY GIVEN that a Case Management Conference will be held with the Honorable **PATRICK WILLIAM CAMPBELL** on **12-JUL-2022** in **DIVISION 10** at **09:00 AM**. All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting. Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file. All counsel and parties are directed to check Case.NET on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

A lead attorney of record must be designated for each party as required by Local Rule 3.5.1. A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2. The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by civil records department, and copies of orders will be sent to the address currently shown in JIS. Civil Records does not update attorney information from answers or other pleadings. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

At the Case Management Conference, counsel should be prepared to address at least the following:

a.      A trial setting;

b.      Expert Witness Disclosure Cutoff Date;

c.      A schedule for the orderly preparation of the case for trial;

d.      Any issues which require input or action by the Court;

e.      The status of settlement negotiations.

## MEDIATION

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case if filed for complex cases, and 6 months after the date the case is filed for other circuit cases, unless otherwise ordered by the Court. Each party shall personally appear at the mediation and participate in the process. In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case. If the parties are unable to agree on a mediator the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

## POLICIES/PROCEDURES

Please refer to the Court's web page www.16thcircuit.org for division policies and procedural information listed by each judge.

**/S/ PATRICK WILLIAM CAMPBELL**
PATRICK WILLIAM CAMPBELL, **Circuit Judge**

## Certificate of Service

This is to certify that a copy of the foregoing was mailed postage pre-paid or hand delivered to the plaintiff with the delivery of the file-stamped copy of the petition. It is further certified that a copy of the foregoing will be served with the summons on each defendant named in this action.

Attorney for Plaintiff(s):
JEREMY MARTIN SUHR, 1600 GENESSEE SUITE 416, KANSAS CITY, MO 64102

Defendant(s):
EMPLOYERS INSURANCE COMPANY OF WAUSAU

Dated: 01-APR-2022

MARY A. MARQUEZ
Court Administrator

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY

| | | |
|---|---|---|
| **THE ONE GROUP HOSPITALITY INC.,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **EMPLOYERS INSURANCE COMPANY** | ) | |
| **OF WAUSAU,** | ) | |
| Serve: Registered Agent | ) | |
| CSC-Lawyers Incorporating Service | ) | |
| Company | ) | |
| 221 Bolivar St. | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## PETITION FOR DECLARATORY JUDGMENT AND BREACH OF CONTRACT

Plaintiff, The One Group Hospitality Inc. ("TOG"), files this Petition for Declaratory Judgment and Breach of Contract against Defendant, Employers Insurance Company of Wausau ("Wausau"), alleging as follows:

### I.    NATURE OF ACTION

1.      This is an action for declaratory judgment and breach of contract arising out of the refusal of Wausau to live up to its promise to its policyholder, TOG. Wausau promised to pay for, in exchange for premiums paid, physical loss or physical damage to, and related business interruption losses and expenses, TOG's covered locations under an "all risk" insurance policy, Policy Number YAC-L9L-471218-019 for the period December 10, 2019 to December 10, 2020 (the "All Risk Policy"). A copy of the All Risk Policy is attached hereto as **Exhibit A**, and is incorporated herein by reference.

2.      TOG is a global hospitality company that owns and operates upscale and elevated casual restaurants worldwide, including 35 restaurants across the United States under the trade

names STK and Kona Grill (collectively, the "TOG Restaurants"). As of March 2020, TOG owned and operated TOG Restaurants in Missouri, as well as in Alabama, Idaho, New Jersey, Indiana, Maryland, Nebraska, Michigan, Minnesota, Georgia, Colorado, Tennessee, Ohio, Texas, New York, Nevada, Washington, Florida, Arizona, Illinois, California, and Puerto Rico.

3.      This all changed in 2020 with the COVID-19 pandemic. The pandemic had an unprecedented and catastrophic effect on TOG's property and business operations, as well as the operations of its direct and indirect suppliers, causing millions of dollars in losses.

4.      The havoc wrought by the pandemic is well-documented. According to the Centers for Disease Control and Prevention ("CDC"), as of February 28, 2022, COVID-19 has infected more than seventy-eight million people and killed nearly 945,000 in the United States. The states where TOG's properties are located have not been spared from this tragedy.

5.      Beyond the human toll, the pandemic has had a devastating impact on the economies where TOG's properties are located, causing widespread physical losses, property damage and loss for many businesses, including the TOG Restaurants. As a result of the pandemic, TOG has been prevented from conducting normal business operations and deprived of the use of its business properties. Even when permitted to open, as a result of the spread of COVID-19, TOG's properties required substantial physical alterations and other protective measures. Further, the presence of COVID-19 and SARS-CoV-2 within TOG Restaurants also caused direct physical loss or damage to properties (or both) by transforming the properties from usable and safe into properties that are unsatisfactory and prohibited for use, uninhabitable, unfit for their intended function, and extremely dangerous and potentially deadly for humans. TOG also suffered losses as a result of the interruption of business at its direct and indirect suppliers.

6.      SARS-CoV-2 and COVID-19 caused direct physical loss or damage to properties

(or both) throughout the locales where the TOG Restaurants are based, including to TOG's covered properties and surrounding properties, and those of its direct and indirect suppliers, by altering the physical conditions of the properties so that they were no longer safe or fit for occupancy or use, and/or permitted to be used. Specifically, SARS-CoV-2 attaches itself to surfaces and properties, thereby producing physical change in the condition of the surfaces and properties—from safe and touchable to unsafe and deadly. SARS-CoV-2 and COVID-19 also physically alter and damage the air within buildings such that the air is no longer safe to breathe.

7.     It is often the case that the source of a covered property insurance loss can ultimately be cleaned, removed, contained, or remediated, yet that does not mean that there was no "loss or damage to" property in the first place. This was true for mold, odors, smoke, fumes, and asbestos fibers that triggered coverage in other cases and the same is true here. That is especially significant when it comes to business interruption losses, where even modest impacts to property lead to covered losses. There are plenty of cases in which a right to claim business interruption loss was found where nothing had to be done to fix the property damage, which cleared by natural action. SARS-CoV-2 can be disinfected or cleaned, but it still causes a distinct and demonstrable alteration to property. That is what has triggered coverage for TOG's significant losses here.

8.     Because of the physical alterations of its properties, including the air, airspaces, and surfaces in its properties, which rendered the insured properties incapable of performing their essential functions, TOG sustained direct physical loss or damage to its property (or both). The disruption of normal business operations, and the operations of its direct and indirect suppliers, resulted in the severe and substantial losses more particularly described below.

9.     As a direct cause from the COVID-19 pandemic and/or the closure orders, together

with Wausau's failure to live up to its obligations under the All Risk Policy, TOG was forced to file this action. TOG would not have had to file and incur the cost of this legal proceeding if TOG had paid the loss and damage it was obligated to pay. To date, TOG has suffered millions of dollars in loss and damage, all of which remains unreimbursed by Wausau despite being covered under the terms of the All Risk Policy purchased.

10. TOG's purchase of this broad "all risk" coverage created a reasonable expectation that the coverage will apply if TOG has a business interruption resulting from unforeseen and fortuitous events, such as the physical damage to and inability to use its properties or a forced government shutdown of its businesses as a result of a pandemic or other large-scale natural disaster. In particular, TOG could not foresee the physical damage produced by the COVID-19 pandemic or the government orders shuttering its properties as a result of the physical damage produced by the COVID-19 pandemic. After faithfully paying a high premium for "all risk" coverage, business owner-insured TOG, who was forced to close its properties from these unprecedented events, had a reasonable expectation that its "all risk" business interruption insurance would apply and protect it. TOG had such expectations and sought coverage from Wausau for the losses.

11. Despite the coverage provided and the expectations of TOG, who paid a significant premium for it, Wausau preemptively denied claims submitted by businesses for "all risk" coverage during the COVID-19 pandemic. In violation of state law, Wausau denied coverage without conducting an investigation or considering supporting evidence. Through its conduct, Wausau wrongfully breached its obligations under the All Risk Policy and left TOG without the insurance benefits it paid for, relied upon, and desperately needed during the business closures and interruptions and to remediate its ongoing property damage.

12.     The insurance industry has repeatedly and falsely warned courts and the media that COVID-19-related claims will bankrupt insurers and force them to raise premiums and restrict coverages – but they have reaped enormous profits by denying covered claims and have continued to raise premiums despite refusing to uphold their coverage obligations.

13.     TOG seeks a declaration that the presence, statistically certain presence, or suspected presence of the SARS-CoV-2 virions in or on TOG's property and the ubiquitous presence of the virions throughout the locales and states where TOG's covered properties are located, causes direct physical loss or direct physical damage to property within the meaning of those phrases as used in the All Risk Policy sufficient to trigger coverage under the All Risk Policy.

14.     TOG also seeks a declaration that various orders issued by governmental officials on account of the presence of persons infected with and/or suffering from COVID-19 and the presence of SARS-CoV-2 in places of business and gathering prevented TOG from accessing and using its insured properties to conduct its ordinary business activities and deprived TOG of its property and the functionality of its property, thereby constituting "physical loss or damage" to property within the meaning of that phrase as used in the All Risk Policy sufficient to trigger coverage in favor of TOG under the All Risk Policy.

15.     TOG also seeks monetary damages for Wausau's breach of its obligations under the All Risk Policy as declared by the Court and to pay TOG's losses in full including, without limitation, loss mitigation expenses.

## II.     PARTIES

16.     The One Group Hospitality Inc. is a Delaware corporation with its principal place of business in Colorado.  TOG operates a Kona Grill restaurant in this County.

17.     Employers Insurance Company of Wausau is a Wisconsin corporation with its principal place of business in Wisconsin. Upon information and belief, Employers Insurance

Company of Wausau is a wholly-owned subsidiary of Liberty Mutual Holding Company Inc.

18.     Wausau is, and at all relevant times herein has been, engaged in the business of selling "all risk" insurance policies, other insurance policies and other products and services to, among others, companies like TOG.

### III.     JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Wausau because it is registered to do business in the State of Missouri and has consistent and significant commercial interactions within the State of Missouri. Further, Wausau purposefully availed itself of the laws of Missouri by insuring properties, such as those owned and operated by TOG, located in Missouri.

20.     Jurisdiction is also proper in this Court pursuant to R.S. Mo. §§ 506.500.1(1), (2) & (5) and 526.010 because Wausau transacted business and entered into contracts for the performance of services within this State, including contracting to insure risks and property located within this State at the time of contracting, and the relief being requested results from Wausau's conduct within this State

21.     This Court has jurisdiction to grant declaratory relief under R.S. Mo. § 526.010 because an actual controversy exists between the parties as to their respective rights and obligations under the All Risk Policy.

22.     Venue is proper in this Court under R.S. Mo. § 508.010 because Wausau transacts business in Jackson County, and TOG suffered loss and/or damage to property located in this County.

### IV.     FACTUAL BACKGROUND

***The COVID-19 Global Pandemic***

23.     In December 2019, during the term of the All Risk Policy, an outbreak of illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first

identified in Wuhan, Hubei Province, China. In an unprecedented event that has not occurred in more than a century, a pandemic of global proportions then ensued, with the illness and virus quickly spreading to Europe and then to the United States.

24.     In 2020, COVID-19 decimated the economies of the states and cities where the TOG Restaurants, and its direct and indirect suppliers, are located, including TOG's business operations.

25.     COVID-19 is highly transmissible and spreads rapidly. For example, as of March 1, 2020 there were 87,137 confirmed COVID-19 cases across the globe.[1] That number increased to over 800,000 confirmed cases in April and over 3,000,000 cases in May.[2] According to the CDC, to date, COVID-19 has infected more than thirty-three million people and killed nearly 600,000 in the United States alone.

26.     At the pandemic's peak, over 4,000 Americans were perishing per day from COVID-19.[3] A substantial number of Americans are still dying daily, with surges of cases and new and ever more contagious variants of COVID-19 occurring throughout the U.S and worldwide.[4] COVID-19 is now the third-leading cause of death in this country, surpassed only by heart disease and cancer.[5]

---

[1] *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200301-sitrep-41-covid-19.pdf.

[2] *See* https://graphics.reuters.com/CHINA-HEALTH-MAP/0100B59S39E/index.html.

[3] Eugene Garcia, Lisa Marie Pane and Thalia Beaty, *U.S. tops 4,000 daily deaths from coronavirus for 1st time*, AP NEWS, Jan. 8, 2021, https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited May 25, 2021).

[4] https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendsdeaths (last visited May 25, 2021); Johns Hopkins Medicine, *Coronavirus Second Wave? Why Cases Increase*, updated Nov. 17, 2020, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus (last visited May 25, 2021).

[5] Gary Stix & Youyou Zhou, *COVID-19 Is Now the Third Leading Cause of Death in the U.S.*, SCI. AM. (Oct. 8, 2020), https://www.scientificamerican.com/article/covid-19-is-now-the-third-leading-cause-of-death-in-the-u-s1/ (last visited June 3, 2021).

7

27.     COVID-19 can be transmitted in several ways, including via human-to-human contact, airborne viral particles, particularly within enclosed properties like the insured locations, and touching surfaces or objects that have SARS-CoV-2 virions on them.

28.     COVID-19 spreads easily from person to person and person to surface or object. Research has revealed that COVID-19 primarily is spread by small, physical droplets expelled from the nose or mouth when an infected person talks, yells, sings, coughs, or sneezes. A person who sneezes can release a cloud of SARS-CoV-2-containing droplets that can span as far as 23 to 27 feet. The CDC has stated that SARS-CoV-2 is most likely to spread when people are within six feet of each other, but has also recognized that SARS-CoV-2 may spread from an infected person who is more than six feet away or who has left a given space. Further, according to the CDC, longer exposure time likely increases exposure risk to COVID-19.

29.     Infected people shed copious amounts of SARS-CoV-2 into the air and surfaces around them by several different mechanisms, as illustrated in the below figure.[6] SARS-CoV-2 damages the air and surfaces of a property.

---

[6] TOG already has engaged a virologist expert, Dr. Angela Rasmussen, Ph.D., who at the appropriate phase of this litigation will substantiate and elaborate on SARS-CoV-2 and the physical damage it causes to property. Dr. Rasmussen is an affiliate of the Georgetown Center for Global Health Science and Security and a research scientist III (Associate Professor equivalent) at the Vaccine and Infectious Disease Organization-International Vaccine Centre (VIDO-InterVac), as well as an adjunct professor in the department of biochemistry, microbiology, and immunology at the University of Saskatchewan.

8



30.

31.　　SARS-CoV-2 is exhaled in respiratory particles through normal breathing, as well as coughing, speaking, singing, shouting, or exerted breathing, into the air by persons with COVID-19, including symptomatic and asymptomatic persons, where it persists in respiratory aerosols and droplets. Aerosols can remain suspended in the air for prolonged periods of time, where they can travel distances greater than 6 feet and eventually settle on surfaces to become fomites (infectious objects). Infectious aerosols can accumulate in enclosed spaces and present a significant infection risk in a manner that is dependent on concentration, not distance. Notably, without adequate ventilation and air filtration, the transformation of indoor air by people in an enclosed space for a long period of time presents a substantial infection hazard that cannot be mitigated solely with masks and distancing, resulting in damage to the property.

32.　　In addition to damage to the property via transformation of the indoor air, SARS-CoV-2 can be deposited on surfaces either through direct contact with respiratory secretions or

saliva of an infected person (transfer by hand or tissue) or by settling of particles from the air.

33.     Inhalation of infectious aerosols is a major mode of SARS-CoV-2 transmission, providing a clear mechanism for SARS-CoV-2 in the air to damage property. Although fomite transmission is thought to be uncommon, it is still a viable mode of transmission along with the more dominant modes of transmission by direct contact and inhalation of infectious SARS-CoV-2, and risk of fomite transmission is dependent on prevalence in the community, virus shedding, environmental features such as heat or humidity, mitigation efforts such as masks, distancing, or ventilation, rate of deposition of virus particles onto surfaces, frequency of exposure to those surfaces, and achieving minimum infectious dose.

34.     All three modes of transmission have been demonstrated in multiple experimental models. Exhaled respiratory particles and fecal bioaerosols present a significant transmission risk even after they have settled and are no longer suspended in the air, and disturbances can resuspend them in the air.

35.     Thus, SARS-CoV-2 causes property damage by rendering property unsafe and unfit for habitation and use, by transforming both the shared air breathed by the property's occupants and the physical surfaces of the property itself.

36.     The presence of infected people on the property ensure that infectious SARS-CoV-2 will inevitably be shed into the air and onto surfaces, damaging the property by rendering it unsafe for occupation and use without extreme mitigation measures.

37.     Making matters worse, pre-symptomatic and asymptomatic individuals can also transmit COVID-19.[7] Over 40% of all infections occur from people without any symptoms.[8] Thus,

---

[7] *See* https://www.nature.com/articles/s41591-020-0869-5.
[8] *See id.*; https://www.nbcnews.com/health/healthnews/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481.

even individuals who appear healthy and present no identifiable symptoms of the disease have and continue to spread the virus by breathing, speaking, or touching objects and surfaces. These activities deposit SARS-CoV-2 virions in the air and on surfaces rendering the air and surfaces changed from their previous condition. According to the World Health Organization (the "WHO"), the incubation period for COVID-19, *i.e.*, the time between exposure to SARS-CoV-2 and symptom onset, can be up to 14 days. Other studies suggest that the period may be up to 21 days.

38. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers. In addition, studies from the CDC and others estimate that between 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers). Pre-symptomatic and asymptomatic carriers are likely unaware that they are spreading SARS-CoV-2 by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

39. Although these virus-containing droplets are very small, they are still physical, tangible objects that can travel and attach to other surfaces, "such as tables, doorknobs, and handrails," and cause harm, loss, and damage, and physically alter the property and/or the integrity of the property. Viruses, themselves, are microscopic and made up of genetic material surrounded by a protein shell[9], but they are capable of being observed and can attach themselves to other things they encounter. When droplets and viruses contact objects, they alter those objects, although not in way perceptible by the naked human eye. These virus-containing droplets physically exist

---

[9] *See* https://rockedu.rockefeller.edu/component/what-are-viruses-made-of/.

ubiquitously in the communities and buildings in which TOG operates.

40. According to the CDC and the WHO, a person may become infected by touching these surfaces or objects that have SARS-CoV-2 on them, and then touching his or her mouth, eyes, or nose. And, when an uninfected person touches a surface containing SARS-CoV-2, the uninfected person may transmit COVID-19 to another person, by touching and infecting a second surface, which is subsequently touched by that other person. The CDC has thus recommended certain physical and structural remedial measures for businesses to put into place in order to limit transmission and continued surface alteration.

41. Numerous scientific studies have reported that SARS-CoV-2 can survive and persist within the air and on surfaces and buildings after infected persons are present at a given location. Studies have found that SARS-CoV-2 remains active and dangerous in the air in properties and on common surfaces, including plastic, stainless steel, glass, wood, cloth, ceramics, rubber, and even money.[10] All of these materials are widely present at TOG's insured locations and subject to touch by the multitudes of people visiting the TOG Restaurants daily. A business reliant on a high volume of patrons physically occupying space, dining, and conversing, such as TOG, is particularly vulnerable to this danger.

42. Generally enclosed spaces where large numbers of people gather in close proximity for social and business purposes, including highly trafficked indoor restaurants like TOG's, are reportedly particularly susceptible to circumstances favorable to the spread of SARS-CoV-2 virions. An article published in April 2020 analyzed a case study of three families (families A, B,

_____

[10] *See, e.g.,* https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(20)30003-3/fulltext; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4659470/; *See* https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days; https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.

and C) who had eaten at an air-conditioned restaurant in Guangzhou, China.[11] One member of family A, patient A1, had recently traveled from Wuhan, China. On January 24, 2020, that family member ate at a restaurant with families A, B, and C. By February 5, 2020, 4 members of family A, 3 members of family B, and 2 members of family C had become ill with COVID-19. The only known source for those affected persons in families B and C was patient A1 at the restaurant. Moreover, a study detected SARS-CoV-2 inside the heating and ventilation ("HVAC") system connected to hospital rooms of sick patients. The study found SARS-CoV-2 in ceiling vent openings, vent exhaust filters, and ducts located as much as 56 meters (over 183 feet) from the rooms of the sick patients.[12]

43.     Additionally, the CDC has stated that "there is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away" and infected people who entered the space shortly after the person with COVID-19 had left.[13] A published systematic review of airborne transmission of SARS-CoV-2 corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments to decrease bioaerosol concentration and physically reduce potential spread of SARS-CoV-2 in properties like the insured locations.[14]

44.     The CDC has recommended "ventilation interventions" to help reduce exposure to

---

[11] *See* https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article.
[12] Karolina Nissen, et al., *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, 10 NATURE SCI. REPORTS 19589 (Nov. 11, 2020), https://doi.org/10.1038/s41598-020-76442-2 (last visited May 25, 2021).
[13] CDC, *How COVID-19 Spreads* (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 25, 2021).
[14] Zahra Noorimotlagh, et al., *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited May 25, 2021).

13

the airborne SARS-CoV-2 in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[15] These and other remedial measures must be implemented, at high cost and extra expense, to reduce the amount of the SARS-CoV-2 present in a given space and to make property safe for its intended use. These remedial measures demonstrate direct physical loss or damage to interior spaces like the insured locations even where no virus is present.

45.     The extent and nature of presymptomatic viral shedding suggests that property damage through environmental exposure and persistence in the air, surfaces, and floors is inevitable for high-traffic venues such as restaurants, hospitals, casinos, cruise line vessels, and event spaces, environments that are highly conducive to SARS-CoV-2 spread. This leads to additive, sustained property damage, as those who are infected then shed virus themselves, further damaging the property and rendering it unsafe and unfit for use.

46.     A single introduction of SARS-CoV-2 can persist in indoor environments for long periods of time. SARS-CoV-2 RNA has been detected on packages even after international transport, as well as on numerous environmental samples in locations where infected people have visited or shopped, such as markets, airplanes, ships, or event venues.

47.     The proposition advanced by the insurance industry that an indoor space containing the infectious SARS-CoV-2 virions can be made safe and fit for its functional and intended use even though the virions remain in the air and circulating throughout indoor environments either affixed to property or in an aerosol capacity because the virions can be removed by routine surface

---

[15] CDC, *Ventilation in Buildings* (last updated Feb. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited May 25, 2021).

cleaning is false.

48.    A number of studies have also demonstrated that SARS-CoV-2 is "much more resilient to cleaning than other respiratory viruses so tested."[16] The measures that must be taken to remove SARS-CoV-2 from property are significant and far beyond ordinary or routine cleaning.

49.    Efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the disinfecting agent, dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[17]

50.    Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents. The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[18]

51.    In order to be effective, cleaning and disinfecting procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.[19] Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[20]

52.    When considering disinfection, the safety of products and procedures must be

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Joon Young Song, et al., *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited May 25, 2021).

considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[21]

53.     Moreover, the aerosolized SARS-CoV-2 particles and virions cannot be eliminated by routine cleaning. Cleaning surfaces in an indoor space will not remove the aerosolized SARS-CoV-2 particles and virions from the air that people can inhale and develop COVID-19 – no more than cleaning friable asbestos particles that have landed on a surface will remove the friable asbestos particles suspended in the air that people can inhale.

54.     Given the ubiquity and pervasiveness of SARS-CoV-2, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the virus from entering an indoor space like the insured properties and exhaling millions of additional particles and virions into the air, further: (a) filling the air with the aerosolized SARS-CoV-2 virions that can be inhaled, sometimes with deadly consequences; and (b) depositing SARS-CoV-2 particles and virions on surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

55.     Even as vaccines to protect against COVID-19 have recently become more available, distribution remains uneven. Effective control of the disease's spread since the pandemic began has necessarily relied on measures designed to reduce human-to-human and surface-to-human exposure. Similarly, the governmental orders closing or severely limiting use of non-essential business premises like TOG's business premises are one of the most common modes of preventing transmission of the disease because, among other things, the orders reduce the size and frequency of social gatherings and the physical use of properties.

***COVID-19 and SARS-CoV-2 Cause Direct Physical Loss and Damage***

56.     Virologists, scientists, and researchers all have confirmed that SARS-CoV-2

---

[21] *Id.*

remains viable and is active on physical surfaces after deposited on property as in the air. The persistent presence of the deadly, viable SARS-CoV-2 on surfaces and in the air damages buildings and properties rendering them damaged, lost, unsafe, unfit, and uninhabitable for normal occupancy or use.

57.     Specifically, the scientific community has confirmed that SARS-CoV-2 and COVID-19 alter the conditions of properties and buildings such that the premises are physically damaged and no longer safe and habitable for normal use. In this regard, SARS-CoV-2 and COVID-19 cause direct physical loss or damage to buildings and properties (or both).

58.     This direct physical loss or damage to property (or both) results because SARS-CoV-2 has a corporeal existence and is contained in respiratory droplets. Once expelled from infected individuals, these droplets land on, attach, and adhere to surfaces and objects and physically changes these once safe surfaces to "fomites." Fomites are objects, previously safe to touch, that now serve as a vehicle and mechanism for transmissions of an infectious agent. Fomites are the result of SARS-CoV-2 physically changing air and property, making it unsafe. This physical alteration and change makes physical contact with those previously safe indoor spaces and inert surfaces (*e.g.*, walls, handrails, desks) unsafe and potentially deadly. This represents a physical change in the affected enclosed space, surface or object, causing severe property loss and damage. Affected properties are unusable, dangerous, and unsafe until the COVID-19-related conditions are fully rectified.

59.     Medical and scientific research also has established that SARS-CoV-2 and COVID-19 spread through indoor airborne transmission. When individuals carrying SARS-CoV-2 breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air, accumulate in buildings, and, like dangerous fumes, make the premises unsafe and affirmatively dangerous.

According to experts, buildings and properties accumulate the airborne SARS-CoV-2 indoors, which plays a significant role in community transmission. As a result, SARS-CoV-2 and COVID-19 cause direct physical loss or damage to properties and buildings (or both) by changing the physical condition of air in buildings from safe and breathable to unsafe and dangerous.

60.     Further, airborne viral particles are known to be able to spread into a facility's HVAC system, leading to transmission of SARS-CoV-2 from person to person. The Environmental Protection Agency ("EPA") has recommended that facilities make improvements to their ventilation and HVAC systems by, for example, increasing ventilation with air filtration and outdoor air. Accordingly, COVID-19 and SARS-CoV-2 cause direct physical loss or damage to property (or both) by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended functions, dangerous, and unsafe.

61.     Fomites, droplets, droplet nuclei, and aerosols containing SARS-CoV-2 are not theoretical, informational, or incorporeal, but rather are dangerous physical objects that have a tangible existence. Their presence within an insured property causes direct physical loss or damage to property (or both) by necessitating remedial measures that include without limitation repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, removal of fomites by certified technicians, and other measures. The presence of COVID-19 and SARS-CoV-2 within an insured property also causes direct physical loss or damage to properties (or both) by transforming property from usable and safe into a property that is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

62.     The presence of SARS-CoV-2 on property similarly creates the imminent threat of

further damage to that property or to nearby property. Individuals who come into contact, for example, with respiratory droplets at one location in the property by touching a doorknob, table, or handrail, will carry those droplets on their hands and deposit them elsewhere in the property, causing additional damage and loss. Property impacted by SARS-CoV-2 is just as dangerous as property impacted by fire or fumes or vapors (if not more), and all such damaged property is equally incapable of producing revenues. Like the impact of fire, smoke, or noxious fumes, the impact of potentially fatal COVID-19 constitutes direct physical loss or damage to property (or both).

  63. The direct physical loss or damage to property (or both) described in this section has occurred at TOG's insured locations (including in Jackson County), and at its direct and indirect suppliers, leading to losses covered by the All Risk Policy. TOG had to take action to secure and preserve its properties and its business operations. To the extent that the All Risk Policy requires structural alteration to establish "physical damage," which TOG disputes, such alteration has occurred and rendered the insured properties incapable of performing their essential functions. TOG's losses are ongoing and are likely to increase substantially given the length and ultimate severity of the outbreak, repeated closures of the TOG Restaurants, and the government response. Moreover, to the extent that the All Risk Policy requires a permanent loss of property to establish "physical loss," which TOG disputes, such permanent loss has occurred.

***Reactions at the National, State, and Local Levels***

  64. Across the United States, national, state and local governments tried to slow the spread of COVID-19 and protect people, property, and businesses. Unprecedented directives were issued, requiring certain businesses to close and requiring residents to remain in their homes unless performing "essential" activities.

65.     On January 31, 2020, the United States Department of Health and Human Services declared that a public health emergency existed nationwide because of confirmed cases of COVID-19 in the United States.

66.     Beginning in early March 2020, U.S. state and local governments issued orders suspending or severely curtailing the operations of all "non-essential" or "high risk" businesses in response to the virus and/or risks created by virus. This included restaurants such as those owned and operated by TOG and the operations of its direct and indirect suppliers.

67.     On or about March 2020, U.S. states, counties, and cities where TOG's insured properties, and the properties of its direct and indirect suppliers, are located declared states of emergency to help prepare for broader spread of COVID-19. The TOG Restaurants were only permitted to reopen with physically reduced capacities and physical changes to premises.

68.     On or about March 2020, U.S. states, counties, and cities where TOG's insured properties are located issued orders prohibiting all restaurants within those counties/cities from serving patrons on premises. The orders where applicable allowed restaurants to continue to operate only for purposes of offering products to customers *via* delivery service, customer take-out, pick-up, or for drive-thru service (subject to certain restrictions).

69.     For example, on March 12, 2020, Quinton D. Lucas, the Mayor of the City of Kansas City, Missouri, issued a proclamation declaring a state of emergency, stating that the continued spread of COVID-19 constitutes a natural calamity and presents an imminent threat of widespread illness, which requires emergency action. The proclamation was ordered "to protect life and property" and permitted the city to order evacuations, close public places, impose curfews, limit public gathering and assemblies, and to order the closing of any and all businesses.

70.     Further, on March 13, 2020, Missouri Governor Michael Parson declared a state of emergency due to COVID-19. And on April 3, 2020, Governor Parson and the Missouri Department of Health and Senior Services issued an order requiring individuals within State of Missouri to stay at home except for certain essential activities and prohibited the gathering of more than ten people due to COVID-19.

71.     These orders, together with similarly construed orders issued by government officials, effectively curtailed TOG's stores' on-premises business operations that rely on customers' ability to dine on-premises in an interruption of business operations.

72.     Because of the danger posed by COVID-19 and its spread as described above, TOG also determined that closure was necessary to slow the spread of COVID-19 as a result of infected persons on the property or from those who would enter the property.

73.     Governmental authorities across the U.S. and abroad have issued orders referencing physical property loss or damage or imminent threatened physical property loss or damage from the virus. A motivating factor behind these orders was to protect persons and property from direct physical loss or damage to property (or both) caused by SARS-CoV-2 and COVID-19.

74.     Prior to the issuance of any of the orders curtailing or suspending non-essential business operations, literally thousands of individuals would be present in TOG Restaurants on a daily basis.

75.     The vast majority of those individuals were in-restaurant diners, who would spend a substantial period of time in the restaurant dining, conversing, and relaxing.

76.     Given the number of infected individuals, it is a virtual certainty that infected individuals, both symptomatic and asymptomatic, were present in TOG's stores on a daily basis even prior to the issuance of the governmental orders and would have been present daily in TOG's

restaurants in an ever-increasing number in the absence of the issuance of those orders.

77.    Exhalation by these infected individuals when eating, coughing, sneezing, talking, laughing, and even simply breathing created respiratory droplets and aerosolized particles containing the SARS-CoV-2 virus that were inhaled into the noses, mouths, and lungs of other individuals and deposited on surfaces within the TOG Restaurants where later contact by uninfected individuals undoubtedly resulted in transmission of SARS-CoV-2 to those individuals.

78.     Each visit by an individual, whether symptomatic or asymptomatic, infected with SARS-CoV-2 resulted in either the actual or an imminent threat of deposition and transmission of the SARS-CoV-2 into the air and onto the surfaces within the TOG Restaurants.

79.    For the reasons described above, COVID-19 and the governmental orders caused a total or partial prohibition of access to the TOG Restaurants as well as partial or total interruption of TOG's restaurant operations.  The direct physical loss or damage to property (or both) caused by COVID-19 and/or the orders and the further direct physical loss or damage to property (or both) threatened by COVID-19 have combined to devastate TOG's business operations.

80.    Further, for the reasons described above, COVID-19 and the governmental orders caused a total or partial prohibition of access to certain of the properties of TOG's direct and indirect suppliers, such that TOG experienced contingent business interruption loss because of the delay or failure to receive supplies, materials, food products, and other tangible things necessary to TOG's normal and expected business operations.

***TOG Suffered and Continues to Suffer Covered Losses***

81.    The SARS-CoV-2 virus is a covered cause of loss, because it is a risk of physical loss or damage, and not otherwise excluded under the All Risk Policy.

82.    The issuance of the above-referenced closure orders by government officials is a

covered cause of loss because it is a risk of direct physical loss or direct physical damage, and not otherwise excluded under the All Risk Policy.

83.     Whether the SARS-CoV-2 virus and/or the above-referenced orders caused TOG's losses and expenses, and in what sequence in each covered location, presents a factual question that is inappropriate for resolution at the motion to dismiss stage.

84.     The SARS-CoV-2 virus and/or the above-referenced orders issued by government officials have directly impacted the TOG Restaurants, which do not qualify as essential businesses. The damage and far-reaching restrictions and prohibitions on the activities that can be conducted at the TOG Restaurants, and restoration efforts necessary to rid the premises of COVID-19, have been catastrophic for TOG – interrupting their operations so pervasively as to effectively force them to close, thereby enduring a prolonged curtailment of earnings.

85.     TOG's operations were suspended to allow TOG to repair the insured properties, including restoration efforts to rid the premises of and attempt to protect against further physical loss and/or damage SARS-CoV-2. Until the premises could be repaired and restored and resulting government orders lifted, TOG suffered a complete and permanent loss of use of its business premises and they were unfit for use for their intended purposes.

86.     Ultimately, all TOG premises were closed on March 20, 2020, and remained closed through the end of April 2020, at which point TOG began to open on a gradual basis through end of June 2020. As of the end of June 2020, all of the TOG Restaurants had been reopened but were forced to operate at reduced hours and capacity. Since the reopening, some of the TOG Restaurants were again forced to close for periods of time.

87.     As a result of the physical loss or damage and threatened or actual communicable disease, TOG acted to mitigate the effects on its business in numerous ways.

88.     Prior to business closures in March 2020, the TOG Restaurants were frequented by thousands of individuals a day, including patrons, employees, vendors, and other individuals carrying SARS-CoV-2 and COVID-19.  In addition to breathing SARS-CoV-2 and COVID-19 into the air, these individuals touched countless surfaces in TOG's restaurants, including reception, dining room, bar area, restrooms, kitchen, pool tables and game rooms, the furniture, doors, tables, surfaces on the floors, and other common areas on the premises.

89.     These individuals that frequent the TOG Restaurants daily, ranging from patrons, to employees, to vendors, are carrying or otherwise exposed to SARS-CoV-2 and COVID-19 and would have been in contact with each other, as well as hosts and servers, dining room, bar area, restrooms, kitchen, transitional spaces, the furniture, doors, tables, surfaces on the floors, and other common areas on the premises.

90.     Thus, TOG has been forced to pay decontamination costs, covered under the All Risk Policy, to repair the physical damage caused by COVID-19.  It became clear that TOG's covered properties were (and continue to be) inoperable and unusable without the alterations necessary to protect the safety of its patrons, vendors, and employees. These decontamination costs also were necessary to comply with the emergency directives, laws, and/or ordinances promulgated by governmental authorities and the CDC, among others. None of these costs would have been incurred but for the impacts of the COVID-19 pandemic and the resulting closure orders.

91.     In addition to decontamination costs, TOG has incurred significant losses and extra expense in nearly all aspects of its business. Again, none of these expenses would have been incurred but for the impacts of the COVID-19 pandemic and the resulting closure orders.

92.     Among other things, TOG announced mitigation measures for in-restaurant customers once certain states began to allow reopening of businesses and in-person dining,

requiring proactive measures be taken which led to an uptick in extra expenses.

93.     Further, COVID-19 and the governmental orders caused a total or partial prohibition of access to certain of the properties of TOG's direct and indirect suppliers, such that TOG experienced contingent business interruption loss because of the delay or failure to receive supplies, materials, food products, and other tangible things necessary to TOG's normal and expected business operations.

94.     The above-referenced orders, issued as a direct result of the physical damage described above, have operated to prohibit access to the TOG Restaurants, the properties of TOG's direct and indirect suppliers, and the immediate surrounding businesses, properties, and areas.

95.     The SARS-CoV-2 virus and/or the above-referenced closure orders have also caused TOG to suffer interruption of business operations resulting from TOG taking reasonable and necessary action for the temporary protection and preservation of its covered properties, to prevent immediately impending insured physical loss or damage to its insured locations.

96.     The SARS-CoV-2 virus and/or the above-referenced closure orders have further caused TOG to suffer loss of earnings directly resulting from physical loss or damage to property at the premises of TOG's suppliers, customers, and/or contract service providers.

***The Insurance Coverage Purchased by TOG***

97.     In exchange for a very substantial premium, Wausau agreed to indemnify TOG for property losses, business interruption losses ("Time Element" per the policy language), and other losses under its Premier Property Protector™ "all risk" insurance policy, Policy Number YAC-L9L-471218-019 for the period December 10, 2019 to December 10, 2020. *See* **Ex. A**. The All Risk Policy limit is $115,381,258, which is subject to a deductible and certain sublimits.

98.     When marketing its Premier Property Protector™ policy to the public, Wausau

boasted that this new policy form featured "flexibility, broad coverage, and more relevant capacity in one easy-to-use form." Mike Fallon, the then president of National Insurance, for Wausau's corporate parent's business unit, stressed that "[t]he Premier Property Protector form blends broad coverage, an intuitive structure and easy to understand language...."[22]

99.     This is because the Premier Property Protector™ policy generally, and TOG's policy in particular, is an "all-risk" policy. An "all-risk" policy provides the broadest coverage available. Under an "all-risk" policy, the policyholder's burden is limited; the policyholder need only show that a loss occurred and that the loss was fortuitous. The burden then shifts to the insurance company to show that an express exception in the policy bars or limits coverage. Any risk not specifically and unambiguously excluded in the policy is covered.

100.    The All Risk Policy broadly covers property against "all risks of direct physical loss or damage, except as hereinafter excluded or limited." Ex. A, § I.C. Wausau did not define the phrase "physical loss or damage" in the All Risk Policy.

101.    The presence of the disjunctive "or" in "physical loss or damage" means that coverage is triggered if there is a risk of *either* a direct physical "loss" *or* "damage" to property. It also means that a "loss" is distinct from "damage."

102.    Physical loss or damage to property happens when a covered cause of loss threatens to render or renders property unusable, unsuitable for its intended purpose, or unsafe for human occupancy and/or continued use.

103.    COVID-19 and/or the government shut-down orders described above have caused "direct physical loss or damage" to TOG's property under the All Risk Policy. Specifically, TOG

---

[22] *See Liberty Mutual Enhances Commercial Insurance Property Form*, Business Insurance, https://www.businessinsurance.com/article/20170809/NEWS06/912315067?template=printart.

has suffered a loss of gross earnings that it otherwise would have received if indoor dining was not restricted and curtailed, and the volume of food purchases did not diminish significantly.

104. The All Risk Policy contains a section entitled "Time Element Coverages" which insures TOG's gross earnings. Within that section, coverage is extended for "Extra Expense" which covers the reasonable and necessary extra costs to "temporarily continue as nearly normal as practicable" business operations. Ex. A, § III.

105. The All Risk Policy also contains additional "Time Element Coverages." This includes items such as: "Attraction Property"; "Civil or Military Authority"; "Ingress/Egress"; "Contingent Time Element"; and "Leasehold Interest." *Id.*

106. "Attraction Property" covers actual loss and Extra Expense due to loss or damage at an attraction property within one statute mile from a covered location. "Attraction Property" refers to a property operated by others and that TOG depends on to attract customers to its covered location. *Id.*, § III.E.1.

107. "Civil or Military Authority" coverage insures the "actual loss sustained and EXTRA EXPENSE during the *period of interruption* if an order of civil or military authority prohibits access to a covered location provided such order is caused by physical loss or damage of the type insured by this Policy at a covered location" or within one statute mile from a covered location. *Id.*, § III.E.2.

108. "Ingress/Egress" covers the "actual loss sustained and EXTRA EXPENSE due to the necessary interruption" of business operations "if ingress to or egress from a covered location is prevented, whether or not your premises or property is damaged, provided that such prevention is a direct result of physical loss or damage of the type insured to property of the type insured." *Id.*, § III.E.8.

109. "Contingent Time Element" coverage insures the "actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured by this Policy at *Direct Dependent Time Element Location(s)* and *Indirect Dependent Time Element Location(s)* located within the territory of this Policy." "Direct Dependent Time Element Location(s)" includes any location(s) of a direct: customer, supplier, contract manufacturer or contract service provider to TOG. "Indirect Dependent Time Element Location(s)" includes any location(s) of any company that is a direct customer, supplier, contract manufacturer or contract service provider to any Direct Dependent Time Element Location(s). *Id.*, § III.E.4.

110. In plain English, and as relevant here, the Contingent Time Element coverage under the All Risk Policy provides coverage to TOG if its direct or indirect suppliers (*i.e.*, its suppliers or its suppliers' suppliers) suffer physical loss or damage to property of the type covered under the All Risk Policy. This includes loss due to civil authority and ingress/egress.

111. "Leasehold Interest" covers loss where a lease agreement "requires continuation of rent as a result of a covered loss, and if the covered property is wholly or partially untenantable or unusable, the actual rent payable while the covered property is untenantable or until the lease is terminated…." *Id.*, § III.B.3.

112. The All Risk Policy also provides coverage for "Decontamination Costs" "directly resulting from a covered loss at a covered location" as a result of enforcement of a law or ordinance in force at the time of decontamination. *Id.*, § II.D.7. As a result of COVID-19 and/or the civil authority orders described above, the TOG Restaurants were required by government orders to implement heightened decontamination procedures in order to reopen and operate in any capacity.

113. Direct physical loss or damage due to the continuous spread and transmission of

COVID-19, government action or inaction, and the above-referenced civil authority orders are covered causes of loss not otherwise excluded under the All Risk Policy.

114. The All Risk Policy contains an exclusion for "contamination" but it is limited in scope and does not apply here. Specifically, the "contamination" exclusion provides:

We do not cover the following unless directly resulting from a covered loss:

    a.    **Contamination,** and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided elsewhere in this Policy.

115. The All Risk Policy defines "covered loss" as "loss to **covered property** caused by direct physical loss or damage insured by this Policy." *Id.*, § VII.5.

116. "Contamination" is defined as "[a]ny condition of property that results from a **contaminant.**" *Id.*, § VII.4. "Contaminant" is "[a]ny foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew." *Id.*, § VII.3.

117. On its face, the contamination exclusion applies only to **actual** "contamination" (not the threatened presence of contamination) and any "**cost**" due to actual contamination (not any "loss" or "damage" due to the threatened presence of or actual contamination).

118. The contamination exclusion also does not apply to concurrent causes of loss. Concurrent causation occurs when a loss is brought about through a combination of two or more potential causes. If one of the concurrent causes is covered, there is coverage under the All Risk Policy. If Wausau intended for the contamination exclusion to apply to concurrent causes of loss, then it should have said so like it did in other exclusions. *See, e.g., id.,* § II.C.2. ("We do not cover physical loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing to the loss concurrently or in any other sequence").

119. The All Risk Policy's contamination exclusion does not apply here for at least the following reasons.

120. The contamination exclusion precludes coverage only for any "cost" due to actual contamination, not "loss" or "damage" due to actual or the threatened presence of contamination. The All Risk Policy clearly distinguishes between "cost" and "loss" and "damage." If Wausau intended for this exclusion to preclude coverage for direct physical "loss" or "damage" due to contamination, then it should have said so like it did in other All Risk Policy exclusions it drafted. *See*, *e.g.*, *id.*, § II.C.2 ("We do not cover physical loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing to the loss concurrently or in any other sequence...."); *see also id.*, § II.C.1.d ("We do not cover ... [l]oss or damage or deterioration arising from any delay."); *id.*, §II.C.1.f ("We do not cover ... [l]oss or damage from enforcement of any law or ordinance ... [r]equiring the demolition of any property, including the cost in removing its debris.").

121. Further, the All Risk Policy expressly provides coverage both for "Decontamination Costs" and also removal of "contaminated covered property or the contaminant in or on covered property" resulting from a covered loss. *Id.*, § II.D.6, 7. These separate coverages underscore the fact that Wausau never intended to exclude coverage related to "contamination" where, as here, there is plainly a covered loss.

122. At a minimum, the All Risk Policy's contamination exclusion is ambiguous and should be construed against Wausau as the sole drafter of its All Risk Policy and in favor of the policyholder, TOG. *See Thor Equities, LLC v. Factory Mutual Ins. Co.*, No. 20-3380, 2021 U.S. Dist. LEXIS 62967, 2021 WL 1226983 (S.D.N.Y. Mar. 31, 2021).

123. Further, there are concurrent causes of TOG's loss, and the contamination

exclusion, by its express terms, does not apply to one of them. Thus, even if TOG's loss somehow is determined to be due to a virus, government action or inactions and the above-mentioned civil authority orders, among other potential causes, were a concurrent cause of loss that are covered under the All Risk Policy. If Wausau wanted the contamination exclusion to apply to concurrent causes of loss, then it knew how to exclude them, but it decided not to do so.

***TOG's Claim and Wausau's Wrongful Denial of Coverage***

124.    On March 17, 2020, TOG provided Wausau with notice of its claim for coverage, informing Wausau that it experienced, and continues to experience, physical loss and/or damage to insured property and goods and suffered resulting business interruption losses as a result of the COVID-19 pandemic.

125.    On March 23, 2020, Wausau informed TOG that it was denying coverage under the All Risk Policy. Wausau stated, among other things, that "[a]s there was no physical damage and contamination is an excluded peril, there is no coverage for your business interruption loss."

126.    Contrary to Wausau's positions, TOG has sustained actual loss and has incurred extra expense directly resulting from direct physical loss or damage to property (or both) of the type insured under the All Risk Policy. No exclusions under the All Risk Policy apply to preclude coverage for TOG's claims.

127.    TOG has substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the All Risk Policy and applicable law, or alternatively, TOG has been excused from performance by Wausau's acts, representations, conduct, or omissions.

## FIRST CAUSE OF ACTION
### (Declaratory Relief, pursuant to R.S. Mo. § 527.010)

128.    TOG incorporates by reference the allegations contained in Paragraphs 1-127.

129.     As set forth above, Wausau sold TOG the All Risk Policy protecting against all risks of direct physical loss or damage to property and time element coverages now being suffered by TOG as a result of COVID-19 and recent orders of civil authority that closed, and curtailed the operations of, the TOG Restaurants and the operations of its direct and indirect suppliers.

130.     Wausau breached and continues to breach its promises, as set forth in the All Risk Policy, by, among other things, failing and/or refusing to honor its promises to pay for loss or damage to property and time element coverages now being suffered by TOG as a result of COVID-19 and recent orders of civil authority.

131.     As a direct and proximate result of Wausau's breaches of contract and refusal to acknowledge its coverage obligations, TOG has suffered and will continue to suffer serious harm.

132.     An actual and justiciable controversy exists between TOG and Wausau regarding the interpretation, application and meaning of the All Risk Policy.

133.     Accordingly, TOG is entitled to declaratory judgment of its rights and of the obligations of Wausau under the All Risk Policy.

134.     Declaratory relief from this Court will resolve all outstanding issues between TOG and Wausau under the All Risk Policy.

WHEREFORE, pursuant to R.S. Mo. § 527.010, TOG seeks judgment in its favor as to Count I as follows:

a.     TOG suffered loss, damage and/or costs covered under the All Risk Policy;

b.     The All Risk Policy's contamination exclusion does not bar or limit coverage for the loss, damage and/or costs suffered by TOG;

c.     COVID-19 and/or the entry of civil authority orders declaring that the suspected presence of COVID-19 causes physical loss or damage to

property sufficient to trigger coverage under the All Risk Policy;

d.   The entry of an Order declaring that Wausau must pay TOG the limits of liability for direct loss or damage to covered property, for the loss of income sustained by TOG due to COVID-19 and the necessary suspensions, and curtailments, of its operations, and the operations of its direct and indirect suppliers, for extra expenses, and for all additional coverages provided under the All Risk Policy; and

e.   The award of such additional relief as the Court deems just and appropriate.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

135.   TOG incorporates by reference the allegations contained in Paragraphs 1-135.

136.   TOG has incurred, and will incur in the future, loss of income, Extra Expenses and other covered loss or damage due to COVID-19 and orders of civil authority that closed and curtailed TOG's operations and the operations of its direct and indirect suppliers.

137.   In breach of the All Risk Policy, Wausau refused or otherwise failed to recognize any coverage afforded for TOG's loss, damage and/or costs, thereby causing damage to TOG.

WHEREFORE, TOG seeks judgment in its favor as to Count II as follows:

a.   The entry of an award requiring Wausau to pay TOG all monetary damages suffered by TOG caused by Wausau's breaches, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs; and

b.   The award of such additional relief as the Court deems just and appropriate.

## JURY DEMAND

TOG demands a jury trial for all issues so triable.

Dated: March 21, 2022

Respectfully submitted,

BOULWARE LAW LLC

By:   /s/ Jeremy M. Suhr
Jeremy M. Suhr                    MO # 60075
1600 Genessee Street, Suite 416
Kansas City, MO 64102
Tele:   (816) 492-2826
jeremy@boulware-law.com


David M. Cummings (*pro hac vice* forthcoming)
**REED SMITH LLP**
10 S. Wacker Dr., 40th Floor
Chicago, IL 60606
T:  (312) 207-1000
F:  (312) 207-6400
dcummings@reedsmith.com

*ATTORNEYS FOR THE ONE GROUP HOSPITALITY INC.*

EXHIBIT A

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**A.** Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, **we** are required to provide **you** with a notice disclosing the portion of **your** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of **your** premium attributable to such coverage is shown in D. PREMIUM in the Declarations.

**B.** Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals the percentage indicated below of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

Federal share of terrorism losses: 84%, calendar year 2016
Federal share of terrorism losses: 83%, calendar year 2017
Federal share of terrorism losses: 82%, calendar year 2018
Federal share of terrorism losses: 81%, calendar year 2019
Federal share of terrorism losses: 80%, calendar year 2020

**C.** Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and **we** have met **our** insurer deductible under the Terrorism Risk Insurance Act, **we** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**REPORTING A COMMERCIAL CLAIM 24 HOURS A DAY**

**Liberty Mutual Insurance claims professionals across the United States are ready to resolve your claim quickly and fairly, so you and your team can focus on your business. Our claims teams are specialized, experienced and dedicated to a high standard of service.**

**We're Just a Call Away — One Phone Number to Report All Commercial Insurance Claims**

Reporting a new claim has never been easier. A Liberty Mutual customer service representative is available to you 24/7 at **800-362-0000** for reporting new property, auto, liability and workers' compensation claims. With contact centers strategically located throughout the country for continuity and accessibility, we're there when we're needed!

**Additional Resource for Workers' Compensation Customers**

In many states, employers are required by law to use state-specific workers compensation claims forms and posting notices. This type of information can be found in the Policyholders Toolkit section of our website along with other helpful resources such as:

- Direct links to state workers compensation websites where you can find state-specific claim forms
- Assistance finding local medical providers
- First Fill pharmacy forms — part of our managed care pharmacy program committed to helping injured workers recover and return to work

Our Policyholder Toolkit can be accessed at **www.libertymutualgroup.com/toolkit.**

For all claims inquiries please call us at **800-362-0000.**

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 43 of 166

## NEW YORK HAZARDOUS MATERIALS NOTICE

New York law requires you to notify local fire officials of the presence of hazardous materials at any of your operations in that state. Since you have property coverage there, the Insurance Department in New York requires us to notify you of this obligation.

The law specifically requires:

- Every commercial business to report the presence of hazardous materials to the chief of the fire department having responsibility for fire protection at each location where hazardous materials may be found.
- Every insurance carrier to issue forms to its commercial fire policyholders for reporting the presence of hazardous materials.

Use form, DOS-0347 (Hazardous Materials Report Form) to notify your local fire department in New York. Mail this form to them, not to Liberty Mutual Insurance Group. Any questions you have regarding specifics of the law should be addressed to the fire department having jurisdiction over the location involved.

To obtain copies of the reporting form, contact the State Office of Fire Prevention and Control in Albany or go to: http://www.dhses.ny.gov/ofpc/documents/forms/hm209uc.pdf.

**SNI 31 01 07 13**          © 2013 Liberty Mutual Insurance. All rights reserved.          Page 1 of 1

# Notice to Policyholder

The additional charge shown on your policy as FIF (Fire Insurance Fee) has been mandated by the New York State Legislature to be collected by insurance companies and paid to the New York Superintendent of Insurance.  All such monies are then to be paid by the Superintendent into the State's general fund.

**POLICYHOLDER NOTICE - COMPANY CONTACT INFORMATION**

In the event you need to contact someone about this policy for any reason, please contact your Sales Representative or Producer of Record as shown on the policy Declarations or Information Page.

If you have additional questions, you may contact the company at the following address:

**Liberty Mutual Insurance**
**175 Berkeley Street**
**Boston, MA 02116**
**+1 (800) 344-0197**

**MISSOURI NOTICE TO POLICYHOLDERS**

This policy may include rates and forms which may not be filed with the Missouri department of insurance, financial institutions and professional registration.

SNI 24 01 11 18        © 2018 Liberty Mutual Insurance        Page 1 of 1

**TEXAS PERIOD TO FILE A CLAIM OR BRING**
**LEGAL ACTION AGAINST US NOTICE -**
**WIND OR HAIL - CATASTROPHE AREA**

This Notice does not form a part of your insurance contract. No coverage is provided by this Notice, nor can it be construed to replace any provisions of your policy (including its endorsements). If there is any conflict between this Notice and the policy (including its endorsements), **the provisions of the policy (including its endorsements) shall prevail.**

Carefully read your policy, including the endorsements attached to your policy.

In accordance with Texas Insurance Code Section 2301.010(f), we are notifying you that:

    **1.**   With respect to loss or damage in the State of Texas caused by wind or hail in the catastrophe area, as defined by the Texas Insurance Code, any claim must be filed with us not later than one (1) year after the date of the loss or damage that is the subject of the claim, except that a claim may be filed after the first anniversary of the date of the loss or damage for good cause shown by the person filing the claim; and

    **2.**   Any legal action brought against us under the policy for loss or damage in the State of Texas caused by wind or hail in the catastrophe area, as defined by the Texas Insurance Code, must be brought within the earlier of the following:

    **a.**   Two (2) years and one (1) day from the date we accept or reject the claim; or

    **b.**   Three (3) years and one (1) day from the date of the loss or damage that is the subject of the claim.



# PREMIER PROPERTY PROTECTOR™

POLICY COVER PAGE

| POLICY NUMBER:<br>YAC-L9L-471218-019 | DATE OF ISSUE:<br>12/19/2019 |
|---|---|
| COMPANY PROVIDING INSURANCE:<br>Employers Insurance Company of Wausau<br><div align="center">( hereafter referred to as **we**, **us** or **our** )</div> | |

In consideration of this Policy's Provisions, Conditions, Stipulations, LIMITS OF LIABILITY and of premium charged, **we** cover property, as described in this Policy, against all risks of direct physical loss or damage, except as hereinafter excluded or limited, while located as described in this Policy.

**We** insure:

| The One Group Hospitality Inc.<br><div align="center">( hereafter referred to as **you** or **your(s)** )</div> |
|---|

The term of this Policy is from 12/10/2019 to 12/10/2020 at 12:01 a.m., local time. In the event of a claim, the Policy period is measured by local time at the **location** where the direct physical loss or damage occurs.

PRODUCER NAME AND OFFICE

E B COHEN & ASSOCIATES ASSURANCE AGENCY LLC
101 EISENHOWER PKWY,
ROSELAND, New Jersey 07068

Your policy is issued by a stock insurance company subsidiary of the Liberty Mutual Holding Company Inc., a Massachusetts mutual holding company. The named insured first named in the Declarations is a member of Liberty Mutual Holding Company Inc.

As a member of Liberty Mutual Holding Company Inc., the named insured first named is entitled, among other things, to vote either in person or by proxy at the annual meeting or special meetings of said company. The Annual Meeting of Liberty Mutual Holding Company Inc. is at its offices located at 175 Berkeley Street, Boston, Massachusetts, on the second Wednesday in April each year at ten o'clock in the morning. Members of Liberty Mutual Holding Company Inc. may request a copy of the company's annual financial statements, which are posted on Liberty Mutual's website at www.libertymutual.com or by writing to Liberty Mutual Holding Company Inc., 175 Berkeley Street, Boston, Massachusetts, 02116, Attention: Corporate Secretary.

You may be eligible to participate in the distribution of surplus funds of the company through any dividends that may be declared for this policy. A declaration or payment of dividends is not guaranteed. The amount of any dividends that may be declared shall be to the extent, and upon the conditions fixed and determined by the Board of Directors and in compliance with any laws that apply.

IN WITNESS WHEREOF, the company has caused this Policy to be executed and attested, and, if required by state law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

President

Secretary

Case 4:22-cv-00285-BP Document 1-1 Filed 05/02/22 Page 49 of 166

# TABLE OF CONTENTS

POLICY COVER PAGE

SECTION I - DECLARATIONS ........................................................................................... 5

   **A.** FIRST NAMED INSURED AND MAILING ADDRESS ................................................ 5

   **B.** POLICY PERIOD ..................................................................................................... 5

   **C.** INSURING AGREEMENT ......................................................................................... 5

   **D.** PREMIUM ................................................................................................................ 5

   **E.** PREMIUM PAYABLE ............................................................................................... 6

   **F.** COVERED LOCATION(S) ........................................................................................ 6

   **G.** TERRITORY ............................................................................................................ 6

   **H.** JURISDICTION ........................................................................................................ 6

   **I.** CURRENCY ............................................................................................................. 6

   **J.** DEFINED WORDS ................................................................................................... 7

   **K.** LIMITS OF LIABILITY .............................................................................................. 7

   **L.** CANCELLATION TIME SPECIFICATIONS .............................................................. 12

   **M.** DEDUCTIBLES ........................................................................................................ 12

   **N.** QUALIFYING PERIOD(S) ........................................................................................ 16

SECTION II – PROPERTY DAMAGE ................................................................................. 17

   **A.** COVERED PROPERTY ........................................................................................... 17

   **B.** PROPERTY NOT COVERED ................................................................................... 17

   **C.** EXCLUSIONS ......................................................................................................... 18

   **D.** PROPERTY DAMAGE COVERAGES AND LIMITATIONS ........................................ 22

     **1.** ACCOUNTS RECEIVABLE ................................................................................ 22

     **2.** BRANDS AND LABELS ..................................................................................... 22

     **3.** CONTROL OF DAMAGED GOODS .................................................................... 23

     **4.** COURSE OF CONSTRUCTION ......................................................................... 23

     **5.** DATA, PROGRAMS OR SOFTWARE ................................................................. 23

     **6.** DEBRIS REMOVAL ........................................................................................... 24

     **7.** DECONTAMINATION COSTS ............................................................................ 24

     **8.** DEFENSE FOR PERSONAL PROPERTY OF OTHERS ...................................... 25

     **9.** DEFERRED PAYMENTS ................................................................................... 25

     **10.** DEMOLITION AND INCREASED COST OF CONSTRUCTION ............................. 25

     **11.** ERRORS AND OMISSIONS ............................................................................... 26

     **12.** EXPEDITING EXPENSE .................................................................................... 26

     **13.** FINE ARTS ....................................................................................................... 27

**14.** FIRE DEPARTMENT SERVICE CHARGES ................................................................. 27

**15.** LAND AND WATER CLEANUP, REMOVAL AND DISPOSAL ................................. 27

**16.** MISCELLANEOUS **PERSONAL PROPERTY** ........................................................ 27

**17.** NEWLY ACQUIRED **LOCATIONS** ....................................................................... 28

**18.** OFF PREMISES INTERRUPTION OF SERVICES – PROPERTY DAMAGE ........ 28

**19.** PROFESSIONAL FEES ........................................................................................... 28

**20.** PROTECTION AND PRESERVATION OF PROPERTY ........................................ 29

**21.** RADIOACTIVE CONTAMINATION ....................................................................... 29

**22.** TAX LIABILITY ...................................................................................................... 29

**23.** TEMPORARY REMOVAL OF PROPERTY ............................................................ 30

**24.** TRANSIT ............................................................................................................... 30

**25.** **VALUABLE PAPERS AND RECORDS** .............................................................. 32

**SECTION III – TIME ELEMENT** ............................................................................... 33

   **A.** LOSS INSURED ........................................................................................................ 33

   **B.** TIME ELEMENT COVERAGES ................................................................................ 33

      **1.** *GROSS EARNINGS* ............................................................................................ 33

      **2.** EXTRA EXPENSE ............................................................................................... 35

      **3.** LEASEHOLD INTEREST ................................................................................... 35

      **4.** RENTAL INSURANCE ....................................................................................... 35

   **C.** PERIOD OF LIABILITY ............................................................................................ 36

   **D.** TIME ELEMENT EXCLUSIONS .............................................................................. 37

   **E.** TIME ELEMENT COVERAGES AND LIMITATIONS ............................................. 38

      **1.** *ATTRACTION PROPERTY* ............................................................................. 38

      **2.** CIVIL OR MILITARY AUTHORITY .................................................................. 38

      **3.** COMPUTER SYSTEMS NON PHYSICAL DAMAGE ....................................... 39

      **4.** CONTINGENT TIME ELEMENT ...................................................................... 39

      **5.** CRISIS MANAGEMENT ..................................................................................... 40

      **6.** DELAY IN STARTUP ......................................................................................... 40

      **7.** EXTENDED PERIOD OF LIABILITY ............................................................... 40

      **8.** INGRESS / EGRESS .......................................................................................... 41

      **9.** OFF PREMISES INTERRUPTION OF SERVICES – TIME ELEMENT .......... 41

      **10.** ON PREMISES INTERRUPTION OF SERVICES – TIME ELEMENT ........... 41

      **11.** PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ..... 42

      **12.** RELATED **LOCATIONS** ................................................................................. 42

      **13.** RESEARCH AND DEVELOPMENT ................................................................ 42

      **14.** SOFT COSTS ................................................................................................... 42

**SECTION IV – DESCRIBED LOSSES** ....................................................................... 44

    **A.** *EARTH MOVEMENT* ......................................................................................................... 44

    **B.** *EARTH MOVEMENT* SPRINKLER LEAKAGE .......................................................... 44

    **C.** *EQUIPMENT BREAKDOWN* ............................................................................... 44

    **D.** *FLOOD* ................................................................................................................ 47

    **E.** *NAMED STORM* .................................................................................................. 47

## SECTION V - GENERAL POLICY CONDITIONS ................................................ 48

    **A.** ASSIGNMENT ....................................................................................................... 48

    **B.** CANCELLATION .................................................................................................... 48

    **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD ....................................... 48

    **D.** CONFORMITY TO STATUTES ............................................................................. 48

    **E.** INSPECTION ......................................................................................................... 49

    **F.** LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ...................................... 49

    **G.** LIBERALIZATION .................................................................................................. 50

    **H.** NO REDUCTION BY LOSS ................................................................................... 50

    **I.** NONRENEWAL ...................................................................................................... 50

    **J.** OTHER INSURANCE ............................................................................................. 50

    **K.** PAIR, SET OR PARTS .......................................................................................... 51

    **L.** POLICY MODIFICATION ........................................................................................ 51

    **M.** TITLES .................................................................................................................. 51

    **N.** TRANSFER OF RIGHTS AND DUTIES ................................................................ 51

    **O.** VACANCY .............................................................................................................. 51

    **P.** VALUATION ........................................................................................................... 52

## SECTION VI – LOSS CONDITIONS ................................................................... 55

    **A.** ABANDONMENT OF PROPERTY ......................................................................... 55

    **B.** APPRAISAL ........................................................................................................... 55

    **C.** COLLECTION FROM OTHERS ............................................................................. 55

    **D.** COMPANY OPTION .............................................................................................. 55

    **E.** DUTIES AFTER A LOSS ....................................................................................... 55

    **F.** LOSS ADJUSTMENT / PAYABLE ......................................................................... 56

    **G.** PAYMENT OF LOSS ............................................................................................. 57

    **H.** SUBROGATION .................................................................................................... 57

    **I.** SUIT AGAINST THE COMPANY ........................................................................... 57

## SECTION VII – DEFINITIONS ............................................................................. 58

## APPENDIX A - SCHEDULE OF COVERED LOCATIONS ................................... 61

## APPENDIX B - NEW MADRID EARTH MOVEMENT ZONES ............................. 62

## APPENDIX C - PACIFIC NORTHWEST *EARTH MOVEMENT* ZONE ................. 63

APPENDIX D - *NAMED STORM* TIERS FOR USA INCLUDING ITS COMMONWEALTHS AND TERRITORIES ................................................................................................................. 64

APPENDIX E - *FLOOD* HAZARD **LOCATIONS** ................................................................... 67

FORMS AND ENDORSEMENTS ......................................................................................... 68

    Disclosure Pursuant to Terrorism Risk Insurance Act ......................................................... 68

    Reporting a Commercial Claim 24 Hours a Day ................................................................. 68

    New York Hazardous Materials Notice ................................................................................. 68

    Notice to Policyholder ........................................................................................................... 68

    Policyholder Notice - Company Contact Information ............................................................ 68

    Missouri Notice to Policyholders .......................................................................................... 68

    Texas Period To File A Claim Or Bring Legal Action Against Us Notice - Wind Or Hail - Catastrophe Area ..... 68

    Cap on Losses From Certified Acts of Terrorism ................................................................ 68

    Lock and Key Replacement Endorsement .......................................................................... 68

    Reward Coverage Endorsement ......................................................................................... 68

    Countersignature Endorsement - FL .................................................................................... 68

    Countersignature Endorsement - NV ................................................................................... 68

STATE AMENDATORY ENDORSEMENTS ......................................................................... 69

    Alabama Changes ............................................................................................................... 69

    Arizona Changes ................................................................................................................. 69

    California Changes ............................................................................................................... 69

    Florida Changes .................................................................................................................. 69

    Georgia Changes ................................................................................................................ 69

    Illinois Changes ................................................................................................................... 69

    Indiana Changes ................................................................................................................. 69

    Maryland Changes .............................................................................................................. 69

    Michigan Changes ............................................................................................................... 69

    Minnesota Changes ............................................................................................................. 69

    Missouri Changes ................................................................................................................ 69

    Nebraska Changes .............................................................................................................. 69

    Nevada Changes ................................................................................................................. 69

    New Jersey Changes........................................................................................................... 69

    New York Changes .............................................................................................................. 69

    New York Changes - Cancellation and Nonrenewal ........................................................... 69

    Ohio Changes ..................................................................................................................... 69

    Texas Changes ................................................................................................................... 69

# SECTION I - DECLARATIONS

**A. FIRST NAMED INSURED AND MAILING ADDRESS**

The One Group Hospitality Inc. and any subsidiary, and the interest of The One Group Hospitality Inc. in any partnership or joint venture in which The One Group Hospitality Inc. has management control, ownership, or is obligated to insure, as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as **you** or **yours**, including legal representatives.

When any Insured described above is a party to a written contract or agreement on file that requires a legal entity to be identified as an additional insured under this Policy, this Policy includes the legal entity as an additional insured, as its interest may appear, for physical damage to **covered property** which is the subject of the written contract or agreement on file, before any loss occurs; and does not provide any TIME ELEMENT Coverage to the legal entity, except as provided under LEASEHOLD INTEREST of this Policy or as specifically endorsed to the Policy.

411 W. 14th Street
New York, NY 10014

**B. POLICY PERIOD**

The term of this Policy is from December 10, 2019 to December 10, 2020 at 12:01 a.m., local time. In the event of a claim, the Policy period is measured by local time at the **location** where the direct physical loss or damage occurs.

**C. INSURING AGREEMENT**

In consideration of this Policy's Provisions, Conditions, Stipulations, LIMITS OF LIABILITY and of premium charged, **we** cover property, as described in this Policy, against all risks of direct physical loss or damage, except as hereinafter excluded or limited, while located as described in this Policy.

**D. PREMIUM**

This Policy is issued in consideration of the following initial premium inclusive of any premium shown on endorsements which are part of the Policy at the time of issue.

| | |
|---|---|
| Policy Premium (Excluding premium for "certified act(s) of **terrorism**" under the **Terrorism** Risk Insurance Act (TRIA), as amended): | $249,776 |
| | |
| Policy Premium for "certified act(s) of **terrorism**" under the **Terrorism** Risk Insurance Act (TRIA), as amended: | $5,851 |
| • Policy Premium for Fire Following Acts of **Terrorism** (in States where required) | $4,373 |
| | |
| State or Municipal Taxes, Surcharges and Other Miscellaneous Charges: (See State or Municipal Taxes, Surcharges and Other Miscellaneous Charges summary shown below) Surcharges are not applicable in New York. | $157 |
| | |
| Total Policy Premium/Other Charges for Above Policy Period: | $260,157 |
| | |
| Policy Premium will be billed annually. | |

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 54 of 166

| The Deposit Premium/Other Charges is: | $260,157 |
|---|---|

**State or Municipal Taxes, Surcharges and Other Miscellaneous Charges**

Surcharges are not applicable in New York. The amount shown below for State or Municipal Taxes, Surcharges and Other Miscellaneous Charges is comprised of the following amounts:

| State or Municipal Taxes, Surcharges and Other Miscellaneous Charges | Amount |
|---|---|
| NJ PLIGA (Property Liability Insurance Guaranty Association) | $17 |
| MN Fire Safety Surcharge | $8 |
| FL Fire Marshall Regulatory Surcharge | $96 |
| FL Emergency Management & Preparedness and Assistance Trust Fund Surcharge | $4 |
| NY Fire Insurance Fee | $32 |
| State or Municipal Taxes, Surcharges and Other Miscellaneous Charges Total | $157 |

**E. PREMIUM PAYABLE**

The First Named Insured pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of the First Named Insured.

Premiums will be paid in the currency designated in paragraph **I. CURRENCY.**

**F. COVERED LOCATION(S)**

This Policy applies at a **location(s):**

**1.** Listed on a SCHEDULE on file with **us;**

**2.** Listed on the SCHEDULE attached to this Policy;

**3.** Covered as a **Miscellaneous Unnamed Location;** or

**4.** Covered under the terms and conditions of the NEWLY ACQUIRED **LOCATIONS** Coverage or ERRORS AND OMISSIONS Coverage.

**G. TERRITORY**

Coverage under this Policy applies to **covered property** within the continental United States of America, Hawaii and Puerto Rico.

**H. JURISDICTION**

The validity and interpretation of this Policy shall be governed by and construed in accordance with the laws of the State of New York.

Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**I. CURRENCY**

All amounts, including deductibles and LIMITS OF LIABILITY, indicated in this Policy are in U.S. Dollars unless

otherwise indicated by the three-letter currency designator as defined in Table A.1 Currency and Funds code list, International Standards Organization (ISO) 4217, edition effective at inception of this Policy.

**J. DEFINED WORDS**

Words in bold face type have special meanings in this Policy and are defined in the DEFINITIONS section of this Policy. These definitions apply to this entire Policy and to any endorsements to it. Definitions that apply to individual sections or paragraphs are italicized and defined in the applicable sections or paragraphs.

**K. LIMITS OF LIABILITY**

When a POLICY LIMIT OF LIABILITY is specified in the LIMITS OF LIABILITY Table in the Declarations, **our** maximum LIMIT OF LIABILITY in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the stated POLICY LIMIT OF LIABILITY.

1. When a PROPERTY DAMAGE and TIME ELEMENT LIMIT OF LIABILITY is specified in the LIMITS OF LIABILITY Table in the Declarations, it will apply to all coverages provided throughout this Policy, unless a LIMIT OF LIABILITY or "NCP" (No Coverage Provided) is indicated.

   a. When a LIMIT OF LIABILITY is specified in the LIMITS OF LIABILITY Table in the Declarations, such limit will be the maximum amount payable for such loss or damage and cannot be combined with any other LIMIT OF LIABILITY.

   b. If "NCP" is specified in the LIMITS OF LIABILITY, there is no coverage provided in this Policy.

2. LIMITS OF LIABILITY in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

   a. When a LIMIT OF LIABILITY that applies in the aggregate during any Policy year is shown, **our** maximum amount payable will not exceed such LIMIT OF LIABILITY during any Policy year.

   b. When a LIMIT OF LIABILITY applies to a **location(s)**, specified property, DESCRIBED LOSSES or a specific coverage, the smallest applicable LIMIT OF LIABILITY will be the maximum amount payable.

   c. Should an **occurrence** result in liability payable under more than one Policy issued to **you** by **us**, or by **our** subsidiaries, partners, or associated insurance companies, the maximum amount payable in the aggregate under all such policies will be the applicable LIMIT(S) OF LIABILITY indicated in this Policy.

   d. When a LIMIT OF LIABILITY applies to TIME ELEMENT only, **our** maximum amount payable will not exceed such LIMIT OF LIABILITY per **occurrence**.

3. LIMITS OF LIABILITY specified below or elsewhere in this Policy do not increase and are part of and not in addition to the POLICY LIMIT OF LIABILITY or the PROPERTY DAMAGE and TIME ELEMENT LIMIT OF LIABILITY.

4. LIMITS OF LIABILITY apply per **occurrence** unless otherwise specified, including time and distance limits.

| COVERAGE | LIMITS OF LIABILITY AND TIME AND DISTANCE LIMITS |
|---|---|
| **Real Property** | NCP |
| **Personal Property** | $115,381,648 |
| TIME ELEMENT | $25,825,422 |
| ACCOUNTS RECEIVABLE | $1,000,000 |
| *ATTRACTION PROPERTY* | 1 statute miles from a covered **location** 30 consecutive days, not to exceed $100,000 |
| BRANDS AND LABELS | $25,000 |
| CIVIL OR MILITARY AUTHORITY | 1 statute miles from a covered **location** 30 consecutive days, not to exceed $1,000,000 |
| COMPUTER SYSTEMS NON PHYSICAL DAMAGE and DATA, PROGRAMS OR SOFTWARE, combined | $100,000 |
| CONTINGENT TIME ELEMENT<br><br>• *Direct Dependent Contingent Time Element* **Location(s)**: Not Scheduled or on file with **us**<br><br>• *Indirect Dependent Contingent Time Element* **Location(s)**: Not Scheduled or on file with **us** | $250,000<br><br><br>$25,000 |
| CONTROL OF DAMAGED GOODS | $25,000 |
| COURSE OF CONSTRUCTION | $25,000 |
| CRISIS MANAGEMENT | 30 consecutive days, not to exceed  $25,000 |
| DEBRIS REMOVAL | $1,000,000 |
| DECONTAMINATION COSTS | $500,000 |
| DEFERRED PAYMENTS | $25,000 |

| | |
|---|---|
| DELAY IN STARTUP | $100,000 |
| DEMOLITION AND INCREASED COST OF CONSTRUCTION | $2,500,000 |
| ERRORS AND OMISSIONS | $1,000,000 |
| EXPEDITING EXPENSE | $1,000,000 |
| EXTENDED PERIOD OF LIABILITY | 365 consecutive days |
| EXTRA EXPENSE | $2,500,000 |
| **FINE ARTS** | $100,000 |
| FIRE DEPARTMENT SERVICE CHARGES | $100,000 |
| IMPOUNDED WATER | 30 consecutive days, not to exceed $25,000 |
| INGRESS / EGRESS | 1 statute miles from a covered **location** 30 consecutive days, not to exceed $1,000,000 |
| LAND AND WATER CLEANUP, REMOVAL AND DISPOSAL in the **annual aggregate** | $100,000 |
| LEASEHOLD INTEREST | $1,000,000 |
| MISCELLANEOUS **PERSONAL PROPERTY** | $25,000 |
| **Miscellaneous Unnamed Locations** | $100,000 |
| Mold, Mildew or Fungus directly resulting from a **Covered Loss** | $250,000 |
| NEWLY ACQUIRED **LOCATIONS** | 90 consecutive days, not to exceed $2,500,000 |
| OFF PREMISES INTERRUPTION OF SERVICES – PROPERTY DAMAGE and OFF PREMISES INTERRUPTION OF SERVICES – TIME ELEMENT | $2,500,000 |
| **Ordinary Payroll** | 180 consecutive days |

| | |
|---|---|
| PROFESSIONAL FEES | $100,000 |
| RADIOACTIVE **CONTAMINATION** | $25,000 |
| RENTAL INSURANCE | $1,000,000 |
| RESEARCH AND DEVELOPMENT | $25,000 |
| *SOFT COSTS* | $25,000 |
| TAX LIABILITY | $25,000 |
| TRANSIT | $100,000 |
| **VALUABLE PAPERS AND RECORDS** | $1,000,000 |

LIMITS OF LIABILITY TABLE – PART TWO

| COVERAGE | LIMITS OF LIABILITY AND TIME AND DISTANCE LIMITS |
|---|---|
| *EARTH MOVEMENT* in the **annual aggregate** | $15,000,000 |
| except the following limits apply per **occurrence** and in the **annual aggregate**, and are part of and not in addition to the *EARTH MOVEMENT* **annual aggregate** limit: | |
| • **Covered property** situated in: | |
| California Earth Movement | $1,000,000 |
| Nevada Earth Movement | $10,000,000 |
| except: | |
| • **Covered property** at the **location(s)** covered by the following Coverage(s) and Limitations: | |
| Civil or Military Authority, Contingent Time Element, Course of Construction, Errors And Omissions, Ingress/Egress, Miscellaneous Unnamed Locations, Newly Acquired Locations, Off Premises Interruption Of Services - PD and TE | NCP |
| *EARTH MOVEMENT* SPRINKLER LEAKAGE | $15,000,000 |

except:
- **Covered property** situated in:

| | |
|---|---:|
| California Earth Movement | $1,000,000 |
| Nevada Earth Movement | $10,000,000 |

except:
- **Covered property** at the **location(s)** covered by the following Coverage(s) and Limitations:

| | |
|---|---:|
| Civil or Military Authority, Contingent Time Element, Course of Construction, Errors And Omissions, Ingress/Egress, Miscellaneous Unnamed Locations, Newly Acquired Locations, Off Premises Interruption Of Services - PD and TE | NCP |

---

EQUIPMENT BREAKDOWN

| | |
|---|---:|
| PROPERTY DAMAGE | Included |
| TIME ELEMENT | Included |

except:

The following limits are part of and not in addition to the EQUIPMENT BREAKDOWN limits specified above:

| | |
|---|---:|
| • Ammonia **Contamination** | $250,000 |
| • CONTINGENT TIME ELEMENT | $250,000 |
| • Spoilage Damage | $250,000 |

---

| | |
|---|---:|
| *FLOOD* in the **annual aggregate** | $15,000,000 |

except the following limits apply per **occurrence** and in the **annual aggregate**, and are part of and not in addition to the *FLOOD* **annual aggregate** limit:

- **Covered property** at **locations** situated in:

| | |
|---|---:|
| Flood Hazard - Moderate | $10,000,000 |
| Flood Hazard - High | $2,500,000 |

except:
- **Covered property** at the specified **location(s)**:

| | |
|---|---:|
| 9.1 2305 Collins Ave Miami Beach FL, 33139 | NCP |

except:
- **Covered property** at the **location(s)** covered by the following Coverage(s) and Limitations:

| | |
|---|---|
| Civil or Military Authority, Contingent Time Element, Course of Construction, Errors And Omissions, Ingress/Egress, Miscellaneous Unnamed Locations, Newly Acquired Locations, Off Premises Interruption Of Services - PD and TE | NCP |
| *NAMED STORM*<br><br>except:<br>• **Location(s)** situated in: | Included |
| Named Storm Harris County, TX, Named Storm Tier 1 - NC to TX | Included |
| Named Storm Florida | Included |

ENDORSEMENT LIMITS OF LIABILITY

| Endorsement Number | Endorsement Name | LIMITS OF LIABILITY |
|---|---|---|
| CNP 90 06 01 17 | Disclosure Pursuant to Terrorism Risk Insurance Act | TRIA Accepted |
| PY 04 03 01 17 | Cap on Losses From Certified Acts of Terrorism | |
| PY 03 04 01 17 | Lock and Key Replacement Endt | |
| PY 03 12 01 17 | Reward Coverage Endt | $25,000 |

**L. CANCELLATION TIME SPECIFICATIONS**

| | |
|---|---|
| Cancellation for Nonpayment of Premium | Ten (10) days |
| Cancellation for All Reasons Other Than Nonpayment of Premium | 60 days |

**M. DEDUCTIBLES**

Subject to the Deductible General Provisions stated below, **we** will not pay unless a **covered loss**, including any insured TIME ELEMENT loss, exceeds the deductible(s) specified below. **We** will then pay the amount of **covered loss** in excess of the deductible, up to the applicable LIMIT OF LIABILITY.

Deductible General Provisions

**We** will be liable only if **you** sustain a **covered loss**, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified. When this Policy insures more than one (1) **location**, the deductible(s) will apply against the total loss covered by this Policy in an **occurrence** unless otherwise stated.

1. Unless otherwise stated, if two or more deductibles apply to an **occurrence**, the total deductible will not exceed the largest applicable deductible, except as follows:

a. When a separate PROPERTY DAMAGE and TIME ELEMENT deductible apply, each will be applied separately.

b. If there are multiple **locations** involved in an **occurrence** where two or more deductibles apply to a **location** in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**, regardless of the number of **locations** involved in the **occurrence**.

c. Unless specified otherwise, if deductibles are specified for a **location**, the largest deductible applicable will be applied to that **location** regardless of the number of **locations** involved in the **occurrence**.

d. Equipment Breakdown: With regard to Equipment Breakdown coverage, if one or more deductible amounts are shown below, each will be applied separately.

e. The stated *EARTH MOVEMENT* deductible will be applied to *EARTH MOVEMENT* loss. The stated *FLOOD* deductible will be applied to *FLOOD* loss. The stated *NAMED STORM* deductible will be applied to *NAMED STORM* loss. Provisions **1.a.** and **1.b.** above will also be applied to each.

2. When a percent deductible is specified, whether separate or combined, the deductible amount will be determined as follows:

a. PROPERTY DAMAGE: The percentage of the total reported values on file with **us** for the **covered property** at the corresponding **location(s)** (including sub-**locations**) where the direct physical loss or damage occurred; plus

b. TIME ELEMENT: The percentage of the full TIME ELEMENT values that would have been earned in the 12-month period following the **occurrence**, had no loss occurred, by use of the facilities at the **location** where the direct physical loss or damage occurred, plus that proportion of the full TIME ELEMENT values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12-month period following the **occurrence**.

c. Equipment Breakdown: The percentage of the gross amount of loss, damage or expense (prior any deductible) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

3. When a minimum deductible is shown, the minimum deductible is the sum of:

a. The specific **location** deductible for each covered **location** where the amount of physical loss or damage exceeds the specific **location** deductible; and

b. The amount of physical loss or damage for each covered **location** where the amount of physical loss or damage is less than the specific **location** deductible.

4. When an average daily value deductible is provided, this deductible will be determined as follows:

a. The total amount of TIME ELEMENT loss applicable for the entire **location** where the direct physical loss or damage happens will be included.

b. Divide the result in Paragraph **a.** by the number of days the business would have been open during the PERIOD OF LIABILITY. The result is the average daily value.

    **c.** Multiply the average daily value in Paragraph **b.** by the number of days specified in the DEDUCTIBLE TABLE below.

    If more than one (1) **location** is included in the valuation of the loss, the average daily value will be the combined value of all affected **locations**.

**5.** When a per unit deductible is specified, the following shall be considered a separate unit of insurance:

    **a.** Each separate building, the contents of each separate building and **covered property** in each yard at that covered **location**.

    **b.** TIME ELEMENT loss as applicable, including all other **locations** where TIME ELEMENT loss ensues as provided by this Policy.

**6.** When a time deductible is shown, **we** will not be liable for any loss under that coverage that occurs during that specified time period immediately following the direct physical loss or damage. If a time deductible is shown in days, each day shall mean twenty four (24) consecutive hours.

**7.** When a deductible is shown in the Declarations for a *NAMED STORM*, the following applies:

    **a.** All direct physical loss or damage to **covered property** including TIME ELEMENT loss caused by or resulting from a *NAMED STORM* will be subject to the deductible obtained by calculating all of the following:

        **(1)** The sum of all applicable percentage deductibles calculated as described in Deductible General Provisions Item **2.** above, subject to any applicable minimums or maximums; and

        **(2)** Any other applicable deductible amounts.

<div align="center">

DEDUCTIBLE TABLE – PART ONE

</div>

| Coverage | Deductible Percentage / Amounts |
|---|---:|
| **Personal Property** | $10,000 |
| TIME ELEMENT | $10,000 |
| All direct physical loss or damage to covered property (including any insured TIME ELEMENT loss) caused by or resulting from water damage, other than water damage caused by flood, fire or wind<br>  • **Personal Property** and TIME ELEMENT | $50,000 |
| OFF PREMISES INTERRUPTION OF SERVICES – PROPERTY DAMAGE AND TIME ELEMENT | $10,000 |
| TRANSIT | $10,000 |
| Fine Arts | $10,000 |

DEDUCTIBLE TABLE – PART TWO

| Coverage | Deductible Percentage / Amounts |
|---|---|
| *EARTH MOVEMENT* | $25,000 |
| except: <br> • **Covered property** situated in: | |
| California Earth Movement | 5% subject to $100,000 minimum |
| Nevada Earth Movement | $25,000 |
| *EARTH MOVEMENT* SPRINKLER LEAKAGE | $25,000 |
| except: <br> • **Covered property** situated in: | |
| California Earth Movement | 5% subject to $100,000 minimum |
| Nevada Earth Movement | $25,000 |
| EQUIPMENT BREAKDOWN | |
| PROPERTY DAMAGE | $25,000 |
| TIME ELEMENT | $25,000 |
| • Spoilage Damage | $25,000 |
| • Ammonia **Contamination** | $25,000 |
| *FLOOD* | $25,000 |
| except: <br> • **Covered property** at **locations** situated in: | |
| Flood Hazard - Moderate | $100,000 |
| Flood Hazard - High | $500,000 Real Property <br> $500,000 Personal Property <br> $100,000 Other |
| *NAMED STORM* | $10,000 |
| except: <br> • **Locations** situated in: | |

| | |
|---|---|
| Named Storm Harris County, TX, Named Storm Tier 1 - NC to TX | 2% subject to $100,000 minimum |
| Named Storm Florida | 5% subject to $100,000 minimum |

## OCCURRENCE TIME SPECIFICATIONS

| | |
|---|---|
| *EARTH MOVEMENT* | continuous 72 hours |
| *NAMED STORM* | continuous 72 hours |

**N.** QUALIFYING PERIOD(S)

A *qualifying period* applies for the coverages shown in the Table below. *Qualifying period* is the period of time that must be exceeded for coverage to apply. Once the *qualifying period* has been exceeded, coverage applies from the initial event of loss.

*QUALIFYING PERIOD* TABLE

| Coverage | *QUALIFYING PERIOD* |
|---|---|
| COMPUTER SYSTEMS NON PHYSICAL DAMAGE and DATA, PROGRAMS OR SOFTWARE, combined | 24 hours |
| CRISIS MANAGEMENT | 24 hours |
| OFF PREMISES INTERRUPTION OF SERVICES – PROPERTY DAMAGE AND TIME ELEMENT | 24 hours |

# SECTION II – PROPERTY DAMAGE

**A. COVERED PROPERTY**

1. **We** cover **your** insurable interest in the following types of property that are located at or within one-thousand (1,000) feet of a covered **location**, unless otherwise excluded:

   a. **Real Property**, including new buildings, structures and additions in the COURSE OF CONSTRUCTION.

   b. **Personal Property**, including *personal property of others*.

      *Personal property of others* are tangible things that **you** do not own, other than **real property**, that:

      (1) are sold by **you** and that **you** have agreed, prior to loss, to insure for the account of the purchaser during delivery;

      (2) **you** have agreed in writing prior to any loss or damage to provide coverage;

      (3) are in **your** care, custody or control;

      (4) **you** have an insurable interest in, or an obligation to provide coverage;

      (5) **you** are legally liable for;

      (6) are improvements and betterments consisting of fixtures, alterations, installation or additions comprising part of a building not owned by **you** and acquired or made at **your** expense which **you** cannot legally move, but only to the extent of **your** insurable interest therein; or

      (7) are **personal property** (other than vehicles) of **your** employees and officers.

2. **We** also cover the interest of contractors and subcontractors in **covered property** during construction at or within one-thousand (1,000) feet of a covered **location** to the extent of **your** legal liability for direct physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

**B. PROPERTY NOT COVERED**

**We** do not cover the following types of property:

1. Aircraft, except when unfueled and manufactured by **you**;

2. Animals, standing timber including undisturbed natural wooded areas, or growing crops;

3. Bridges or tunnels, however pedestrian walkways connecting buildings are covered;

4. Caves, caverns, mines of any type, or any property contained within them;

5. Contraband or property in the course of illegal transportation or trade;

6. Currency, money, negotiable and non-negotiable instruments, notes or securities;

7. Dams, dikes, levees, docks, wharfs, piers or bulkheads;

Case 4:22-cv-00285-BP    Document 1-1    Filed 05/02/22    Page 66 of 166

8. **Electronic data**, computer programs or software, except when they are stock in process, finished stock manufactured by **you**, raw materials, supplies, other merchandise not manufactured by **you** or as provided in this Policy;

9. Land and any substance in or on land except this exclusion does not apply to **land improvements**;

10. **Land improvements** at a golf course;

11. Overhead transmission and distribution systems located more than one-thousand (1,000) feet away from a covered **location**;

12. *Personal property of others* that is in the care, custody or control of **you** or **your** affiliates for which **you** are acting as a warehouseman, bailee for hire, or carrier for hire.

13. Precious metals or precious stones, except when used in industrial or service operations;

14. Property in transit, except as otherwise provided by this Policy;

15. Property more specifically insured, except for any excess over any LIMITS OF LIABILITY of such more specific insurance;

16. Property sold by **you** under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to **your** customers, except as provided by the DEFERRED PAYMENTS coverage of this Policy;

17. Spacecraft, satellites, associated launch vehicles and any property contained therein;

18. Vehicles otherwise insured for physical loss or damage;

19. Water except this exclusion does not apply to water that is contained within any enclosed tank, piping system or any other processing equipment; or

20. Watercraft, except watercraft **you** manufacture and are part of **your** inventory while being stored un-fueled and on dry land at a covered **location**.

**C.** EXCLUSIONS

The following exclusions apply unless otherwise stated in this Policy:

1. **We** do not cover:

   a. Indirect or remote loss or damage;

   b. Interruption of business, except to the extent provided by this Policy;

   c. Loss of market or loss of use;

   d. Loss or damage or deterioration arising from any delay;

   e. Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss;

   f. Loss or damage from enforcement of any law or ordinance:

      (1) Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or
      (2) Requiring the demolition of any property, including the cost in removing its debris;

except as provided by the DECONTAMINATION COSTS and DEMOLITION AND INCREASED COST OF CONSTRUCTION coverages of this Policy;

**g.** Loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense; or

**h.** Loss or damage caused by or resulting from freezing, disease or drought to landscape gardening, including plants, trees and shrubs.

**2. We** do not cover physical loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing to the loss concurrently or in any other sequence:

**a. Terrorism**, including action in hindering or defending against an actual or expected incident of **terrorism**, but this exclusion applies only when one of the following are attributed to an incident of **terrorism:**

**(1)** The **terrorism** is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive **contamination**; or

**(2)** Radioactive material is released, and it appears that one purpose of **terrorism** was to release such material; or

**(3)** The **terrorism** is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**(4)** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the **terrorism** was to release such materials; or

**(5)** Loss or damage to property located outside of the United States, unless there is a law in effect in the jurisdiction where the loss or damage occurs that expressly prohibits this exclusion; or

**(6)** The total of all damage to property, whether covered by this Policy or otherwise, exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, **we** will include all insured damage sustained by property of all persons and entities affected by the **terrorism** and business interruption (TIME ELEMENT) losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any **terrorism** exclusions. Multiple incidents of **terrorism** which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one (1) incident, for the purpose of determining whether the threshold is exceeded.

With respect to this item **2.a.(6)**, the immediately preceding paragraph describes the threshold used to measure the magnitude of an incident of **terrorism** and the circumstances in which the threshold will apply, for the purpose of determining whether this exclusion will apply to that incident. When the exclusion applies to an incident of **terrorism**, there is no coverage in this Policy.

However, this exclusion does not apply to:

**(1)** If **terrorism** results in fire, in which case **we** cover the direct physical loss or damage caused by the fire but only if there is a statute in effect in the jurisdiction where the loss or damage occurs that expressly prohibits the exclusion of fire losses resulting from **terrorism**. This exception is subject to all applicable Policy provisions including the LIMIT OF LIABILITY on the affected property. Such coverage for ensuing loss applies only to direct loss or damage by fire to **covered property**. This coverage does not apply to insurance provided under any TIME ELEMENT coverages, or to fire legal liability coverage; or

**(2)** While the United States **Terrorism** Risk Insurance Act (TRIA), as amended, is in effect:

    **(a)** To loss or damage caused by a "Certified Act of **Terrorism**" provided that **you** elected coverage for such, and only to the extent provided by the terms and conditions of the applicable CERTIFIED ACTS OF **TERRORISM** AND DISCLOSURE PURSUANT TO **TERRORISM** RISK INSURANCE ACT endorsement; or

    **(b)** To loss or damage caused by **terrorism** that would have been certified as an "act of **terrorism**", but was not certified solely because the total of all property and casualty insurance losses resulting from the act failed to exceed the $5,000,000 "certified act of **terrorism**" threshold specified under TRIA.

**b.** Nuclear reaction or nuclear radiation or radioactive **contamination**. However, this exclusion does not apply if:

    **(1)** The RADIOACTIVE **CONTAMINATION** PROPERTY DAMAGE COVERAGE AND LIMITATION applies but only to the extent provided; or

    **(2)** Fire directly results from the nuclear reaction, nuclear radiation, or radioactive **contamination**, in which case **we** cover the physical loss or damage caused by the fire but only if there is a statute in effect in the jurisdiction where the loss or damage happens that expressly prohibits the exclusion of fire losses resulting from nuclear reaction, radiation or **contamination**.

**c.** Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

    **(1)** Government or sovereign power (de jure or de facto);

    **(2)** Military, naval or air force; or

    **(3)** Agent or authority of any party specified in **(1)** or **(2)** above.

**d.** Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

**e.** The unlawful possession, use, release, discharge, dispersal or disposal of any chemical, biological, viral, radioactive or similar agents or matter, whether in time of peace or war and regardless of who commits the act.

**f.** Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

**g.** Seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

**h.** Risks of contraband, or illegal transportation or trade.

**i.** Any criminal, fraudulent or dishonest act, including theft, committed alone or in collusion with others:

    **(1)** By **you** or any proprietor, partner, director, trustee, officer or employee of an Insured; or

    **(2)** By any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by **you** to do anything in connection with property insured under this Policy.

However, **we** do cover direct physical loss or damage intentionally caused by **your** employee or any individual specified in **(2)** above provided that said individuals acted without **your** knowledge.

j.  Lack of the following services:

(1) Incoming electricity, fuel, water, gas, steam or refrigerant;

(2) Outgoing sewerage; or

(3) Incoming or outgoing voice, data or video,

all when caused by an event away from the covered **location** except as provided in the ON/OFF PREMISES INTERRUPTION OF SERVICES coverages of this Policy. But, if the lack of such a service causes physical loss or damage of the type insured by this Policy at a covered **location**, then only that resulting damage is covered.

3.  **We** do not cover the following, but, if direct physical loss or damage not excluded by this Policy results, then **we** cover that resulting damage only:

a.  Faulty workmanship, material, construction or design.

b.  Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

c.  Deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

d.  Settling, cracking, shrinking, bulging, or expansion of:

(1) Foundations (including any pedestal, pad, platform or other property supporting machinery)

(2) Floors

(3) Pavements

(4) Walls, including retaining walls

(5) Ceilings

(6) Roofs

e.  Extremes or changes in temperature (except to machinery or equipment) or changes in relative humidity, all whether atmospheric or not.

f.  Cumulative effects of smog, smoke, vapor, liquid and dust.

g.  Insect, animal or vermin damage.

h.  Loss or damage to the interior portion of buildings under construction caused by rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

4.  **We** do not cover the following unless directly resulting from a **covered loss**:

a.  **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided elsewhere in this Policy.

b.  Shrinkage.

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 70 of 166

    **c.** Changes in color, flavor, texture or finish.

    **d.** Remediation, change, correction, repair or assessment of any date or time recognition in any **electronic data processing equipment** or media.

    **e.** Failure of **electronic data processing equipment** or media to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times.

**D.** PROPERTY DAMAGE COVERAGES AND LIMITATIONS

**We** provide the following PROPERTY DAMAGE COVERAGES AND LIMITATIONS for a **covered loss** as specified in the LIMITS OF LIABILITY Table in the Declarations, subject to the terms, conditions and exclusions of this Policy.

**1.** ACCOUNTS RECEIVABLE

    **a.** **We** cover the following resulting from a **covered loss** to accounts receivable records located while anywhere within the Policy territory, including while in transit:

        **(1)** Any shortage in the collection of accounts receivable.

        **(2)** The interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum. Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

        **(3)** The reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

        **(4)** Any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

    **b.** Accounts receivable records include records stored as **electronic data**. In the event of loss, **you** will:

        **(1)** Use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

        **(2)** Reduce the loss by use of any property or service owned or controlled by **you** or obtainable from other sources.

        **(3)** Reconstruct, if possible, accounts receivable records so that no shortage is sustained.

    **c.** The settlement of loss will be made within ninety (90) days from the date of the **covered loss**. All amounts recovered by **you** on outstanding accounts receivable on the date of loss will belong and be paid to **us** up to the amount of loss paid by **us.** All recoveries exceeding the amount paid will belong to **you.**

    **d.** **We** do not cover shortage resulting from:

        **(1)** Bookkeeping, accounting or billing errors or omissions; or
        **(2)** Alteration, falsification, manipulation; or

        **(3)** Concealment, destruction or disposal, of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

**2.** BRANDS AND LABELS

In the event of a **covered loss** to **your** branded or labeled merchandise, and **we** elect to take all or any part of that property, **you** may at **our** expense:

**a.** Stamp "salvage" on the property or its containers; or

**b.** Remove or obliterate the brands or labels,

if doing so will not damage the property.

**You** must re-label such property or its containers to be in compliance with any applicable law.

3. CONTROL OF DAMAGED GOODS

**We** grant control to **you** of physically damaged **covered property** consisting of finished goods manufactured by or for **you** as follows:

**a.** **You** will have full rights to the possession and control of damaged property in the event of physical damage to **your covered property** provided proper testing is done to show which property is physically damaged.

**b.** Using reasonable judgment, **you** will decide if the physically damaged **covered property** can be reprocessed or sold.

**c.** Property **you** determine to be unfit for reprocessing or selling will not be sold or disposed of except by **you**, or with **your** consent.

Any salvage proceeds received will reduce the recoverable loss.

4. COURSE OF CONSTRUCTION

**a.** **We** cover direct physical loss or damage at a covered **location** to buildings or structures that **you** begin to construct during the Policy period.

**b.** **We** also cover materials, supplies, machinery, equipment and fixtures:

**(1)** At a covered **location** and intended for installation in the new construction;

**(2)** After such property has been delivered to **you** or **your** contractor, and while such property is located offsite at a storage **location**; or

**(3)** After such property has been delivered to **you** or **your** contractor, and while such property is in transit from a storage **location** to another storage **location** or to a covered **location**.

**c.** This coverage only applies to the construction of **covered property you** intend to own or occupy once constructed.

**d.** This coverage does not apply to any property owned or rented by any contractor or subcontractor.

5. DATA, PROGRAMS OR SOFTWARE

**a.** **We** cover direct physical loss or damage to **your electronic data**, computer programs or software, including direct physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this Policy's territory, including:

**(1)** The cost of the following reasonable and necessary actions taken by **you** provided such actions are taken due to actual insured physical loss or damage to **electronic data**, computer programs or software:

**(a)** Actions to temporarily protect and preserve insured **electronic data**, computer programs or software.

**(b)** Actions taken for the temporary repair of insured physical loss or damage to **electronic data**, computer programs or software.

**(c)** Actions taken to expedite the permanent repair or replacement of such damaged property.

**(2) Your** reasonable and necessary cost to temporarily protect or preserve covered **electronic data**, computer programs or software against immediately impending direct physical loss or damage to **electronic data**, computer programs or software. In the event that there is no direct physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such direct physical loss or damage.

**b.** With respect to destruction, distortion or corruption caused by the malicious introduction of machine code or instruction, this PROPERTY DAMAGE COVERAGE AND LIMITATION will apply only when the *qualifying period* specified in the *Qualifying Period* Table in the Declarations is exceeded.

**c.** Any amounts recoverable under this PROPERTY DAMAGE COVERAGE AND LIMITATION are excluded from coverage elsewhere in this Policy.

**d.** This PROPERTY DAMAGE COVERAGE AND LIMITATION excludes loss or damage to **electronic data**, computer programs or software when they are stock in process, finished stock manufactured by **you**, raw materials, supplies or other merchandise not manufactured by **you**.

**e.** With respect to this PROPERTY DAMAGE COVERAGE AND LIMITATION, the following additional exclusions apply:

**(1)** Errors or omissions in processing or copying; and

**(2)** Loss or damage to **electronic data**, computer programs or software from errors or omissions in programming or machine instructions.

**6.** DEBRIS REMOVAL

**a.** **We** cover **your** reasonable and necessary costs to remove debris from a covered **location** that remains as a direct result of a **covered loss**.

**b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION covers the costs of removal of contaminated **covered property** or the **contaminant** in or on **covered property** only if the **contamination**, due to the actual presence of **contaminant(s)**, results from a **covered loss**.

**c.** This PROPERTY DAMAGE COVERAGE AND LIMITATION does not cover the costs of removal of:

**(1)** Contaminated uninsured property; or

**(2)** The **contaminant** in or on uninsured property,

whether or not the **contamination** results from a **covered loss**.

**7.** DECONTAMINATION COSTS

**a.** **We** cover **your** decontamination costs directly resulting from a **covered loss** at a covered **location** subject to the following conditions:

**(1)** These decontamination costs must be a direct result of enforcement of the law or ordinance that

is in force at the time of the loss regulating decontamination; and

(2) The amount **we** cover includes the increased cost to remove **your** contaminated **covered property** to comply with the law or ordinance.

b.  **We** do not cover costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** resulted from a **covered loss**.

## 8. DEFENSE FOR PERSONAL PROPERTY OF OTHERS

a.  **We** cover the cost to defend that part of any suit against **you** alleging direct physical loss or damage of the type insured by this Policy to personal property of others of the type insured by this Policy, in **your** custody, and while at a covered **location**. **We** may without prejudice undertake any investigation, negotiation or settlement of any such claim or suit as **we** deem appropriate.

b.  **We** do not cover the cost to defend any suit against **you** when **you** are acting as a warehouseman, bailee for hire, or carrier for hire.

## 9. DEFERRED PAYMENTS

a.  **We** cover direct physical loss or damage to **personal property** of the type insured by this Policy sold by **you** under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer. Coverage is limited to the unpaid balance for such property. In the event of loss to property sold under deferred payment plans, **you** will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

b.  **We** do not cover loss:

(1) Pertaining to products recalled including **your** costs to recall, test or to advertise such recall.

(2) From theft or conversion by the buyer of the property after the buyer has taken possession of such property.

(3) To the extent the buyer continues payments.

(4) Not within this Policy's territory.

## 10. DEMOLITION AND INCREASED COST OF CONSTRUCTION

a.  **We** cover **your** reasonable and necessary costs that are described in Item **b.** below, actually incurred to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of **covered property** consisting of buildings, structures, machinery and equipment at a covered **location**, provided:

(1) Such law or ordinance is in force on the date of the **covered loss**;

(2) Its enforcement is a direct result of a **covered loss**; and

(3) The buildings, structures, machinery and equipment were in compliance with such law or ordinance, regardless of any lack of enforcement, prior to the **covered loss**.

b.  This PROPERTY DAMAGE COVERAGE AND LIMITATION, as respects the property insured in Item **a.** above, covers:

(1) The cost incurred to demolish, repair or rebuild the physically damaged portion of such property with materials and in a manner to satisfy such law or ordinance; and

**(2)** The cost incurred:

    **(a)** To demolish the physically undamaged portion of such property insured; and

    **(b)** To rebuild it with materials and in a manner to satisfy such law or ordinance,

    when the demolition of the physically undamaged portion of such property is required to satisfy such law or ordinance, as a result of a **covered loss**.

**c.** This PROPERTY DAMAGE COVERAGE AND LIMITATION excludes any costs incurred as a result of the enforcement of any law or ordinance regulating pollution.

**d.** The amount **we** cover for this PROPERTY DAMAGE COVERAGE AND LIMITATION at each covered **location** in any one (1) **occurrence** will not exceed the actual cost incurred in demolishing the physically damaged and undamaged portions of the property covered in item **a.** above plus:

    **(1)** If rebuilt on the same site, the actual cost incurred in rebuilding there; or

    **(2)** If rebuilt on another site, the lesser of:

        **(a)** The actual cost incurred in rebuilding on the other site, excluding the cost of land; or

        **(b)** The cost that would have been incurred to rebuild on the same site.

## 11. ERRORS AND OMISSIONS

**a.** If direct physical loss or damage is not covered under this Policy solely because of an error or unintentional omission made by **you**:

    **(1)** In the description of where **covered property** is physically located; or

    **(2)** To include any **location**:

        **(a)** Owned, rented or leased by **you** on the effective date of this Policy; or

        **(b)** Purchased, rented or leased by **you** during the term of the Policy; or

    **(3)** That results in termination of the coverage provided by this Policy, except for cancellation due to nonpayment of premium,

    **we** cover the amount **we** would have paid, including any TIME ELEMENT loss, had the error or omission not been made.

**b.** This coverage does not apply to the failure to report values, or the reporting of inaccurate values of **covered property**.

**c.** This PROPERTY DAMAGE COVERAGE AND LIMITATION does not apply if coverage is provided elsewhere in this Policy.

**d.** **You** must report such errors or unintentional omissions to **us** in writing as soon as they are discovered.

## 12. EXPEDITING EXPENSE

**a.** **We** cover **your** reasonable and necessary costs:

    **(1)** For the temporary repair of **covered property** from a **covered loss**; and

      **(2)** To expedite the permanent repair or replacement of such damaged property.

  **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

**13. FINE ARTS**

  **a.** **We** cover direct physical loss or damage to **your fine arts** while anywhere within this Policy's territory, including while in transit.

  **b.** The following additional exclusions apply:

    **We** do not cover:

    **(1)** Loss or damage sustained from any repair, restoration, or retouching process;

    **(2)** Breakage of art glass windows, statuary, marble, glassware, bric-a-brac, porcelains, and similar fragile articles, unless caused by fire, lightning, aircraft, theft and or attempted theft, windstorm, *EARTH MOVEMENT*, *FLOOD*, explosion, vandalism, collision, derailment or overturn of conveyance.

**14. FIRE DEPARTMENT SERVICE CHARGES**

  **We** cover the reasonable and necessary:

  **a.** Fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the **covered property**.

  **b.** Costs incurred by **you** to restore and recharge fire protection systems following a **covered loss.**

**15. LAND AND WATER CLEANUP, REMOVAL AND DISPOSAL**

  **a.** For uninsured property at a covered **location** consisting of land, water, or any other substance in or on land or water at a covered **location**, **we** cover **your** reasonable and necessary cost for the cleanup, removal and disposal of the actual presence of **contaminant(s)** from that property if the release, discharge or dispersal of such **contaminant(s)** is a result of a **covered loss.**

  **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION does not apply:

    **(1)** At any **location** insured for **personal property** only;

    **(2)** At any **location**, or to any property, covered under the NEWLY ACQUIRED **LOCATIONS** or ERRORS AND OMISSIONS coverages provided by this Policy or at a **Miscellaneous Unnamed Location**; or

    **(3)** If **you** fail to give **us** written notice within one hundred eighty (180) days after the loss.

**16. MISCELLANEOUS PERSONAL PROPERTY**

  **a.** **We** cover direct physical loss or damage, that occurs away from a covered **location** but within the Policy's territory, to **personal property** of the type covered under this Policy, which is:

    **(1)** Owned by **you**; or

    **(2)** Owned by others and in **your** care, custody and control, but only to the extent **you** are obligated to insure it for direct physical loss or damage under the type of coverage provided under this Policy.

  **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION excludes coverage that is provided

elsewhere in this Policy.

**17.** NEWLY ACQUIRED **LOCATIONS**

    **a.** **We** cover physical loss or damage to property of the type insured from a loss of the type insured at any **location you** purchase, lease or rent after the inception date of this Policy.

    **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION applies:

        **(1)** From the date of purchase, lease or rental,.

        **(2)** Until the first of the following occurs:

            **(a)** The **location** is bound by **us**;

            **(b)** Agreement is reached that the **location** will not be insured under this Policy; or

            **(c)** The time limit specified in the LIMITS OF LIABILITY Table in the Declarations has been reached. The time limit begins on the date of purchase, lease or rental.

**18.** OFF PREMISES INTERRUPTION OF SERVICES – PROPERTY DAMAGE

    **a.** **We** cover physical loss or damage to **covered property** at a covered **location** when such physical loss or damage results from:

        **(1)** The interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration, voice, data, video; or

        **(2)** The interruption of outgoing sewerage service,

    by reason of a loss of the type insured by this Policy at the facilities of the supplier of such service located within this Policy's territory, that immediately prevents in whole or in part the delivery of such usable service.

    **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION will apply only when the interruption exceeds the *qualifying period* specified in the *Qualifying Period* Table in the Declarations.

    **c.** For purposes of this PROPERTY DAMAGE COVERAGE AND LIMITATION, the *period of service interruption* is the period starting with the time when an interruption of specified services occurs; and ending when the service could be wholly restored.

    **d.** Additional General Provisions:

        **(1)** **You** will immediately notify the suppliers of services of any interruption of any such services.

        **(2)** **We** will not be liable if the interruption of such services is caused directly or indirectly by **your** failure to comply with the terms and conditions of any contracts **you** have for the supply of such specified services.

    **e.** **We** do not cover loss or damage caused by or resulting from the use of services provided by or through a satellite.

    **f.** Exclusion **C.3.e.** does not apply to this PROPERTY DAMAGE COVERAGE AND LIMITATION.

**19.** PROFESSIONAL FEES

a. **We** cover **your** reasonable costs for **your** employees or auditors, architects, accountants and engineers whom **you** hire to prepare and verify the details of a claim from a **covered loss**.

b. Professional fees covered under this PROPERTY DAMAGE COVERAGE AND LIMITATION, however, do not include:

   (1) Any fees or expenses of attorneys;

   (2) Any fees or expenses of public adjusters, loss appraisers or any of their subsidiaries or associated entities;

   (3) Fees based on a contingency; or

   (4) Fees of loss consultants who provide consultation on coverage or negotiate claims.

c. This PROPERTY DAMAGE COVERAGE AND LIMITATION is subject to the deductible that applies to the loss.

20. PROTECTION AND PRESERVATION OF PROPERTY

   a. **We** cover **your** reasonable and necessary costs to temporarily protect or preserve **covered property** provided such actions are necessary due to actual, or to prevent immediately impending threat of, physical loss or damage of the type covered by this Policy to such **covered property**.

   b. This PROPERTY DAMAGE COVERAGE AND LIMITATION is subject to the deductible provisions that would have applied had the physical loss or damage happened.

21. RADIOACTIVE CONTAMINATION

   a. **We** cover radioactive **contamination** to property of the type insured by this Policy from a **covered loss**.

      Radioactive **contamination** is:

   (1) Sudden and accidental radioactive **contamination**; or

   (2) Resultant radiation damage to **covered property**,

      provided that such radioactive **contamination** arises out of radioactive material at a covered **location** and is used as part of **your** business activities.

   b. **We** do not cover radioactive **contamination** if:

   (1) The covered **location** contains:

      (a) A nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction; or

      (b) Any new or used nuclear fuel intended for or used in such a nuclear reactor.

   (2) The **contamination** arises from radioactive material located away from a covered **location**.

22. TAX LIABILITY

   **We** cover **your** increase in tax liability from a **covered loss** at a covered **location** if the tax treatment of:

   a. The profit portion of a loss payment involving finished stock manufactured by **you**; and/or

   b. The profit portion of a TIME ELEMENT loss payment;

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 78 of 166

is greater than the tax treatment of profits that would have been incurred had no loss happened.

**23. TEMPORARY REMOVAL OF PROPERTY**

    **a.** When **covered property** is removed from a covered **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, **we** cover such property:

        **(1)** While at the premises to which such **covered property** has been moved; and

        **(2)** For direct physical loss or damage of the type insured by this Policy at the covered **location** from which such **covered property** was removed.

    **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION does not apply:

        **(1)** To **covered property** removed for normal storage, processing or preparation for sale or delivery; or

        **(2)** If coverage is provided elsewhere in this Policy or by any other insurance policy.

**24. TRANSIT**

    **a.** **We** cover **personal property** not excluded elsewhere in this Policy while it is in transit within the Policy's territory:

        **(1)** Owned by **you**.

        **(2)** Shipped to customers under Free on Board (F.O.B) shipments, Free-Along-Side (F.A.S) shipments and Returned shipments. **Your** contingent interest is admitted.

        **(3)** Of others in **your** actual or constructive custody to the extent of **your** interest or legal liability.

        **(4)** Of others sold by **you** and **you** agreed prior to the loss to insure the **personal property** during course of delivery including:

            **(a)** When shipped by **your** contract service provider or by **your** contract manufacturer to **you** or to **your** customer; or

            **(b)** When shipped by **your** customer to **you** or to **your** contract service provider or to **your** contract manufacturer.

    **b.** This PROPERTY DAMAGE COVERAGE AND LIMITATION starts from the time the property leaves the original point of shipment for transit, and continues while in the due course of transit until delivered, subject to the following conditions:

        **(1)** Coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

        **(2)** If this Policy expires during the due course of transit, coverage is extended until the shipment is delivered to its final destination.

    **c.** **We** also cover:

        **(1)** General average and salvage charges on shipments covered while waterborne; and

        **(2)** Direct physical loss or damage caused by or resulting from:

       (a) Unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

       (b) Improper parties having gained possession of property through fraud or deceit.

**d.** Additional General Provisions:

    **(1)** This PROPERTY DAMAGE COVERAGE AND LIMITATION will not inure directly or indirectly to the benefit of any carrier or bailee.

    **(2) You** have permission, without prejudicing this insurance, to accept:

       **(a)** Ordinary bills of lading used by carriers;

       **(b)** Released bills of lading;

       **(c)** Undervalued bills of lading; and

       **(d)** Shipping or messenger receipts.

    **(3) You** may waive subrogation against railroads under side track agreements.

    **(4)** Except as otherwise stated, **you** will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

**e.** As respects this PROPERTY DAMAGE COVERAGE AND LIMITATION:

    **(1)** The following additional exclusions apply:

    This Policy excludes:

       **(a)** Samples in the custody of salespeople or selling agents.

       **(b)** Property insured under import or export ocean marine insurance.

       **(c)** Waterborne shipments, unless:

          **(i)** By inland water; or

          **(ii)** By roll-on/roll-off ferries; or

          **(iii)** By coastal shipments.

       **(d)** Airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

       **(e)** Property of others, including **your** legal liability for it, hauled on vehicles owned, leased or operated by **you** when acting as a common or contract carrier.

       **(f)** Any transporting vehicle

       **(g)** Property shipped between continents except by land or air within the Policy territory.

**f.** **We** will value property covered under this PROPERTY DAMAGE COVERAGE AND LIMITATION as follows:

**(1)** Property shipped to or for **your** account will be valued at actual invoice to **you**. Included in the value are accrued costs and charges legally due. Charges may include **your** commission as selling agent.

**(2)** Property sold by **you** and shipped to or for the purchaser's account will be valued at **your** selling invoice amount. Prepaid or advanced freight costs are included.

**(3)** Property not under invoice will be valued:

    **(a)** For **your** property, according to the valuation provisions of this Policy applying at the place from which the property is being transported; or

    **(b)** For other property, at the **actual cash value** at the destination point on the date of loss, less any charges saved which would have become due and payable upon arrival at destination.

## 25. VALUABLE PAPERS AND RECORDS

**a.** **We** cover physical loss or damage to **your valuable papers and records** from a **covered loss** at a covered **location**. **We** cover the value blank, plus the cost of copying from backup or from originals of a previous generation, and **your** reasonable and necessary costs to research, replace or restore the information lost or damaged thereon, except for **electronic data** and software. For **electronic data** and software, **we** cover the value of the blank media, and the cost of reproducing the **electronic data** and software from duplicates or originals of the previous generation of the data.

**b.** This coverage does not apply to loss or damage to property that cannot be repaired or restored with like kind or quality.

# SECTION III – TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGES AND LIMITATIONS:

**A.** Is subject to and part of the applicable LIMIT OF LIABILITY that applies to **your** direct physical loss or damage but in no event for more than any LIMIT OF LIABILITY that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGES AND LIMITATIONS; and

**B.** Will not increase the POLICY LIMIT OF LIABILITY and is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

**A.** LOSS INSURED

    **1.** **We** cover **your** actual loss sustained, as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGES AND LIMITATIONS, directly resulting from a loss of the type insured by this Policy:

        **a.** To property described elsewhere in this Policy and not otherwise excluded by this Policy,

        **b.** Used by **you**, or by others with whom **you** have a contract,

        **c.** At a covered **location** or while in transit as provided by this Policy,

        **d.** During the applicable PERIOD OF LIABILITY described in this section.

    **2.** **We** cover TIME ELEMENT loss only to the extent it cannot be reduced through:

        **a.** The use of any property or service owned or controlled by **you**;

        **b.** The use of any property or service obtainable from other sources;

       **c.** Working extra time or overtime; or

        **d.** The use of inventory,

    all whether at a covered **location** or at any other **location**. When measuring the actual loss sustained, the combined operating results of all of **your** associated, affiliated or subsidiary companies will be considered in determining the TIME ELEMENT loss.

    **3.** **We** cover **your** reasonable and necessary expenses to reduce the loss otherwise payable under this section of this Policy. The amount of those recoverable expenses will not exceed the amount by which the insured loss has been reduced.

    **4.** In determining the insured TIME ELEMENT loss, **we** will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. **We** will consider any increase or decrease in demand for **your** goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused the **covered loss**.

**B.** TIME ELEMENT COVERAGES

    **1.** *GROSS EARNINGS*

        **a.** *GROSS EARNINGS* loss is the actual loss sustained by **you** due to the necessary interruption of **your** business during the PERIOD OF LIABILITY of the following:

Gross Earnings less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services, plus all other earnings derived from the operation of the business.

**Ordinary payroll,** including taxes and charges dependent on the payment of wages, for a period of time not to exceed the number of consecutive days as specified in the LIMITS OF LIABILITY in the Declarations table immediately following the interruption of production or suspension of business operations or services, and only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

However, if **you** reduce the daily loss payable under **ordinary payroll,** either by:

      **(1)**  providing gainful employment for, or

      **(2)**  paying less than the normal salary rate to,

all or part of its employees, then the number of consecutive days of **ordinary payroll** may be extended. However, this provision will not increase **our** total liability beyond the amount **we** would have been liable for **ordinary payroll** costs without this provision.

**Ordinary payroll** does not cover any portion of salaries or wages included in Gross Earnings.

**b.**  *GROSS EARNINGS* will be calculated as follows:

    **(1)**  For manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

    **(2)**  For mercantile or non-manufacturing operations: the total net sales less the cost of merchandise sold, materials and supplies consumed in the operations or services rendered by **you.**

    Any amount payable at selling price will be considered to have been sold to **your** regular customers and will be credited against net sales.

**c.**  In determining the amount **we** cover as the actual loss sustained, **we** will consider the continuation of only those charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

**d.**  If **you** would have operated at a deficit had no interruption of production or suspension of business operations or services occurred, the following applies:

    **(1)**  For Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.

    **(2)**  For **ordinary payroll,** the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

**e.**  We cover TIME ELEMENT loss only to the extent that **you** are:

    **(1)**  Wholly or partially prevented from producing goods or continuing business operations or services;

    **(2)**  Unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

    **(3)**  Unable to continue **your** operations or services during the PERIOD OF LIABILITY; and

**(4)** Able to demonstrate a loss of sales for the operations, services or production prevented.

**2.   EXTRA EXPENSE**

   **a.   We** cover **your** reasonable and necessary extra costs of the following incurred during the PERIOD OF LIABILITY applicable:

   **(1)** To temporarily continue as nearly normal as practicable the conduct of **your** business; and

   **(2)** The temporary use of property or facilities of **yours** or others.

   **b.   We** will reduce any recoverable loss under this coverage for any value remaining of any property used to temporarily continue **your** business.

   **c.** EXTRA EXPENSE does not include:

   **(1)** Any loss of income.

   **(2)** Costs that would have been incurred in conducting the business during the same period had no physical loss or damage happened.

   **(3)** Costs of permanent repair or replacement of property that has been damaged or destroyed.

   **(4)** Any expense recoverable elsewhere in this Policy.

**3.   LEASEHOLD INTEREST**

   **a.   We** cover the following:

   **(1)** If the lease agreement requires continuation of rent as a result of a **covered loss**, and if the **covered property** is wholly or partially untenantable or unusable, the actual rent payable while the **covered property** is untenantable or until the lease is terminated, but not exceeding the unexpired term of the lease.

   **(2)** If the **covered property** is partially untenantable, **we** cover the proportion of the lease payment for that portion of the untenantable **covered property**.

   **b.** If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law, **we** cover the additional cost to rent similar space for the unexpired term of the lease for the damaged property. That loss will be computed at present value, compounded annually at the prime rate plus 2%, as published in the Wall Street Journal on the date the lease terminated.   The additional cost will consider the excess rent paid for the same or similar replacement property over actual rent of the original lease, plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the lease.

   **c.** As respects LEASEHOLD INTEREST, the following applies:

   **(1)   We** do not cover loss directly resulting from physical loss or damage to **personal property**.

   **(2)** TIME ELEMENT EXCLUSIONS **D.1.**, **D.2.** and **D.3.** do not apply and the following applies instead:

   **We** do not cover any increase in loss resulting from the suspension, lapse or cancellation of any license, or from **you** exercising an option to cancel the lease; or from any act or omission by **you** that constitutes a default under the lease.

**4.   RENTAL INSURANCE**

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 84 of 166

    **a.** **We** cover **your** actual loss sustained of rental income during the PERIOD OF LIABILITY for:

        **(1)** The fair rental value of any portion of rental property occupied by **you**;

        **(2)** The income reasonably expected from rentals of unoccupied or unrented portions of such property; and

        **(3)** The rental income from the rented portions of such property according to written leases, contracts or agreements in force at the time of loss,

        all not to include non-continuing charges and expenses.

    **b.** RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS **D.1.** does not apply and the following applies instead:

        **We** do not cover any loss of rental income during any period in which the covered **location** would not have been tenantable for any reason other than a **covered loss**.

**C.** PERIOD OF LIABILITY

    **1.** The PERIOD OF LIABILITY applying to CONTINGENT TIME ELEMENT, *GROSS EARNINGS*, EXTRA EXPENSE and RENTAL INSURANCE is as follows:

        **a.** For building and equipment, the period:

            **(1)** Starting from the time of physical loss or damage of the type insured; and

            **(2)** Ending when with due diligence and dispatch the building and equipment could be:

                **(a)** Repaired or replaced; and

                **(b)** Made ready for operations,

                under the same or equivalent physical and operating conditions that existed prior to the damage.

            **(3)** Not to be limited by the expiration of this Policy.

        **b.** For building(s) and equipment covered under COURSE OF CONSTRUCTION:

            **(1)** The equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

            **(2)** Due consideration will be given to the actual experience of the business after completion of the construction and startup.

    **2.** The PERIOD OF LIABILITY for *GROSS EARNINGS* and EXTRA EXPENSE also includes the following:

        **a.** For stock-in-process and mercantile stock, including finished goods not manufactured by **you**, the time required with the exercise of due diligence and dispatch:

            **(1)** To restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

            **(2)** To replace physically damaged mercantile stock.

        **b.** For raw materials and supplies, the period of time:

    **(1)** Of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

    **(2)** Limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

**c.** Impounded Water:

    **(1)** Used for any manufacturing purpose, including as a raw material or for power;

    **(2)** Stored behind dams or in reservoirs; and

    **(3)** On any covered **location,**

    that is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, **our** liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond the number of consecutive days, not to exceed the LIMIT OF LIABILITY specified in the Declarations after the damaged dam, reservoir or connected equipment has been repaired or replaced.

**d.** For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation. This time does not include research, engineering or any other time necessary to restore or recreate lost information.

**e.** For physically damaged or destroyed property covered under DATA, PROGRAMS OR SOFTWARE, the time to recreate or restore including the time for researching or engineering lost information.

**3.** The PERIOD OF LIABILITY applying to *GROSS PROFIT* is as follows:

**a.** The period starting from the time of physical loss or damage of the type insured and ending not later than the period of time specified in the LIMITS OF LIABILITY Table in the Declarations during which period the results of the business shall be directly affected by such damage, not to be limited by the expiration of this Policy.

**b.** For property under construction, the period starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened and ending not later than the period of time specified in the LIMITS OF LIABILITY Table in the Declarations, during which period the results of the business shall be directly affected by such damage, not to be limited by the expiration of this Policy.

The *Rate of Gross Profit* and *Standard Sales* will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

**4.** The PERIOD OF LIABILITY does not include any additional time due to **your** inability to resume operations for any reason, including:

**a.** Making changes to equipment;

**b.** Making changes to the buildings or structures except as provided in the DEMOLITION AND INCREASED COST OF CONSTRUCTION clause in the PROPERTY DAMAGE section; and

**c.** Re-staffing or retraining employees.

If two or more PERIODS OF LIABILITY apply, such periods will not be cumulative.

**D.** TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

1.  Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

    a.  Physical loss or damage not insured by this Policy on or off of the covered **location**.

    b.  Planned or rescheduled shutdown.

    c.  Strikes or other work stoppage.

    d.  Any reason other than physical loss or damage insured under this Policy.

2.  Any increase in loss due to:

    a.  Suspension, cancellation or lapse of any lease, contract, license or orders.

    b.  Damages for breach of contract or for late or noncompletion of orders.

    c.  Fines or penalties.

    d.  Any other consequential or remote loss.

3.  Any loss resulting from physical loss or damage to finished goods manufactured by **you**, or the time required for their reproduction.

E.  TIME ELEMENT COVERAGES AND LIMITATIONS

TIME ELEMENT COVERAGES are extended to include the following, subject to all Policy terms, conditions and exclusions, and the time, distance and/or dollar amounts specified in the LIMITS OF LIABILITY Table in the Declarations:

1.  *ATTRACTION PROPERTY*

    a.  **We** cover **your** actual loss sustained and EXTRA EXPENSE resulting from loss or damage of the type insured by this Policy to property of the type insured at an *attraction property* within the number of statute miles specified in the LIMITS OF LIABILITY Table in the Declarations and during the period of time that:

        (1)  Starts at the time such physical loss or damage happens;

        (2)  Ends when the *attraction property* is:

            (a)  Repaired or replaced; and

            (b)  Made ready for operations.

    b.  As used in this TIME ELEMENT COVERAGE AND LIMITATION, the term *attraction property* is a property that:

        (1)  Is operated by others; and

        (2)  **You** depend on to attract customers to **your** covered **location.**

2.  CIVIL OR MILITARY AUTHORITY

    a.  **We** cover **your** actual loss sustained and EXTRA EXPENSE during the *period of interruption* if an order of civil or military authority prohibits access to a covered **location** provided such order is caused by

physical loss or damage of the type insured by this Policy at a covered **location** or within the number of statute miles specified in the LIMITS OF LIABILITY Table in the Declarations.

b. This TIME ELEMENT COVERAGE AND LIMITATION does not apply to LEASEHOLD INTEREST.

c. The *period of interruption* for this TIME ELEMENT COVERAGE AND LIMITATION will be the period of time:

    **(1)** Starting at the time of such direct physical loss or damage; and

    **(2)** Continuing until the order is lifted, or the time limit specified in the LIMITS OF LIABILITY Table in the Declarations expires, whichever happens first.

This period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

3. COMPUTER SYSTEMS NON PHYSICAL DAMAGE

a. **We** cover **your** actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY directly resulting from the failure of **your electronic data processing equipment** or media to operate, provided that such failure is the direct result of a malicious act directed at **you**.

b. This TIME ELEMENT COVERAGE AND LIMITATION will apply only when the *period of interruption* is in excess of the *qualifying period* specified in the *Qualifying Period* Table in the Declarations.

c. As used above, the *period of interruption*:

    **(1)** Is the period starting when **your electronic data processing equipment** or media fails to operate and ending when with due diligence and dispatch, **your electronic data processing equipment** or media could be restored to the same or equivalent operating condition that existed prior to the failure.

    **(2)** Does not include the additional time to make changes to **your electronic data processing equipment** or media.

4. CONTINGENT TIME ELEMENT

a. **We** cover **your** actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured by this Policy at *Direct Dependent Time Element Location(s)* and *Indirect Dependent Time Element Location(s)* located within the territory of this Policy.

b. **You** agree to take every reasonable and necessary action to mitigate the loss payable hereunder.

c. As used in this Policy, *Direct Dependent Time Element Location(s)* are:

    **(1)** Any **location(s)** of a direct: customer, supplier, contract manufacturer or contract service provider to **you**; or

    **(2)** Any **location(s)** of any company under a royalty, licensing fee or commission agreement with **you**.

*Direct Dependent Time Element Location(s)* does not include **location(s)** that are covered **location(s)** under this Policy or the **location(s)** of any company directly or indirectly supplying to, or receiving from **you**, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

d. As used in this Policy, *Indirect Dependent Time Element Location(s)* are:

    **(1)** Any **location(s)** of any company that is a direct: customer, supplier, contract manufacturer or contract

service provider to **your** *Direct Dependent Time Element* **Location(s).**

*Indirect Dependent Time Element* **Location(s)** does not include **location(s)** that are covered **location(s)** under this Policy or the **location(s)** of any company directly or indirectly supplying to, or receiving from, the *Direct Dependent Time Element* **Location(s)** or the *Indirect Dependent Time Element* **Location(s)**, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**e.** As respects CONTINGENT TIME ELEMENT:

    **(1)** Exclusion **D.3** in the TIME ELEMENT EXCLUSIONS does not apply.

**5.** CRISIS MANAGEMENT

**a.** **We** cover **your** actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY if an order of civil or military authority prohibits access to a covered **location**, but only if such order is a direct result of a violent crime, suicide, attempted suicide or armed robbery at such covered **location**.

**b.** As respects this TIME ELEMENT COVERAGE AND LIMITATION, coverage applies:

    **(1)** Only when the PERIOD OF LIABILITY is in excess of the *qualifying period* specified in the *Qualifying Period* Table in the Declarations; and

    **(2)** For up to the number of consecutive days specified in the LIMITS OF LIABILITY Table in the Declarations, not to exceed the specified LIMIT OF LIABILITY.

The PERIOD OF LIABILITY is the period of time when the time the civil or military authority prohibits access and continuing until the order is lifted, or the time limit specified in the LIMITS OF LIABILITY Table in the Declarations expires, whichever happens first.

**6.** DELAY IN STARTUP

**We** cover **your** actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations resulting directly from physical loss or damage to **covered property** as provided under COURSE OF CONSTRUCTION.

**7.** EXTENDED PERIOD OF LIABILITY

**a.** We cover the *GROSS EARNINGS* loss sustained due to the reduction in sales resulting from:

    **(1)** The interruption of business;

    **(2)** Commencing with the date on which our liability for loss resulting from interruption of business would terminate if this TIME ELEMENT COVERAGE AND LIMITATION had not been included in this Policy; and

    **(3)** Continuing for such additional length of time as would be required with the exercise of due diligence and dispatch to restore **your** business to the condition that would have existed had no loss occurred, but no longer than the number of consecutive days specified in the LIMITS OF LIABILITY Table in the Declarations.

**b.** Coverage under this TIME ELEMENT COVERAGE AND LIMITATION for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the EXTENDED PERIOD OF LIABILITY described in Item **7.a.** above.

**c.** As respects this TIME ELEMENT COVERAGE AND LIMITATION, Item **D.2.** in the TIME ELEMENT EXCLUSIONS in this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or non-completion of orders, or fines or penalties.

**8. INGRESS / EGRESS**

    **a.** **We** cover **your** actual loss sustained and EXTRA EXPENSE due to the necessary interruption of **your** business if ingress to or egress from a covered **location** is prevented, whether or not **your** premises or property is damaged, provided that such prevention is a direct result of physical loss or damage of the type insured to property of the type insured.

    **b.** The *period of interruption* for this TIME ELEMENT COVERAGE AND LIMITATION will be the period of time starting at the time of such direct physical loss or damage, and continuing until ingress or egress is no longer prevented, or for the time limit specified in the LIMITS OF LIABILITY Table in the Declarations, whichever is less.

**9. OFF PREMISES INTERRUPTION OF SERVICES – TIME ELEMENT**

    **a.** **We** cover **your** actual loss sustained and EXTRA EXPENSE during the period of service interruption at a covered **location** when the loss is caused by:

        **(1)** The interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration, voice, data, video; or

        **(2)** The interruption of outgoing sewerage service,

    from physical loss or damage of the type insured, at the facilities of the supplier of such service located within this Policy's territory that immediately prevents in whole or in part the delivery of such usable services.

    **b.** This TIME ELEMENT COVERAGE AND LIMITATION will apply only when the period of service interruption as described below is in excess of the *qualifying period* specified in the *Qualifying Period* Table in the Declarations.

    **c.** The period of service interruption is:

        **(1)** The period starting with the time when an interruption of specified services occurs; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could have resumed normal operations following the restoration of service under the same or equivalent physical and operating conditions that existed prior to the interruption of such services;

        **(2)** is limited to only those hours during which **you** could have used service(s) if it had been available;

        **(3)** Does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

    **d.** Additional General Provisions:

        **(1)** **You** will immediately notify the suppliers of services of any interruption of any such services.

        **(2)** **We** will not be liable if the interruption of such services is caused directly or indirectly by **your** failure to comply with the terms and conditions of any contracts **you** have for the supply of such specified services.

    **e.** **We** do not cover loss or damage caused by or resulting from the use of services provided by or through a satellite.

**10. ON PREMISES INTERRUPTION OF SERVICES – TIME ELEMENT**

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 90 of 166

a. **We** cover **your** actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY directly resulting from direct physical loss or damage of the type insured to the following property located at or within one-thousand (1,000) feet of a covered **location**:

   (1) Electrical equipment and equipment used for the transmission of voice, data or video.

   (2) Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission systems.

11. PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

   a. **We** cover **your** actual loss sustained for a period of time not to exceed forty eight (48) hours prior to and forty eight (48) hours after **you** first took reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage of the type insured to such **covered property**.

   b. This TIME ELEMENT COVERAGE AND LIMITATION is subject to the deductible provisions that would have applied had the direct physical loss or damage occurred.

12. RELATED **LOCATIONS**

   If **you** report values at related **locations** used by **you** (e.g. branch stores, retail outlets and other facilities), but such related **locations** are not listed on the latest Schedule of Covered **Locations** submitted to, accepted by and on file with **us**, and if a TIME ELEMENT loss results at such related **locations** due to **covered loss**, **we** cover such resulting TIME ELEMENT loss in accordance with the terms and conditions of this Policy.

13. RESEARCH AND DEVELOPMENT

   a. **We** cover **your** actual loss sustained of fixed charges and **ordinary payroll** directly attributable to the interruption of research and development project(s) that would not have produced income during the PERIOD OF LIABILITY resulting from a **covered loss**.

   b. **We** cover these fixed charges only to the extent they continue after the **covered loss** and only during the PERIOD OF LIABILITY.

   c. To the extent **you** are able to resume operations, **we** cover only that portion of the fixed charges related to that part of the research and development operation that has not yet been restored.

14. SOFT COSTS

   a. **We** cover **your** actual loss sustained of *Soft Costs* during the *period of delay* directly resulting from a delay of completion of **covered property** under construction as provided under COURSE OF CONSTRUCTION as provided in the PROPERTY DAMAGE COVERAGES AND LIMITATIONS.

   b. *Soft Costs* are costs over and above those that are normal at a covered **location** undergoing renovation or in the course of construction, limited to the following:

   (1) Construction loan fees – **your** additional cost to rearrange loans necessary for the completion of construction, repairs or reconstruction including: the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

   (2) Commitment fees, leasing and marketing expenses – the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

**(3)** Additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction repairs or reconstruction.

**(4)** Property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**c.** *Period of delay* is the period of time between:

**(1)** The date on which the construction, alteration, extension or renovation would have been complete in the absence of a **covered loss** to property under construction as provided under COURSE OF CONSTRUCTION as provided in the PROPERTY DAMAGE COVERAGES AND LIMITATIONS; and

**(2)** The date on which construction, alteration, extension or renovation is actually complete.

# SECTION IV – DESCRIBED LOSSES

**We** only cover the following DESCRIBED LOSSES as specified in the LIMITS OF LIABILITY Table in the Declarations, subject to the terms, conditions and exclusions of this Policy.

**A.** *EARTH MOVEMENT*

   **1.** **We** cover physical loss or damage to **covered property,** including TIME ELEMENT COVERAGES, TIME ELEMENT COVERAGES AND LIMITATIONS and PROPERTY DAMAGE COVERAGES AND LIMITATIONS as provided by this Policy, from a **covered loss** resulting from *EARTH MOVEMENT.*

   **2. Y o u** may elect when the time specified in the **OCCURRENCE** TIME SPECIFICATIONS begins.

   **3.** *EARTH MOVEMENT* is:

   Earthquake, landslide, subsidence or sinking, rising or shifting of the earth, avalanche, whether natural or man-made, or volcanic eruption; regardless of any other cause or event contributing concurrently or in any other sequence of loss.

   However, physical loss or damage from fire, explosion, sprinkler leakage or *FLOOD* caused by *EARTH MOVEMENT* will not be considered to be loss by *EARTH MOVEMENT* within the terms and conditions of this Policy.

**B.** *EARTH MOVEMENT* SPRINKLER LEAKAGE

   **1.** **We** cover physical loss or damage to **covered property,** including TIME ELEMENT COVERAGES, TIME ELEMENT COVERAGES AND LIMITATIONS and PROPERTY DAMAGE COVERAGES AND LIMITATIONS as provided by this Policy, resulting from sprinkler leakage caused by *EARTH MOVEMENT.*

**C.** *EQUIPMENT BREAKDOWN*

   **1.** **We** cover physical loss or damage to **covered property,** including TIME ELEMENT COVERAGES, TIME ELEMENT COVERAGES AND LIMITATIONS and PROPERTY DAMAGE COVERAGES AND LIMITATIONS, as provided by this Policy if such loss or damage is caused by an *accident* to *covered equipment.*

   The coverage provided in this DESCRIBED LOSS is limited to loss or damage caused by an *accident* to *covered equipment.* **We** will not pay for physical loss or damage from any other cause under this DESCRIBED LOSS.

   The following coverages apply solely to Equipment Breakdown:

   **a.** Spoilage Damage

   **We** cover physical loss or damage caused by change in temperature or humidity or by the interruption of power, heat, air-conditioning, or refrigeration as the result of an *accident* to *covered equipment.*

   **b.** Ammonia **Contamination**

   **We** cover physical loss or damage to **covered property** contaminated by ammonia, including any salvage expense as a direct result of an *accident* to *covered equipment.* No coverage for Ammonia **Contamination** is available under DECONTAMINATION COSTS with respects to an *accident* to *covered equipment.*

2. **Conditions**

   a. **Suspension**

   If coverage for Equipment Breakdown is provided by this Policy, and **we** discover a dangerous condition relating to an object, **we** may immediately suspend the insurance provided by this coverage for that *covered equipment* by written notice mailed or delivered to **you** either at **your** address or at the **location** of any object. Suspended insurance may be reinstated by **us**, but only by an endorsement issued as part of this Policy. **You** will be credited for the unearned portion of the premium paid for the suspended insurance, pro rata, for the period of suspension.

3. **Valuation**

   If *covered equipment* requires replacement due to an *accident*, **we** cover **your** additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

   a. However, **we** do not cover more than 150% of what the cost would have been to repair or replace *covered equipment* with like kind and quality.

   b. This does not apply to any property subject to valuation based on **actual cash value**, nor does this provision increase any other applicable LIMIT OF LIABILITY.

   c. The PERIOD OF LIABILITY will not be increased by any of the above.

4. **Definitions**

   a. *Accident*: Physical loss or damage to *covered equipment* that necessitates its repair or replacement due to:

   **(1)** Failure of pressure or vacuum equipment;

   **(2)** Mechanical breakdown including rupture or bursting caused by centrifugal force;

   **(3)** Artificially generated electrical current, including electrical arcing that damages electrical devices, appliances or wires; or

   **(4)** Explosion of:

   **(a)** Steam boiler

   **(b)** Electric steam generator

   **(c)** Steam piping

   **(d)** Steam turbine

   **(e)** Moving or rotating machinery when such explosion is caused by centrifugal force,

   unless such loss or damage is otherwise excluded within this Policy.

   *Accident* does not include:

   **(5)** Fire, including water or other means used to extinguish the fire;

   **(6)** Malfunction, misalignment, miscalibration, tripping off line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning or by the performance of maintenance;

**(7)** Combustion explosion;

**(8)** Discharge of molten material from equipment including the heat from such discharged materials;

**(9)** Lightning;

**(10)** Depletion, deterioration, rust, corrosion, erosion, settling, or wear or tear or any other gradually developing condition;

**(11)** Defects, erasures, error limitations or viruses in computer equipment and programs including the inability to recognize and process any date or time or provide instructions to *covered equipment*;

**(12)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

**(13)** Damage to any structure or foundation supporting the *covered equipment* or any of its parts;

**(14)** Any loss or damage caused by or resulting from any type of electrical insulation breakdown test;

**(15)** Any loss or damage caused by or resulting from any type of hydrostatic, pneumatic or gas pressure test;

**(16)** The functioning of any safety or protective device; or

**(17)** The cracking of any part on an internal combustion turbine exposed to the products of combustion.

**b.** *Covered equipment*:

**(1)** Equipment that generates, transmits, controls or utilizes energy; including electronic communications and data processing equipment; and

**(2)** Equipment which, during normal usage, operates under vacuum or pressure, other than weight of contents.

*Covered equipment* does not mean or include:

**(3)** **Electronic data**;

**(4)** Part of pressure or vacuum equipment that is not under internal pressure of its contents or internal vacuum;

**(5)** Insulating or refractory material;

**(6)** Nonmetallic pressure or vacuum equipment, unless it is constructed and used in accordance with the American Society of Mechanical Engineers (A.S.M.E.) code or other appropriate and approved code;

**(7)** Catalyst;

**(8)** Buried vessels or piping; waste, drainage or sewer piping; piping, valves or fittings forming part of a sprinkler or fire suppression system; water piping that is not part of a closed loop used to conduct heat or cooling from a boiler or a refrigeration or air conditioning system;

**(9)** Structure, foundation, cabinet or compartment supporting or containing the *covered equipment* or part of the *covered equipment* including penstock, draft tube or well casing;

**(10)** Vehicle or any *covered equipment* that is mounted on or used solely with a vehicle;

(11) Dragline, excavation or construction equipment including any *covered equipment* that is mounted on or used solely with any one or more dragline(s), excavation or construction equipment;

(12) Felt, wire, screen, die, extrusion plate, swing hammer, grinding disc, cutting blade, nonelectrical cable, chain, belt, rope, clutch plate, brake pad, nonmetal part or tool subject to periodic replacement;

(13) Cyclotron used for other than medical purposes, satellite or spacecraft including any *covered equipment* mounted on or used solely with any satellite or spacecraft;

(14) Equipment manufactured by **you** for sale.

c. *Production machinery* is any machine or apparatus that processes, forms, cuts, shapes, grinds, or conveys raw materials, materials in process or finished products including any *covered equipment* that is mounted on or used solely with any one or more production machines or apparatus.

## D. *FLOOD*

1. **We** cover physical loss or damage to **covered property**, including TIME ELEMENT COVERAGES, TIME ELEMENT COVERAGES AND LIMITATIONS and PROPERTY DAMAGE COVERAGES AND LIMITATIONS as provided by this Policy, from a **covered loss** resulting from *FLOOD*.

2. *FLOOD* is:

a. Surface waters; rising waters; storm surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not;

b. Sewer back-up resulting from any of the foregoing; or

c. Mudslide or mudflow caused by or resulting from surface water, runoff or accumulation of water on or under the ground;

regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.

**Covered loss** from *FLOOD* associated with a storm or weather disturbance whether or not identified by name by any meteorological authority is considered to be *FLOOD* within the terms of this Policy. However, physical loss or damage from fire, explosion or sprinkler leakage caused by *FLOOD* will not be considered to be loss by *FLOOD* within the terms and conditions of this Policy.

## E. *NAMED STORM*

1. **We** cover physical loss or damage to **covered property**, including TIME ELEMENT COVERAGES, TIME ELEMENT COVERAGES AND LIMITATIONS and PROPERTY DAMAGE COVERAGES AND LIMITATIONS as provided by this Policy, from a **covered loss** resulting from a *NAMED STORM.* However, physical loss or damage caused by fire, explosion, sprinkler leakage or *FLOOD* will not be considered loss by *NAMED STORM* within the terms and conditions of this Policy.

2. **You** may elect when the time specified in the **OCCURRENCE** TIME SPECIFICATIONS begins.

*NAMED STORM* is any storm or weather disturbance that is named by the U. S. National Oceanic and Atmospheric Administration (NOAA) or the U. S. National Weather Service or the National Hurricane Center or any authorized meteorological authority in the country where the storm or weather disturbance happened.

# SECTION V - GENERAL POLICY CONDITIONS

**A.** ASSIGNMENT

**Your** assignment of this Policy will not be valid except with **our** written consent.

**B.** CANCELLATION

1. **You** may cancel this Policy by mailing or delivering to **us** advance written notice of cancellation.

2. **We** may cancel this Policy by mailing or delivering to **you** written notice of cancellation at least:

   a. ten (10) days before the effective date of cancellation if **we** cancel for nonpayment of premium; or

   b. thirty (30) days or the number of days specified in the CANCELLATION TIME SPECIFICATIONS, whichever is greater, before the effective date of cancellation if **we** cancel for any other reason.

3. **We** will mail or deliver **our** written notice of cancellation to **your** last mailing address known to **us**.

4. **Our** written notice of cancellation will state the effective date of cancellation and the Policy period will end on that date.

5. If this Policy is cancelled, **we** will send **you** any premium refund due. If **we** cancel, the refund will be pro rata. If **you** cancel, the refund may be less than pro rata. The cancellation will be effective even if **we** have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

This entire Policy is void, if with the actual intent to deceive

1. **You;**

2. **Your** representatives; or

3. Any insured;

commit fraud or conceal or misrepresent a fact or circumstance concerning:

   a. This Policy;

   b. The **covered property;**

   c. **Your** interest in the **covered property**; or

   d. A claim under this Policy.

**D.** CONFORMITY TO STATUTES

Any provisions required by law to be included in policies issued by **us** shall be deemed to have been included in this Policy.

If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy shall be read so as to eliminate such conflict or deemed to include such provisions for covered **locations** within such jurisdictions.

**E. INSPECTION**

1. During the period of this Policy, **we** will be permitted, but not obligated, to inspect the **covered property**. **Our** right to inspect, the performance of or failure to inspect, and any report arising out of an inspection will not constitute an undertaking or imply that the property is safe, healthful, or in compliance with laws, regulations, codes or standards.

2. This condition does not apply to any inspections, surveys, reports or recommendations **we** may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

   **We** will have no liability to **you** or others because of any inspection or failure to inspect, or on account of anyone's use or reliance upon any report or other information generated during the course of, or as a result of any inspection.

**F. LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS**

1. When specified in the Policy or in Certificates of Insurance on file with **us**, **we** cover loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear.

2. The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

   a. Any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

   b. Foreclosure, notice of sale, or similar proceedings with respect to the property, but only to the extent of a deficiency as provided by state law.

   c. Change in the title or ownership of the property.

   d. Change to a more hazardous occupancy.

   The Lender or Mortgagee will notify **us** of any known change in ownership, occupancy, or hazard and, within ten (10) days of **our** written request, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

3. If this Policy is cancelled at **your** request or by the request of **your** agent, the coverage for the interest of the Lender or Mortgagee will terminate ten (10) days after **we** send to the Lender or Mortgagee written notice of cancellation, unless:

   a. Sooner terminated by authorization, consent, approval, acceptance, or ratification of **your** action by the Lender or Mortgagee, or its agent.

   b. This Policy is replaced by **you**, with a Policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement Policy, notwithstanding any other provision of this Policy.

4. **We** may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice thirty (30) days or the number of days specified in the CANCELLATION TIME SPECIFICATIONS, whichever is greater, prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, **we** may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice ten (10) days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

5. If **we** pay the Lender or Mortgagee for any loss, and deny payment to the debtor, mortgagor or owner, **we** will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage. No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim. At **our** option, **we** may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to **us**, and the remaining debt or mortgage will be paid to **us**.

6. If **you** fail to render proof of loss, the Lender or Mortgagee, upon notice of **your** failure to do so, will render proof of loss within sixty (60) days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, COMPANY OPTION, and SUIT AGAINST THE COMPANY.

7. In the event of a claim, upon request by **us**, the Lender or Mortgagee will cooperate in any claim investigation.

8. In no event will the amount payable to a Lender or Mortgagee exceed the amount which would otherwise have been payable to **you**.

**G.** LIBERALIZATION

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute in any State or jurisdiction within the United States of America so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to **your** benefit within such jurisdiction, effective the date of the change specified in such statute.

**H.** NO REDUCTION BY LOSS

Except for those coverages written with an **annual aggregate** LIMIT OF LIABILITY, **we** cover a **covered loss** without reducing any other applicable LIMIT OF LIABILITY. The reinstatement of any exhausted **annual aggregate** is not permitted unless authorized by **us** in writing.

**I.** NONRENEWAL

1. If **we** decide not to renew this Policy, **we** will mail or deliver a written notice of nonrenewal to **you** at least sixty (60) days before the expiration date of this Policy. Notice will be sent to **your** last mailing address known to **us**. **We** will state the reason for nonrenewal.

2. Proof of mailing will be sufficient evidence of notice.

**J.** OTHER INSURANCE

1. **We** will not be liable if, at the time of loss or damage, there is any other insurance that would apply in the absence of this Policy; except that this Policy will apply only as excess or DIFFERENCE IN CONDITIONS / DIFFERENCE IN LIMITS and in no event as contributing insurance, and then only after all other insurance has been exhausted, notwithstanding paragraph **5.** below.

2. **We** will not be liable if, at the time of loss or damage, there is any insurance with the National Flood Insurance Program (NFIP), except that this Policy shall apply only as excess and in no event as contributing insurance, and then only after all NFIP insurance has been exhausted.

3. **We** will not be liable if, at the time of loss or damage, there is any insurance for the construction of new buildings and additions under a specific policy for the construction of such new buildings and additions, except that this Policy shall apply only as excess and in no event as contributing insurance, and then only after all specific insurance has been exhausted.

4. **We** will not be liable if, at the time of loss or damage, there is any insurance for stock under a specific policy for such stock, except that this Policy shall apply only as excess and in no event as contributing insurance, and then only after all specific insurance has been exhausted.

5. If this Policy is deemed by law to contribute to a loss with other insurance, **we** will pay only **our** proportionate share of the loss, up to the applicable LIMIT OF LIABILITY. **Our** share will be the proportion that the applicable LIMIT OF LIABILITY of this Policy bears to the total applicable LIMITS OF LIABILITY available from all insurance.

6. **You** are permitted to have other insurance over any LIMITS OF LIABILITY specified in this Policy.

7. The existence of such insurance will not reduce any LIMIT OF LIABILITY in this Policy.

8. To the extent this Policy replaces another Policy, coverage under this Policy shall not become effective until such other Policy has terminated.

9. **You** are permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only as excess and only after such other insurance has been exhausted.

**K.** PAIR, SET OR PARTS

In the event of a **covered loss** to an article that is part of a pair or set, **our** payment for that loss will be:

1. The cost to repair or replace any part to restore the pair or set to its value before the loss; or

2. The difference between the value of the pair or set before and after the loss.

In no event will the loss of part of a pair or set be regarded as a total loss of the pair or set.

**L.** POLICY MODIFICATION

This Policy contains all of the agreements between **you** and **us** concerning this insurance. **You** and **we** may request changes to this Policy. Only endorsements issued by **us** and made a part of this Policy can change this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not create a waiver or change any part of this Policy or prevent **us** from asserting any rights under the Policy.

**M.** TITLES

The titles of the paragraphs of this Policy and of any endorsements attached to it are only for reference. They do not affect the terms to which they relate.

**N.** TRANSFER OF RIGHTS AND DUTIES

**Your** rights and duties under this Policy may not be transferred without us giving written consent.

**O.** VACANCY

1. If any of **your real property** is vacant at the inception of this Policy, or becomes vacant, and remains vacant for more than sixty (60) consecutive days, during the Policy period, **you** must:

    a. Notify **us** in writing of the vacancy prior to loss or damage; and

    b. Maintain in complete working order the protective safeguards present prior to the vacancy. Protective safeguards include:

        (1) Automatic sprinkler systems;

       **(2)** Fire alarm systems;
       **(3)** Guard or watchman services;
       **(4)** Burglary systems; and
       **(5)** Monitoring systems.

**2.** If the above requirements are not met, then in addition to the other terms, conditions, limitations and exclusions in this Policy, **we** will:

  **a.** Not pay for any loss or damage caused by or resulting from any of the following:

       **(1)** Breakage of building glass;
       **(2)** Mold, mildew or fungus;
       **(3)** Sprinkler leakage, unless the system has been protected against freezing;
       **(4)** Theft or attempted theft;
       **(5)** Vandalism;
       **(6)** Malicious mischief; or
       **(7)** Water damage.

  **b.** Not pay under DEMOLITION AND INCREASED COST OF CONSTRUCTION;

  **c.** Value the loss or damage for the vacant **real property** (including any loss or damage to **personal property**) at the time of loss at the lesser of:

       **(1)** The **actual cash value**;
       **(2)** The actual cost to repair; or
       **(3)** The selling price, less all saved expenses, if it was being offered or listed for sale at the time of loss.

**3.** **Real property** is considered vacant when it does not contain sufficient property and personnel to conduct **your** customary business operations.

**4.** **Real property** is not considered vacant during its ongoing construction or renovation.

## P. VALUATION

**1.** Adjustment of the physical loss or damage amount under this Policy will be computed as of the date of loss or damage at the place of the loss or damage. Unless stated otherwise in a PROPERTY DAMAGE COVERAGE AND LIMITATION, adjustment of physical loss or damage to **covered property** will be subject to the following:

  **a.** On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

  **b.** On finished goods manufactured by **you**, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no physical loss or damage happened.

  **c.** On raw materials, supplies or merchandise not manufactured by **you**:

       **(1)** If repaired or replaced, **your** actual expenditure in repairing or replacing the damaged or destroyed property; or

       **(2)** If not repaired or replaced, the **actual cash value**.

  **d.** On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

**e.** On property that is:

**(1)** Damaged by fire that directly results from **terrorism** or nuclear reaction; and

**(2)** Is located in a jurisdiction that has a statute that expressly prohibits the exclusion of fire losses resulting from **terrorism** or nuclear reaction,

the **actual cash value** of the fire damage. Any remaining fire damage not attributable to **terrorism** or nuclear reaction shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy.

**f.** On computer equipment of others which **you** are required to insure for direct physical loss or damage while being installed, maintained or repaired, the cost to replace with new if so specified in the contract between **you** and **your** customer.

**g.** On Data, Programs and Software, the actual cost incurred to repair, replace or restore data, programs or software including the costs to recreate and research.

**h.** On **Fine Arts**, the loss amount will not exceed the lesser of the following:

**(1)** The cost to repair or restore such property to the physical condition that existed on the date of loss;

**(2)** The cost to replace; or

**(3)** The stated value on file with **us**.

**i.** On all other property, the lesser of the following:

**(1)** The cost to repair.

**(2)** The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

**(3)** The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

**(4)** The selling price of **real property** or machinery and equipment, other than stock, offered for sale on the date of loss.

**(5)** The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

**(6)** The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

**(7)** The unamortized value of improvements and betterments, if such property is not repaired or replaced at **your** expense.

**(8)** The **actual cash value** if such property is:

**(a)** Useless to **you**; or

**(b)** Not repaired, replaced or rebuilt on the same or another site within two (2) years from the date of loss, unless such time is extended by **us**.

2. **You** may elect not to repair or replace the **covered property** lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to **your** operations within two (2) years from the date of loss. As a condition of collecting under this provision, such expenditure must be unplanned as of the date of loss and be made at a covered **location** under this Policy. This provision does not extend to DEMOLITION AND INCREASED COST OF CONSTRUCTION or to property scheduled for demolition at the time of loss.

3. **We** will not pay more than **your** financial interest in the **covered property**.

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 103 of 166

# SECTION VI – LOSS CONDITIONS

**A.** ABANDONMENT OF PROPERTY

**You** may not abandon property to **us**.

**B.** APPRAISAL

1. If **you** and **we** fail to agree on the amount of a loss, either party may demand that the disputed amount be submitted for appraisal. A demand for appraisal will be made in writing within sixty (60) days after **our** receipt of proof of loss. Each party will then choose a competent and disinterested appraiser. Each party will notify the other of the identity of its appraiser within thirty (30) days of the written demand for appraisal.

2. The two (2) appraisers will choose a competent and disinterested umpire. If the appraisers are unable to agree on an umpire within fifteen (15) days, **you** or **we** may petition a judge of a court of record in the state where the **covered loss** occurred, to select an umpire.

3. The appraisers will then determine the amount of the loss or damage. If the appraisers submit a written report of an agreement to **you** and **us**, the amount they agree on will be the amount of **our** payment for the loss or damage. If the appraisers fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two (2) of these three (3) will determine the amount of loss or damage.

4. Each appraiser will be paid by the party that selects him or her. Other expenses of the appraisal and compensation of the umpire will be paid equally by **you** and **us**.

**C.** COLLECTION FROM OTHERS

**We** will reduce any payment to **you** for a **covered loss** to the extent **you** have collected for that loss from others.

**D.** COMPANY OPTION

1. In the event of **covered loss**, **we** may, at **our** option, either:

   a. Pay the value of **covered property** lost, damaged or destroyed as set forth in VALUATION above;

   b. Pay the cost of repairing or replacing the **covered property** lost, damaged or destroyed;

   c. Take all or any part of the **covered property** at any agreed valuation; or

   d. Repair, rebuild or replace the **covered property** with other property of like kind and quality.

2. **We** will give notice of **our** intentions within thirty (30) days after receiving the sworn statement of loss or as required by law.

**E.** DUTIES AFTER A LOSS

In case of loss **you** will:

1. Give **us** immediate written notice of the loss;

2. Give notice of such loss to the proper authorities if the loss may be due to a violation of the law;

3. As soon as possible, give **us** a description of the property involved and how, when and where the loss happened;

4. Take all reasonable steps to protect the **covered property** from further damage;

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 104 of 166

5. Promptly separate the damaged property from the undamaged property, and keep it in the best possible order for examination;

6. Furnish a complete inventory of the lost, damaged and destroyed property, showing in detail the quantity, and amount of loss claimed under the valuation provision of the Policy;

7. Keep an accurate record of all repair costs;

8. Keep all bills, receipts and related documents that establish the amount of loss;

9. As often as may reasonably be required:

   a. Permit **us** to inspect the damaged property and take samples for inspection, testing and analysis.

   b. Produce for inspection and copying, all of **your** books of account, business records, bills and invoices.

   c. Permit **us** to question, under oath, **you** and any of **your** agents, employees, or representatives involved in the purchase of this insurance or the preparation of **your** claim, including any public adjusters and any of their agents, employees or representatives, and verify **your** answers with a signed acknowledgment.

10. Submit to **us**, within ninety (90) days from the date of loss, unless **we** extend the time in writing, a signed, sworn Proof of Loss that states to the best of **your** knowledge and belief:

    The time and cause of the loss;

    a. **Your** interest and the interest of all others in the property involved;

    b. Any other policies of insurance that may provide coverage for the loss;

    c. Any changes in title or occupancy of the property during the Policy period; and

    d. The amount of **your** claimed loss.

    **You** shall also submit with the Proof of Loss:

    (1) A complete inventory of the lost, damaged and destroyed property, showing in detail the quantity, and amount of loss claimed as specified in the valuation provision of the Policy;

    (2) An accurate record(s) of all repair costs and all bills, receipts and related documents that establish the amount of the loss;

    (3) Specifications for any damaged building; and

    (4) Detailed estimates and invoices for the repair of any damage.

11. Cooperate with **us** in the investigation and adjustment of the loss.

## F. LOSS ADJUSTMENT / PAYABLE

Loss will be adjusted with the First Named Insured. **We** may, at **our** option, adjust the loss to property of others directly with the owner of the property. Such loss will be payable to the First Named Insured or as may be directed by the First Named Insured.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with **us**. When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance. The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

### G. PAYMENT OF LOSS

**We** will pay the insured loss within thirty (30) days after **we** receive and accept the signed, sworn Proof of Loss, if:

1. **You** have complied with all the terms of this Policy;

2. **We** have reached agreement with **you** on the amount of the loss, or

3. Within thirty (30) days of when an appraisal award is made as provided for in LOSS CONDITIONS **B. APPRAISAL.**

### H. SUBROGATION

1. If **we** make payment for a loss, **you** will assign to **us** all **your** rights of recovery against any party for that loss. **We** will not acquire any rights of recovery **you** have waived prior to the loss. **You** agree to cooperate and not to waive, prejudice, settle or compromise any claim against any party after the loss.

2. **You** will be paid any recovery, in the proportion that **your** deductible and any provable uninsured loss bears to the total loss less **your** proportion of fees and expenses.

### I. SUIT AGAINST THE COMPANY

No suit or other legal proceeding shall be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within two (2) years next after the inception of the loss.

# SECTION VII – DEFINITIONS

1. **Actual cash value**: The amount it would cost to repair or replace **covered property**, on the date of loss, with material of like kind and quality, with proper deduction for physical depreciation and obsolescence, but in no event more than the fair market value.

2. **Annual aggregate**: The maximum amount of loss or damage payable in any one (1) Policy year regardless of the number of **occurrences** within the same Policy year.

3. **Contaminant**: Any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

4. **Contamination**: Any condition of property that results from a **contaminant**.

5. **Covered loss**: A loss to **covered property** caused by direct physical loss or damage insured by this Policy.

6. **Covered property**: Property insured by this Policy.

7. **Electronic Data**: Information (including computer programs) stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, drives, **electronic data processing equipment** or any storage medium**.**

8. **Electronic data processing equipment:** Any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether **your** property or not.

9. **Fine Arts:** Property of rarity, historical value, antiquity or artistic merit, including paintings; etchings; pictures (including their negatives); tapestries; statuary; marbles; bronzes; antique jewelry; antique furniture; antique silver; rare books; porcelains; rare or art glassware; art glass windows; valuable rugs; bric-a-brac and porcelains

10. **Land improvements**: Landscape gardening, car parks, parking lots, pavement, roadways, sidewalks, walkways, railways or transformer enclosures; but does not include fill beneath such property, including buildings, structures or additions.

11. **Location(s)**:

    a. As specified in Appendix A – Schedule of Covered **Location(s)**;

    b. Listed on a SCHEDULE on file with **us;** or

    c. If not so specified in Appendix A – Schedule of Covered **Location(s)** or listed on a SCHEDULE on file with **us**, a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty (50) feet wide. Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

12. **Miscellaneous Unnamed Location**: A **location** owned, leased or rented by **you**, but not listed in a Schedule of **locations** on file with **us** or attached to this Policy.

    **Miscellaneous Unnamed Location** does not include:

    a. Newly Acquired **Locations**; or

    b. A **location** for which coverage is found elsewhere in this Policy including ERRORS AND OMISSIONS.

13. **Occurrence**: All loss or damage attributable directly or indirectly to one (1) cause or series of similar

causes. All such loss or damage will be added together and the total loss or damage will be treated as one (1) **occurrence.**

Unless otherwise amended by an endorsement attached to this Policy:

    **a.** All loss or damage resulting from a continuous *FLOOD* event, irrespective of the amount of time or area over which such loss or damage occurs, will be considered a single **occurrence.**

    **b.** All loss or damage from *EARTH MOVEMENT* or *NAMED STORM* within the time specified in the **OCCURRENCE** TIME SPECIFICATIONS will be considered a single **occurrence.**

**14. Ordinary payroll**: Payroll expenses for all of **your** employees except officers, executives, department managers, employees under contract, and other important professional employees. Payroll expenses include the payroll, employee benefits (if directly related to payroll), FICA payments, Union dues and Workers' Compensation premiums **you** pay.

**15. Personal Property: Your** tangible things, other than **real property** owned by **you** and used in **your** business, including:

    **a.** Furniture, fixtures, machinery, **electronic data processing equipment** and stock;

    **b.** Materials, supplies, machinery, equipment and fixtures, including those that are *personal property of others*, which are intended by **you** for use in construction of new additions and buildings at an existing covered **location**, that **you** begin to construct during the Policy period and intend to own or occupy once constructed, while located on the construction site awaiting use in construction.

    **c.** Property, other than **real property**, **you** lease for use in **your** business that **you** have a responsibility to insure;

    **d. Your** interest in improvements and betterments **you** have made in buildings **you** do not own;

    **e. Your valuable papers and records**.

**16. Real Property**: Building(s) and any other structure, including:

    **a.** New buildings and additions under construction, in which **you** have an insurable interest;

    **b.** Completed additions, extensions or permanent fixtures;

    **c.** Machinery and equipment used to service the buildings;

    **d.** Yard Fixtures.

**17. Terrorism**: Activities against persons, organizations or property of any nature:

    **a.** That involve the following or preparation for the following:

        **(1)** Use or threat of force or violence; or

        **(2)** Commission or threat of a dangerous act; or

        **(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

    **b.** When one or both of the following applies:

**(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

18. **Valuable papers and records**: Written or printed documents or records including books, maps, negatives, drawings, abstracts, deeds, mortgages and manuscripts.

19. **We, us** and **our(s)**: The company issuing this Policy, as shown on the Declarations.

20. **You** and **your(s)**: The First Named Insured shown on the Declarations.

# <u>APPENDIX A</u> - SCHEDULE OF COVERED LOCATIONS

1.1 441 Lexington Ave New York New York 10017
2.1 1114 Avenue of The America's New York New York 10016
3.1 26 Little West 12th St New York New York 10014
4.1 1580 East Buena Vista Dr Orlando Florida 32830
5.1 9 West Kinzie St Chicago Illinois 60654
6.1 930 Hilgard Ave Los Angeles California 90024
7.1 1075 Peachtree St NE Atlanta Georgia 30309
8.1 3708 Las Vegas Blvd Las Vegas Nevada 89109
9.1 2305 Collins Ave Miami Beach Florida 33139
10.1 600 F St San Diego California 92101
11.1 1550 Market St Denver Colorado 80202
12.1 1624 Market St Denver Colorado 80202
13.1 700 12th Ave South Nashville Tennessee 37203
14.1 435 Bridge St NW Huntsville Alabama 35806
15.1 7014 E Camelback Rd Scottsdale Arizona 85251
16.1 2224 E Williams Field Rd Gilbert Arizona 85295
17.1 3000 East 1st Ave Denver Colorado 80206
18.1 4134 W Boy Scout Blvd Tampa Florida 33607
19.1 150 University Town Center Dr Sarasota Florida 34243
20.1 5100 Avalon Blvd Alpharetta Georgia 30009
21.1 3573 E Longwing Lane Meridian Idaho 83646
22.1 3051 Butterfield Rd Oak Brook Illinois 60523
23.1 14395 Clay Terrace Dr Carmel Indiana 46032
24.1 One East Pratt St Baltimore Maryland 21202
25.1 30 E Big Beaver Rd Troy Michigan 48083
26.1 11997 Singletree Lane Eden Prairie Minnesota 55344
27.1 12235 Wayzata Blvd Minnetonka Minnesota 55305
28.1 444 Ward Pkwy Kansas City Missouri 64112
29.1 295 N 170th St Omaha Nebraska 68118
30.1 511 US Hwy 1 South Iselin New Jersey 08830
31.1 750 S Rampart Blvd Las Vegas Nevada 89145
32.1 7524 Gibson St Liberty Township Ohio 45069
33.1 15900 LaCantera Pkwy San Antonio Texas 78256
34.1 8687 North Central Expressway Dallas Texas 78256
35.1 88889 Gateway Blvd El Paso Texas 79925
36.1 5973 W Parker Rd Plano Texas 75093
37.1 7400 San Pedro Ave San Antonio Texas 78216

## <u>APPENDIX B</u> - NEW MADRID EARTH MOVEMENT ZONES

| STATE | ZONE | COUNTIES / PARISHES / INDEPENDENT CITIES |
|---|---|---|
| ARKANSAS | 1 | Clay, Craighead, Crittenden, Cross, Green, Independence, Jackson, Lawrence, Lee, Mississippi, Monroe, Phillips, Poinsett, Randolph, St. Francis, White, Woodruff |
| ARKANSAS | 2 | Arkansas, Fulton, Izard, Lonoke, Prairie, Sharp, |
| ILLINOIS | 1 | Alexander, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jefferson, Johnson, Massac, Perry, Pope, Pulaski, Randolph, Saline, Union, Washington, Williamson |
| ILLINOIS | 2 | Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Jasper, Lawrence, Madison, Marion, Monroe, Richland, Saint Clair, Wabash, Wayne, White |
| INDIANA | 2 | Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick |
| KENTUCKY | 1 | Ballard, Calloway, Carlisle, Crittenden, Fulton, Graves, Hickman, Livingston, Lyon, Marshall, McCracken, |
| KENTUCKY | 2 | Caldwell, Christian, Daviess, Henderson, Hopkins, McLean, Muhlenberg, Todd, Trigg, Union, Webster |
| MISSISSIPPI | 1 | DeSoto, Marshall, Tate, Tunica |
| MISSISSIPPI | 2 | Alcorn, Benton, Coahoma, Lafayette, Panola, Quitman, Tippah |
| MISSOURI | 1 | Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Madison, Mississippi, New Madrid, Pemiscott, Perry, Ripley, Scott, Stoddard, Wayne |
| MISSOURI | 2 | Independent City of St. Louis, Iron, Jefferson, Oregon, Reynolds, Shannon, St. Francois, St. Louis, Ste. Genevieve, Washington |
| TENNESSEE | 1 | Benton, Carroll, Chester, Crockett, Dyer, Fayette, Gibson, Hardeman, Haywood, Henderson, Henry, Lake, Lauderdale, Madison, Obion, Shelby, Tipton, Weakley |
| TENNESSEE | 2 | Decatur, Hardin, Houston, Humphreys, McNairy, Montgomery, Perry, Stewart, |

## <u>APPENDIX C</u> - PACIFIC NORTHWEST *EARTH MOVEMENT* ZONE

| REGION / STATE | COUNTIES / COORDINATES |
|---|---|
| CANADA: BRITISH COLUMBIA and VANCOUVER ISLAND | South of 50° N latitude and west of 120° W longitude |
| OREGON | Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill |
| WASHINGTON | Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom |

# APPENDIX D - *NAMED STORM* TIERS FOR USA INCLUDING ITS COMMONWEALTHS AND TERRITORIES

## SOUTHERN TIER ONE: NORTH CAROLINA TO TEXAS

| STATE | COUNTIES / PARISHES / INDEPENDENT CITIES |
|---|---|
| Alabama | Baldwin, Mobile |
| Florida | Entire State |
| Georgia | Brantly, Bryan, Camden, Chatham, Charlton, Effingham, Glynn, Liberty, Long, McIntosh, Pierce, Wayne |
| Louisiana | Acadia, Ascension, Assumption, Calcasieu, Cameron, East Baton Rouge, East Feliciana, Iberia, Iberville, Jefferson, Jefferson Davis, Lafayette, Lafourche, Livingston, Orleans, Plaquemines, Pointe Coupee, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Martin, St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion, Washington, West Baton Rouge |
| Mississippi | George, Hancock, Harrison, Jackson, Pearl River, Stone |
| North Carolina | Beaufort, Bertie, Bladen, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Duplin, Gates, Hertford, Hyde, Jones, Lenoir, Martin, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Pitt, Tyrrell, Washington, Wayne |
| South Carolina | Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Horry, Jasper, Williamsburg |
| Texas | Aransas, Bee, Brazoria, Brooks, Calhoun, Cameron, Chambers, Fort Bend, Galveston, Goliad, Hardin, Harris, Hidalgo, Jackson, Jasper, Jefferson, Jim Wells, Kenedy, Kleberg, Liberty, Matagorda, Nueces, Orange, Refugio, San Patricio, Victoria, Wharton, Willacy |

## NAMED STORM TIERS FOR USA INCLUDING ITS COMMONWEALTHS AND TERRITORIES

### NORTHERN TIER ONE: VIRGINIA TO MAINE

| STATE | COUNTIES / PARISHES / INDEPENDENT CITIES |
|---|---|
| Connecticut | Fairfield, Middlesex, New Haven, New London |
| Delaware | Sussex |
| Maine | Cumberland, Hancock, Knox, Lincoln, Penobscot, Sagadahoc, Waldo, Washington, York |
| Maryland | Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico, Worcester |
| Massachusetts | Barnstable, Bristol, Dukes, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk |
| New Hampshire | Rockingham |
| New Jersey | Atlantic, Bergen, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Union |
| New York | Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk |
| Rhode Island | Bristol, Newport, Washington |
| Virginia | Accomack, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York |
| | Independent Cities: Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg |

### SOUTHERN TIER TWO: NORTH CAROLINA TO TEXAS

| STATE | COUNTIES / PARISHES / INDEPENDENT CITIES |
|---|---|
| Alabama | Clarke, Coffee, Conecuh, Covington, Dale, Escambia, Geneva, Houston, Monroe, Washington |
| Louisiana | Allen, Avoyelles, Beauregard, Evangeline, St. Helena, St. Landry, West Feliciana |
| Mississippi | Forrest, Greene, Jones, Lamar, Marion, Perry, Pike, Walthall, Wayne |
| North Carolina | Cumberland, Edgecombe, Greene, Johnston, Robeson, Sampson, Wilson |
| South Carolina | Bamberg, Calhoun, Clarendon, Dillon, Florence, Hampton, Marion, Orangeburg |
| Texas | Austin, Brazos, Colorado, De Witt, Duval, Fayette, Gonzales, Grimes, Jim Hogg, Karnes, Lavaca, Live Oak, McMullen, Montgomery, Newton, Polk, San Jacinto, Starr, Tyler, Walker, Waller, Washington |

## NAMED STORM TIERS FOR USA INCLUDING
## ITS COMMONWEALTHS AND TERRITORIES

| Other States, Commonwealths and Territories of The United States of America | | |
|---|---|---|
| | TIER | |
| AMERICAN SAMOA | 2 | Entire Territory |
| GUAM | 1 | Entire Territory |
| HAWAII | 1 | Entire State |
| NORTHERN MARIANA ISLANDS | 1 | Entire Commonwealth |
| PUERTO RICO | 1 | Entire Commonwealth |
| U.S. VIRGIN ISLANDS | 1 | Entire Territory |
| All other US Territories and Possessions | 1 | Entire Territory |

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 115 of 166

# APPENDIX E - *FLOOD* HAZARD **LOCATIONS**

High Hazard **Location(s)**
3.1 26 Little West 12th St New York, New York 10014
4.1 1580 East Buena Vista Dr Orlando, Florida 32830
9.1 2305 Collins Ave Miami Beach, Florida 33139
22.1 3051 Butterfield Rd Oak Brook, Illinois 60523
23.1 14395 Clay Terrace Dr Carmel, Indiana 46032
24.1 One East Pratt St Baltimore, Maryland 21202
25.1 30 E Big Beaver Rd Troy, Michigan 48083
33.1 15900 LaCantera Pkwy San Antonio, Texas 78256

Moderate Hazard **Location(s)**
15.1 7014 E Camelback Rd Scottsdale, Arizona 85251
16.1 2224 E Williams Field Rd Gilbert, Arizona 85295
17.1 3000 East 1st Ave Denver, Colorado 80206
19.1 150 University Town Center Dr Sarasota, Florida 34243
28.1 444 Ward Pkwy Kansas City, Missouri 64112

# FORMS AND ENDORSEMENTS

Form(s) and Endorsement(s) made a part of this Policy at time of issue:

| Form or Endorsement Number | Form or Endorsement Name |
|---|---|
| CNP 90 06 01 17 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| CNI 90 11 07 18 | Reporting a Commercial Claim 24 Hours a Day |
| SNI 31 01 07 13 | New York Hazardous Materials Notice |
| EN4231 01-04 | Notice to Policyholder |
| SNI 90 01 12 18 | Policyholder Notice - Company Contact Information |
| SNI 24 01 11 18 | Missouri Notice to Policyholders |
| SNP 42 02 07 13 | Texas Period To File A Claim Or Bring Legal Action Against Us Notice - Wind Or Hail - Catastrophe Area |
| PY 04 03 01 17 | Cap on Losses From Certified Acts of Terrorism |
| PY 03 04 01 17 | Lock and Key Replacement Endorsement |
| PY 03 12 01 17 | Reward Coverage Endorsement |
| IC0018 01-04 | Countersignature Endorsement - FL |
| IC 00 19 01 04 | Countersignature Endorsement - NV |

# STATE AMENDATORY ENDORSEMENTS

| Endorsement Number | Endorsement Name |
| --- | --- |
| PY 01 01 01 17 | Alabama Changes |
| PY 01 03 01 17 | Arizona Changes |
| PY 01 05 01 17 | California Changes |
| PY 01 07 01 17 | Florida Changes |
| PY 01 08 01 17 | Georgia Changes |
| PY 01 10 01 17 | Illinois Changes |
| PY 01 43 08 17 | Indiana Changes |
| PY 01 14 01 17 | Maryland Changes |
| PY 01 15 09 17 | Michigan Changes |
| PY 01 16 01 17 | Minnesota Changes |
| PY 01 18 01 17 | Missouri Changes |
| PY 01 20 01 17 | Nebraska Changes |
| PY 01 21 01 17 | Nevada Changes |
| PY 01 23 01 17 | New Jersey Changes |
| PY 01 24 05 18 | New York Changes |
| PY 02 34 01 17 | New York Changes - Cancellation and Nonrenewal |
| PY 01 27 01 17 | Ohio Changes |
| PY 01 33 01 17 | Texas Changes |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

This endorsement modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Cap On Certified Terrorism Losses

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and **we** have met **our** insurer deductible under the Terrorism Risk Insurance Act, **we** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** Application Of Exclusions

The terms and limitations of SECTION **II.C.** EXCLUSIONS, **2.a.** do not serve to create coverage for any loss which would otherwise be excluded under this endorsement or the Policy, such as losses excluded under SECTION **II.C.** EXCLUSIONS, **2. b., c., d.,** or **e.**

Case 1:22-cv-00285-JLT-BAC Document 32 Filed 05/02/22 Page 119 of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**LOCK AND KEY REPLACEMENT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** **We** provide the following PROPERTY DAMAGE COVERAGE AND LIMITATION for a **covered loss** as specified in the LIMITS OF LIABILITY Table in the Declarations, subject to the terms, conditions and exclusions of this Policy:

LOCK AND KEY REPLACEMENT

When a master key or grand master key is lost or damaged from a **covered loss**, **we** cover the lesser of:

**a.**  The actual cost to replace keys;

**b.**  The cost to rekey or reprogram the current locks to accept new keys; or

**c.**  New locks including the installation and reprogramming of the new locks.

All other terms and conditions remain unchanged.

Case 4:22-cv-00285-BP   Document 1-1   Filed 05/02/22   Page 120 of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**REWARD COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** **We** provide the following PROPERTY DAMAGE COVERAGE AND LIMITATION for a **covered loss** as specified in the LIMITS OF LIABILITY Table in the Schedule of this endorsement, subject to the terms, conditions and exclusions of this Policy:

REWARD COVERAGE

**1.** **We** will reimburse **you** for amounts **you** pay for information leading to the conviction of any person(s) responsible for a **covered loss** of arson, theft or vandalism provided:

    **a.** The individual(s) report(s) the suspected individual or individuals to local law enforcement officials;

    **b.** The individual or individuals responsible for the **covered loss** confesses and/or pleads guilty without going to trial; and

    **c.** The informant is not implicated in the arson, theft or vandalism.

**2.** **Our** payment of this reward will not be increased by:

    **a.** The number of individuals reporting the individual or individuals responsible for the **covered loss**;

    **b.** The number of individual or individuals involved in the **covered loss**; or

    **c.** The number of **covered losses**.

**3.** No deductible applies to this PROPERTY DAMAGE COVERAGE AND LIMITATION.

All other terms and conditions remain unchanged.

Schedule

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| REWARD COVERAGE | $25,000 |

Policy number  YAC-L9L-471218-019

This endorsement is effective  12/10/2019 and will terminate with the policy.  It is issued by the company designated in the Declarations.  All other provisions of the policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## COUNTERSIGNATURE ENDORSEMENT

This endorsement is effective at the inception of the policy and attaches to and forms a part of this policy.

| Type of Insurance | State |
|---|---|
| PREMIER PROPERTY PROTECTOR™ | Florida |

Signed by _____
Countersigning Agent

Policy number  YAC-L9L-471218-019

This endorsement is effective  12/10/2019 and will terminate with the policy.  It is issued by the company designated in the Declarations.  All other provisions of the policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## COUNTERSIGNATURE ENDORSEMENT

This endorsement is effective at the inception of the policy and attaches to and forms a part of this policy.

| Type of Insurance | State |
|---|---|
| PREMIER PROPERTY PROTECTOR™ | Nevada |

Signed by 

Countersigning Agent

IC0019 01-04

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ALABAMA CHANGES**

This endorsement applies only to **covered property** located in Alabama and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** The following is added to SECTION II – PROPERTY DAMAGE, **C.2** EXCLUSIONS:

  **k.** Any act committed by **you** or at **your** direction, by others, which is intended to cause loss or damage. This exclusion will not apply to deny coverage to an innocent additional named insured or additional insured who did not cooperate in or contribute to the creation of the loss, provided it is a **covered loss**, and the loss arose out of an act of domestic abuse. Such coverage will be provided only if the innocent additional named insured or additional insured provides evidence to **us** that the loss is related to the act of domestic abuse and:

   **(1)** Files and does not voluntarily dismiss a complaint against the abuser under the Protection From Abuse Act;

   **(2)** Seeks a warrant for the abuser's arrest and pledges to cooperate in any criminal prosecution of the abuser who committed the act causing the loss or damage.

   **Our** payment for a **covered loss** to the innocent additional named insured or additional insured is limited to that insured's insurable interest in the **covered property** as reduced by any payment to a mortgagee or other secured interest. In no event will **we** pay more than the applicable LIMIT OF LIABILITY.

**B.** The following is added to SECTION V - GENERAL POLICY CONDITIONS:

  INCREASE IN PREMIUM

  If **we** increase **your** renewal premium, **we** will mail or deliver to **you** written notice of **our** intent to increase the premium at least thirty (30) days before the effective date of the premium increase.

  Any notice of renewal premium increase will be mailed or delivered to **your** last known address.  If notice is mailed, it will be by registered or first class mail.  Proof of mailing will be sufficient proof of notice.

**C.** The following is added to SECTION VI – LOSS CONDITIONS, **H.** SUBROGATION:

  **3.** If **we** pay an additional named insured or additional insured for loss arising out of an act of domestic abuse by another insured, the rights of the additional named insured or additional insured, who did not cooperate in or contribute to the creation of the loss, to recover damages from the perpetrator of domestic abuse are transferred to **us** to the extent of **our** payment. Following the loss, the additional named insured or additional insured who did not cooperate in or contribute to the loss may not waive such rights to recover against the perpetrator of domestic abuse.

© 2016 Liberty Mutual Insurance
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**D.** Paragraph **1.** of SECTION VII - DEFINITIONS is replaced with the following:

    **1.** **Actual cash value**: The amount it would cost to repair or replace **covered property**, at the time of the loss at the **location** where the loss happened, with material of like kind and quality and used for the same purpose, subject to a deduction for depreciation. However, if the **covered property** is a residential property that, at the time of loss or damage, has nominal or no economic value, or a value disproportionate to replacement cost less depreciation, the determination of **actual cash value** as set forth herein is not required. **Actual cash value** applies to valuation of **covered property** regardless of whether that property has sustained partial or total loss or damage. The **actual cash value** of **covered property** may be significantly less than its replacement cost.

All other terms and conditions remain unchanged.

**PY 01 01 01 17**      © 2016 Liberty Mutual Insurance      Page 2 of 2

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Case 4:22-cv-00285-BP Document 31 Filed 05/02/22 Page 125 of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ARIZONA CHANGES**

This endorsement applies only to **covered property** located in Arizona and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.**  The following is added to SECTION II – PROPERTY DAMAGE, **C.2.** EXCLUSIONS:

    **k.**  Any act committed by **you** or at **your** direction, by others, which is intended to cause loss or damage. This exclusion will not apply to deny coverage to an innocent additional named insured or additional insured who did not cooperate in or contribute to the creation of the loss, provided it is a **covered loss**, and the loss arose out of an act of domestic violence. Coverage will be provided only if the innocent additional named insured or additional insured pledges to cooperate in any criminal prosecution of the abuser who committed the act causing the loss or damage.

    **Our** payment for a **covered loss** to the innocent additional named insured or additional insured is limited to that insured's insurable interest in the **covered property** as reduced by any payment to a mortgagee or other secured interest. In no event will **we** pay more than the applicable LIMIT OF LIABILITY.

**B.**  Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

    **C.**  CONCEALMENT, MISREPRESENTATION OR FRAUD

    **We** will not pay for any loss or damage in any case involving misrepresentations, omissions, concealment of facts or incorrect statements:

    **1.**  That are fraudulent;

    **2.**  That are material either to the acceptance of the risk, or to the hazard assumed by **us**; and

    **3.**  Where, if the true facts had been known to **us** as required either by the application for the Policy or otherwise, **we** in good faith would either:

        **a.**  Not have issued the Policy;

        **b.**  Not have issued the Policy in as large an amount; or

        **c.**  Not have provided coverage with respect to the hazard resulting in the loss.

**C.**  The following is added to SECTION VI – LOSS CONDITIONS, **H.** SUBROGATION:

    **3.**  If **we** pay an additional named insured or additional insured for loss arising out of an act of domestic violence by another insured, the rights of the additional named insured or additional insured, who did not cooperate in or contribute to the creation of the loss, to recover damages from the perpetrator of domestic violence are transferred to **us** to the extent of **our** payment.  Following the loss, the additional named insured or additional insured who did not cooperate in or contribute to the loss may not waive such rights to recover against the perpetrator of domestic violence.

All other terms and conditions remain unchanged.

Case 4:22-cv-00286-BRM Document 24 Filed 05/02/22 Page 126 of 166

Policy Number   YAC-L9L-471218-019
Issued by       Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CALIFORNIA CHANGES**

This endorsement applies only to **covered property** located in California and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **H.** JURISDICTION of SECTION I -- DECLARATIONS is replaced by the following:

**H.** JURISDICTION

Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

1. If a **covered loss** is caused by or results from fire, **we** will not cover the resulting loss or damage if, with the actual intent to deceive, **you** commit fraud or intentionally conceal or misrepresent any material fact or circumstance, whether before or after the loss, concerning:

   **a.** This Policy;

   **b.** The **covered property**;

   **c.** **Your** interest in the **covered property**; or

   **d.** A claim under this Policy.

2. If a **covered loss** is caused by or results from other than fire, this entire Policy is immediately void if, with the actual intent to deceive, **you, your** representative or any insured commit fraud or intentionally conceal or misrepresent any material fact or circumstance, whether before or after the loss, concerning:

   **a.** This Policy;

   **b.** The **covered property**;

   **c.** **Your** interest in the **covered property**; or

   **d.** A claim under this Policy.

**C.** Paragraph **B.** APPRAISAL of SECTION VI – LOSS CONDITIONS is replaced by the following:

**B.** APPRAISAL

1. If **you** fail to agree with **us** on the value of the **covered property** or the amount of a loss, either party may demand that the disputed amount be submitted for appraisal. A demand for appraisal will be made in writing within sixty (60) days after **our** receipt of proof of loss. Each party will then choose a competent and disinterested appraiser.  Each party will notify the other of the identity of its appraiser within twenty (20) days of the written demand for appraisal.

Including copyrighted material of Insurance Services Office, Inc. with its permission.

2. The two (2) appraisers will choose a competent and disinterested umpire. If the appraisers are unable to agree on an umpire within fifteen (15) days, **you** or **we** may petition a judge of a court of record in the state where the **covered loss** happened, to select an umpire.

3. The appraisers will then determine the value of the **covered property** and the amount of the loss or damage. If the appraisers submit a written report of an agreement to **you** and **us**, the amount they agree on will be the amount of **our** payment for the loss or damage. If the appraisers fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will determine the amount of loss or damage.

4. Each appraiser will be paid by the party that selects him or her. Other expenses of the appraisal and compensation of the umpire will be paid equally by **you** and **us**.

All other terms and conditions remain unchanged.

Case 4:22-cv-00286-DPM Includes copyrighted material of Insurance Services Office, Inc., with its permission. Filed 05/02/23 Page 129 of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**FLORIDA CHANGES**

This endorsement applies only to **covered property** located in Florida and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **H.** JURISDICTION of SECTION I – DECLARATIONS is replaced by the following:

   **H.   JURISDICTION**

   Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** Exclusion **2.a.** (**terrorism**) in paragraph **C.** EXCLUSIONS of SECTION II – PROPERTY DAMAGE is deleted.

**C.** The definition of *EARTH MOVEMENT* in SECTION IV – DESCRIBED LOSSES is replaced by the following:

   **3.**   *EARTH MOVEMENT* is:

      Earthquake, landslide, subsidence or sinking, rising or shifting of the earth, *sinkhole* collapse, avalanche, whether natural or man-made, or volcanic eruption; regardless of any other cause or event contributing concurrently or in any other sequence of loss. *Catastrophic ground cover collapse* will not be considered *EARTH MOVEMENT* within the terms and conditions of this Policy.

      However, physical loss or damage from fire, explosion, sprinkler leakage or *FLOOD* caused by *EARTH MOVEMENT* will not be considered to be loss by *EARTH MOVEMENT* within the terms and conditions of this Policy.

**D.** Paragraph **G.** PAYMENT OF LOSS of  SECTION VI – LOSS CONDITIONS is replaced by the following:

   **G.   PAYMENT OF LOSS**

      **We** will pay the insured loss within twenty (20) days after **we** receive and accept the signed, sworn Proof of Loss, if:

      **1.**   **You** have complied with all the terms of this Policy;

      **2.**   **We** have reached agreement with **you** on the amount of the loss, or

      **3.**   An appraisal award is made as provided for in  SECTION VI – LOSS CONDITIONS, **B.** APPRAISAL.

**E.** Paragraph **I.** SUIT AGAINST THE COMPANY of SECTION VI – LOSS CONDITIONS is replaced by the following:

   **I.    SUIT AGAINST THE COMPANY**

      No suit or other legal proceeding shall be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within five (5) years next after the inception of the loss.

Case 1:22-cv-00286-JB-N   Document 1-2   Filed 05/02/22   Page 129 of 166

**F.** The following is added to SECTION VI – LOSS CONDITIONS, **E.** DUTIES AFTER A LOSS:

A claim, supplemental claim or reopened claim for loss or damage caused by hurricane or other windstorm is barred unless notice of claim is given to **us** in accordance with the terms of this Policy within three (3) years after the hurricane first made landfall or a windstorm other than hurricane caused the **covered loss**.

**G.** The following is added to SECTION VI – LOSS CONDITIONS, **F.** LOSS ADJUSTMENT / PAYABLE:

*Sinkhole Loss*

Upon receipt of a claim for a *sinkhole loss*, **we** shall adhere to the following standards when investigating a claim:

1. Inspect **your location** to determine if there is *structural damage* that may be the result of *sinkhole activity*.

2. If **we** confirm that *structural damage* exists but are unable to identify a valid cause of such damage or discover that such damage is consistent with *sinkhole loss*, **we** shall engage a *professional engineer* or a *professional geologist* to conduct testing as provided in s.627.7072 to determine the cause of the loss within a reasonable professional probability and issue a report as provided in s.627.7073, only if *sinkhole loss* is covered under this Policy. Except as provided in subsections **4.** and **6.** below, the fees and costs of the *professional engineer* or *professional geologist* shall be paid by **us**.

3. Following the initial inspection of **your location**, **we** shall provide written notice to **you** disclosing the following information:

   **a.** What **we** have determined to be the cause of damage, if **we** have made such a determination.

   **b.** A statement of the circumstances under which **we** are required to engage a *professional engineer* or a *professional geologist* to verify or eliminate *sinkhole loss* and to engage a *professional engineer* to make recommendations regarding land and building stabilization and foundation repair.

   **c.** A statement regarding **your** right to request testing by a *professional engineer* or a *professional geologist*, the circumstances under which **you** may demand certain testing, and the circumstances under which **you** may incur costs associated with testing.

4. **a.** If coverage for *sinkhole loss* is available and **we** deny the claim without performing testing under s.627.7072, **you** may demand testing by **us** under s.627.7072.

   **(i)** **Your** demand for testing must be communicated to **us** in writing within sixty (60) days after **you** receive **our** denial of the claim.

   **(ii)** **You** shall pay fifty (50) percent of the actual costs of the analyses and services provided under s.627.7072 and s.627.7073 or $2,500, whichever is less.

   **b.** **We** shall reimburse **you** for the costs if **our** engineer or geologist provides written certification pursuant to s.627.7073 that there is *sinkhole loss*.

5. If a *sinkhole loss* is verified, **we** shall pay to stabilize the land and building and repair the foundation in accordance with the recommendations of the *professional engineer* retained pursuant to subsection **2.** above, with notice to **you**, subject to the terms and conditions of this Policy. **We** shall pay for other repairs to the structure and contents in accordance with the terms of this Policy. If a covered building suffers a *sinkhole loss* or a *catastrophic ground cover collapse*, **you** must repair such damage or loss in accordance with **our** *professional engineer*'s recommended repairs. However, if **our** *professional engineer* determines that the repair cannot be completed within the LIMITS OF LIABILITY of this Policy, **we** will pay to complete the repairs recommended by **our** *professional engineer* or tender the LIMITS OF LIABILITY of this Policy to **you**.

© 2016 Liberty Mutual Insurance

Case 4:22-cv-00285 Electronically Filed 05/02/22 in its entirety

a. **We** may limit **our** total claims payment to the **actual cash value** of the *sinkhole loss*, which does not include underpinning or grouting or any other repair technique performed below the existing foundation of the building, until **you** enter into a contract for the performance of building stabilization or foundation repairs in accordance with the recommendations set forth in **our** report issued pursuant to s.627.7073.

b. In order to prevent additional damage to the building or structure, **you** must enter into a contract for the performance of building stabilization and foundation repairs within ninety (90) days after **we** confirm coverage for the *sinkhole loss* and notify **you** of such confirmation. This time period is tolled if either party invokes the *neutral evaluation* process, and begins again ten (10) days after the conclusion of the *neutral evaluation* process.

c. After **you** enter into the contract for the performance of building stabilization and foundation repairs, **we** shall pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred. **We** may not require **you** to advance payment for such repairs.

d. The stabilization and all other repairs to the structure and contents must be completed within twelve (12) months after entering into the contract for repairs described in subparagraph b. above unless:

   (i) There is mutual agreement between **us** and **you**;

   (ii) The claim is involved with the *neutral evaluation* process;

   (iii) The claim is in litigation; or

   (iv) The claim is under appraisal or mediation.

e. Upon **our** obtaining the written approval of any lienholder, **we** may make payment directly to the persons selected by **you** to perform the land and building stabilization and foundation repairs. The decision by **us** to make payments to such persons does not hold **us** liable for the work performed. **You** may not accept a rebate from any person performing the repairs specified in this section. If **you** do receive a rebate, coverage is void and **you** must refund the amount of the rebate to **us**. Any person making the repairs specified in this section who offers a rebate commits insurance fraud punishable as a third degree felony as provided in s.775.082, s.775.083 or s.775.084.

6. If **we** obtain, pursuant to s.627.7073, written certification that there is no *sinkhole loss* or that the cause of the damage was not *sinkhole activity*, and if **you** have submitted the *sinkhole* claim without good faith grounds for submitting such claim, **you** shall reimburse **us** for fifty (50) percent of the actual costs of the analyses and services provided under ss.627.7072 and 627.7073; however, **you** are not required to reimburse **us** more than $2,500 with respect to any claim. **You** are required to pay reimbursement only if **you** requested the analyses and services provided under ss.627.7072 and 627.7073 and **we**, before ordering the analysis under s.627.7072, inform **you** in writing of **your** potential liability for reimbursement and give **you** the opportunity to withdraw the claim.

7. **We** will not nonrenew this Policy on the basis of filing claims for *sinkhole loss* if the total of such payments does not equal or exceed the applicable LIMITS OF LIABILITY for this Policy in effect on the date of loss, for property damage to the covered **location(s)**, as shown on the Declarations Page, or if **you** repaired the structure in accordance with the engineering recommendations made pursuant to subsection **2.** above upon which any payment or Policy proceeds were based. If **we** pay such limits for *sinkhole loss*, **we** may nonrenew this Policy.

8. **We** may engage a professional structural engineer to make recommendations as to the repair of the structure.

9. *Catastrophic ground cover collapse* is geological activity that results in all of the following:

   a. The abrupt collapse of the ground cover;

   b. A depression in the ground cover clearly visible to the naked eye;

c. *Structural damage* to the covered building, including the foundation; and

d. The covered building being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

Contents coverage applies if there is a loss resulting from a *catastrophic ground cover collapse*. *Structural damage* consisting merely of the settling or cracking of a foundation, structure or building does not constitute a loss resulting from a *catastrophic ground cover collapse*.

10. *Neutral evaluation* is the alternative dispute resolution provided in s.627.7074.

11. *Neutral evaluator* is a *professional engineer* or a *professional geologist* who has completed a course of study in alternative dispute resolution designed or approved by the Department of Financial Services for use in the *neutral evaluation* process and who is determined by the Department of Financial Services to be fair and impartial, and may not otherwise be ineligible for certification as provided under 627.7074.

12. *Primary structural member* is a structural element designed to provide support and stability for the vertical and lateral loads of the overall structure.

13. *Primary structural system* is an assemblage of *primary structural members*.

14. *Professional engineer* is a person, as defined in s.471.005, who has a bachelor's degree or higher in engineering. A *professional engineer* must also have experience and expertise in the identification of *sinkhole activity* as well as other potential causes of *structural damage*.

15. *Professional geologist* is a person, as defined in s.492.102, who has a Bachelor's degree or higher in geology or related earth science and experience and expertise in the identification of *sinkhole activity* as well as other potential geologic causes of *structural damage*.

16. *Sinkhole* is a landform created by subsidence of soil, sediment or rock as underlying strata are dissolved by groundwater. A *sinkhole* forms by collapse into subterranean voids created by dissolution of limestone or dolostone or by subsidence as these strata are dissolved.

17. *Sinkhole activity* is settlement or systematic weakening of the earth supporting the covered building only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

18. *Sinkhole loss* is *structural damage* to the covered building, including the foundation, caused by *sinkhole activity*. If applicable, contents coverage and additional living expenses apply only if there is *structural damage* to the covered building caused by *sinkhole activity*.

19. *Structural damage* is a covered building, regardless of the date of its construction, that experienced the following:

a. Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code;

b. Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the *primary structural members* or *primary structural systems* that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those *primary structural members* or *primary structural systems* exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose or location;

c. Damage that results in listing, leaning or buckling of the exterior load-bearing walls or other vertical *primary structural members* to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code.

Case 4:22-cv-00285-RH-MAF Document 12 Filed 05/02/22 Page 132 of 166
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**d.** Damage that results in the building, or any portion of the building containing *primary structural members* or *primary structural systems*, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such a building as defined within the Florida Building Code; or

**e.** Damage occurring on or after October 15, 2005 that qualifies as "substantial structural damage" as defined in the Florida Building Code.

All other terms and conditions remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**GEORGIA CHANGES**

This endorsement applies only to **covered property** located in Georgia and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **B. POLICY PERIOD** of SECTION I – DECLARATIONS is replaced by the following:

**B.  POLICY PERIOD**

The term of this Policy is from 12/10/2019 to 12/10/2020 at 12:01 a.m. at the **location** of property involved as provided in this Policy.

**B.** Paragraph **2.d.** of SECTION II – PROPERTY DAMAGE, **C.** EXCLUSIONS is replaced by the following:

   **d.** Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act. However:

   **(1)** if there is a statute in effect in the jurisdiction where the loss or damage happens that prohibits the exclusion of fire losses caused by such discharge, explosion or use; and

   **(2)** such discharge, explosion or use directly results in fire

   **we** cover the physical loss or damage caused by the fire.

**C.** Paragraph **2.e.** of SECTION II – PROPERTY DAMAGE, **C.** EXCLUSIONS is replaced by the following:

   **e.** The unlawful possession, use, release, discharge, dispersal or disposal of any chemical, biological, viral, radioactive or similar agents or matter, whether in time of peace or war and regardless of who commits the act. However,

   **(1)** if there is a statute in effect in the jurisdiction where the loss or damage happens that prohibits the exclusion of fire losses caused by such possession, use, release, discharge dispersal or disposal; and

   **(2)** such possession, use, release, discharge dispersal or disposal directly results in fire

   **we** cover the physical loss or damage caused by the fire.

**D.** Paragraph **23.d.(1)** of SECTION II – PROPERTY DAMAGE, **D.** PROPERTY DAMAGE COVERAGES AND LIMITATIONS, OFF PREMISES INTERRUPTION OF SERVICES – PROPERTY DAMAGE is replaced by the following:

   **(1) You** will promptly notify the suppliers of services of any interruption of any such services.

**E.** Paragraph **9.d.(1)** of SECTION III – TIME ELEMENT, **E.** TIME ELEMENT COVERAGES AND LIMITATIONS, OFF PREMISES INTERRUPTION OF SERVICES – TIME ELEMENT is replaced by the following:

   **(1) You** will promptly notify the suppliers of services of any interruption of any such services.

Case 4:22-cv-00285-P Document 1 Filed 05/02/22    Page 134 of 166
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**F.** Paragraph **7.** is added to SECTION V – GENERAL POLICY CONDITIONS, **B.** CANCELLATION with respect to a Policy that is written to permit an audit:

    **7.** If **you** fail to submit to or allow an audit for the current or most recently expired term, **we** may cancel this Policy subject to the following:

        **a.** **We** will make two (2) documented efforts to send **you** and **your** agent notification of potential cancellation. After the second notification has been sent, **we** have the right to cancel this Policy by mailing or delivering a written notice of cancellation to **you** at least ten (10) days before the effective date of cancellation, but not within twenty (20) days of the first documented notification effort.

        **b.** If **we** cancel this Policy based on **your** failure to submit to or allow an audit, **we** will send the written notice of cancellation to **you** at the last known mailing address by certified mail or statutory overnight delivery with return receipt requested.

**G.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

    **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

      **We** will cancel this Policy and deny any claims, if with the actual intent to deceive

      **1.** **You**;

      **2.** **Your** representatives; or

      **3.** Any insured;

      commit fraud or conceal or misrepresent a fact or circumstance concerning:

      **a.** This Policy;

      **b.** The **covered property**;

      **c.** **Your** interest in the **covered property**; or

      **d.** A claim under this Policy.

**H.** The following is added to paragraph **2.a.** of SECTION V – GENERAL POLICY CONDITIONS, **Q.** VACANCY:

    However, if such loss or damage results in fire, **we** will pay for the loss or damage caused by that fire.

**I.** Paragraph **4.** is added to SECTION V – GENERAL POLICY CONDITIONS, **R.** VALUATION:

    **4.** **We** will not pay for an actual or perceived reduction in the market value of any **covered property**. But if the **covered property** that has sustained physical loss or damage is subject to an endorsement which explicitly addresses market value, then that endorsement will apply to such **covered property** in accordance with its terms.

**H.** Paragraph **1.** of SECTION VI – LOSS CONDITIONS, **E.** DUTIES AFTER A LOSS is replaced by the following:

    **1.** Give **us** prompt written notice of the loss;

All other terms and conditions remain unchanged.

Case 4:22-cv-00085-BP Document 1 Filed 05/02/22 Page 135 of 166
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ILLINOIS CHANGES**

This endorsement applies only to **covered property** located in Illinois and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **H.** JURISDICTION of SECTION I – DECLARATIONS is replaced by the following:

   **H.** JURISDICTION

     Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** Paragraph **k.** of SECTION II – PROPERTY DAMAGE, **C.2.** EXCLUSIONS is added:

   **k.** Any act committed by **you** or at **your** direction, by others, which is intended to cause loss or damage. This exclusion will not apply to deny coverage to an innocent additional named insured who did not cooperate in or contribute to the creation of the loss, provided it is a **covered loss**, and the loss arose out of a pattern of criminal domestic violence and the perpetrator of the loss is criminally prosecuted for the act causing the loss.

     **Our** payment for a **covered loss** to the innocent additional named insured is limited to that insured's insurable interest in the **covered property** as reduced by any payment to a mortgagee or other secured interest. In no event will **we** pay more than the applicable LIMIT OF LIABILITY.

**C.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of  SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

   **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

    **1.** This Policy is void if **you** or any insured commit fraud or conceal or misrepresent a fact in the process leading to the issuance of this Policy, and such fraud, concealment or misrepresentation is stated in the Policy or endorsement or in the written application for this Policy and:

      **a.** Was made with actual intent to deceive; or

      **b.** Materially affected either **our** decision to provide this insurance or the hazard **we** assumed.

    However, this condition will not serve as a reason to void this Policy after the Policy has been in effect for one year or one Policy term, whichever is less.

    **2.** **We** do not provide coverage under this Policy to **you** or any other insured who, at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

Case 4:22-cv-00286-BP   Document 1   Filed 05/02/22   Page 136 of 166

    **a.** This Policy;

    **b.** The **covered property**;

    **c.** **Your** interest in the **covered property**; or

    **d.** A claim under this Policy.

  **3.** Notwithstanding the limitations stated in **1.** above, **we** may cancel this Policy in accordance with the terms of the Cancellation Condition.

**D.** Paragraph **3.** of SECTION V – GENERAL POLICY CONDITIONS, **F.** LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS of is replaced by the following:

  **3.** If this Policy is cancelled at **your** request, the coverage for the interest of the Lender or Mortgagee will terminate ten (10) days after **we** send to the Lender or Mortgagee written notice of cancellation, unless:

    **a.** Sooner terminated by authorization, consent, approval, acceptance, or ratification of **your** action by the Lender or Mortgagee, or its agent.

    **b.** This Policy is replaced by **you**, with a Policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement Policy, notwithstanding any other provision of this Policy.

**E.** Paragraph **I.** SUIT AGAINST THE COMPANY of SECTION VI – LOSS CONDITIONS is replaced with the following:

  **I.** SUIT AGAINST THE COMPANY

    No suit or other legal proceeding will be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within two (2) years next after the inception of the loss, extended by the number of days between the date **you** submitted the statement of loss to **us** and the date **we** deny the claim in whole or in part.

All other terms and conditions remain unchanged.

Includes copyrighted material of Insurance Services Office, with its permission.

Policy Number   YAC-L9L-471218-019
Issued by        Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**INDIANA CHANGES**

This endorsement applies only to **covered property** located in Indiana and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **H.** JURISDICTION of SECTION I – DECLARATIONS is replaced by the following:

**H.** JURISDICTION

Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

1. This entire Policy is void, if with the actual intent to deceive

   **a.** **You;**

   **b.** **Your** representatives; or

   **c.** Any insured;

   commit fraud or conceal or misrepresent a fact or circumstance concerning:

   **(1)** This Policy;

   **(2)** The **covered property;**

   **(3)** **Your** interest in the **covered property;** or

   **(4)** A claim under this Policy.

2. However, this provision does not apply when a claim is made by an *innocent coinsured*, provided:

   **a.** A **covered loss** occurs to the primary residence of the *innocent coinsured*; and

   **b.** The *final settlement* for the **covered loss** to the primary residence of the *innocent coinsured* is at least 60% of available insurance proceeds under this Policy.

3. The following is added and supersedes any provision to the contrary:

   **a.** Any payment made pursuant to paragraph **C.2.** above will be for:

   **(1)** The actual cost of repair or replacement of the **covered property** that is the subject of the claim if the actual cost of repair or replacement is less than or equal to the maximum LIMIT OF LIABILITY under this Policy; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

      **(2)** The maximum LIMIT OF LIABILITY under this Policy if the actual cost of repair or replacement of the **covered property** that is the subject of the claim is greater than the maximum LIMIT OF LIABILITY under this Policy.

    **b.** Any payment made pursuant to paragraph **C.2.** above is limited to the following:

      **(1)** An *innocent coinsured's* ownership interest in the **covered property**, less any payments **we** make to a mortgagee or other lienholder with a secured interest in the **covered property**.

      **(2)** **We** will not pay another insured for any part of the claim for which **we** have already paid to an *innocent coinsured*.

      **(3)** **We** will not pay an amount that is greater than the amount an *innocent coinsured* is entitled to under a decree of dissolution of marriage between the *innocent coinsured* and an individual described in paragraph **C.4.a.** below.

**4.** For the purpose of this endorsement, *innocent coinsured* means an insured who:

    **a.** Did not have knowledge of, cooperate in, or intentionally contribute to a **covered loss** that was caused or arranged by another individual who is an insured and:

      **(1)** Died in connection with the circumstances that caused the **covered loss**; or

      **(2)** Has been charged with a crime based on a court finding that there is probable cause to believe that the individual committed the crime in connection with the circumstances that caused the **covered loss**;

    **b.** Signs a sworn affidavit attesting that they did not have knowledge of, cooperate in, or intentionally contribute to the **covered loss**; and

    **c.** Cooperates in the investigation and resolution of the claim for the **covered loss**, any police investigation related to the **covered loss**, and any criminal prosecution of the individual that caused or arranged the **covered loss**.

**5.** For the purpose of this endorsement, *final settlement* is a determination:

    **a.** Of the amount owed by **us** to an *innocent coinsured* under this Policy for **covered loss** to the *innocent coinsured's* primary residence; and

    **b.** Made by:

      **(1)** Acceptance of a proof of loss by **us**;

      **(2)** Execution of a release by the *innocent coinsured*;

      **(3)** Acceptance of an arbitration award by the *innocent coinsured* and **us**; or

      **(4)** Judgment of a court of competent jurisdiction.

      However, *final settlement* does not apply to any loss or damage related to contents, personal property, or another loss that is not covered under this Policy.

All other terms and conditions remain unchanged.

Case 4:22-cv-00286-P Document 1-4 Filed 05/02/22 Page 139 of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**MARYLAND CHANGES**

This endorsement applies only to **covered property** located in Maryland and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **H.** JURISDICTION of SECTION I – DECLARATIONS is replaced by the following:

**H.** JURISDICTION

Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

**We** do not provide coverage in any case of fraud by **you**, at any time, as it relates to this Policy. **We** also do not provide coverage if **you, your** representatives or any insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**1.** This Policy;

**2.** The **covered property**;

**3.** **Your** interest in the **covered property**; or

**4.** A claim under this Policy.

**C.** Paragraph **I.** SUIT AGAINST THE COMPANY of SECTION VI – LOSS CONDITIONS is replaced by the following:

**I.** SUIT AGAINST THE COMPANY

No suit or other legal proceeding shall be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within three (3) years of the date that the suit accrues.

**D.** The following is added to SECTION VI – LOSS CONDITIONS:

**J.** MARYLAND FRAUD WARNING

Pursuant to Maryland Insurance Article section §27-805, "Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison."

All other terms and conditions remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Policy Number   YAC-L9L-471218-019
Issued by         Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**MICHIGAN CHANGES**

This endorsement applies only to **covered property** located in Michigan and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **I.** SUIT AGAINST THE COMPANY of SECTION VI – LOSS CONDITIONS is replaced by the following:

    **I.**   SUIT AGAINST THE COMPANY

    No suit or other legal proceeding shall be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within two (2) years next after the inception of the loss. The time for commencing an action against **us** is tolled from the time **you** notify **us** of the loss or damage until **we** formally deny liability for the claim.

**B.** The following is added to SECTION V – GENERAL POLICY CONDITIONS, **F.** LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS and SECTION VI – LOSS CONDITIONS, **G.** PAYMENT OF LOSS:

    If a municipality has elected to apply the provisions of 1998 Michigan Public Act 217, and the insured loss is subject to the provisions of the Act, **we** will withhold a part of **our** payment for fire, explosion, malicious mischief, windstorm or hail, or riot or civil commotion loss or damage to **your** covered **real property** in that municipality. The withheld amount will be paid either to the municipality or to **you** and the mortgagee, if any, or with **your** consent, the licensed contractor hired by **you** to perform repair, replacement or removal services on the lost or damaged **real property** according to the provisions of Public Act 217. **We** will notify **you,** any mortgagee and the municipality of any loss subject to the provisions of Public Act 217.

    If a municipality has elected to apply the provisions of MICH. COMP. LAWS § 500.3011, any further payment for claims for loss or damage to **your** covered **real property** or covered **personal property** located on **real property** caused by fire or explosion of $2,000 or more will be withheld if **you** have failed to submit a required report to the fire or law enforcement authority designated by the municipality.

All other terms and conditions remain unchanged.

Policy Number   YAC-L9L-471218-019
Issued by        Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**MINNESOTA CHANGES**

This endorsement applies only to **covered property** located in Minnesota and modifies insurance provided under the following:

PREMIER PROPERTY PRODUCT™

**A.** The following is added to SECTION I – DECLARATIONS, **M.** DEDUCTIBLES, Deductibles General Provisions:

**8.** The PROPERTY DAMAGE deductible will not apply to **real property** in the event of a total loss.

**B.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

**We** will not pay for any loss or damage if **you** have:

**1.** Before a loss, willfully; or

**2.** After a loss, willfully and with intent to defraud;

concealed or misrepresented any material fact or circumstances concerning this Policy, the **covered property**, or **your** interest in the **covered property**.

**C.** Paragraph **9.c.** of SECTION VI – LOSS CONDITIONS, **E.** DUTIES AFTER A LOSS is replaced by the following:

**9.** As often as may reasonably be required:

**c.** After **we** inform **you** of **your** right to counsel and that **your** answers may be used against **you** in later civil or criminal proceedings, permit **us** under oath to question **you** and any of **your** agents, employees, or representatives involved in the purchase of this insurance or the preparation of **your** claim, and verify **your** answers with a signed acknowledgement.

**D.** Paragraph **G.** PAYMENT OF LOSS of SECTION VI – LOSS CONDITIONS is replaced by the following:

**G.** PAYMENT OF LOSS

**1.** **We** will pay the insured loss within five (5) business days after **we** receive and accept the signed, sworn Proof of Loss, if:

**a.** **You** have complied with all the terms of this Policy;

**b.** **We** have reached agreement with **you** on the amount of the loss, or

**c.** An appraisal award is made as provided for in LOSS CONDITIONS **B.** APPRAISAL.

Case Includes copyrighted material of Insurance Services Office, with its permission.

2.  In the event of a total loss, the LIMIT OF LIABILITY for **real property** represents its value.  This provision does not apply to any claim for total loss to any building which is insured as part of a blanket LIMIT OF LIABILITY applicable to two or more buildings.  Any claim for total loss to a building insured on a blanket basis will be settled at replacement cost or at **actual cash value**, depending on the Policy provisions applicable to the building sustaining the total loss.

E.  The following is added to SECTION VI – LOSS CONDITIONS, **H.** SUBROGATION:

3.  **Our** rights do not apply against any person or organization insured under this or any other Policy issued by **us** with respect to the same loss.

All other terms and conditions remain unchanged.

Includes copyrighted material of Insurance Services Office, with its permission.

Policy Number   YAC-L9L-471218-019
Issued by       Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**MISSOURI CHANGES**

This endorsement applies only to **covered property** located in Missouri and modifies insurance provided under the following:

PREMIER PROPERTY PRODUCT™

**A.** Paragraph **H.** JURISDICTION of SECTION I – DECLARATIONS is replaced by the following:

**H.** JURISDICTION

Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** The following is added to SECTION II – PROPERTY DAMAGE, **C.2.** EXCLUSIONS:

**k.** Any act committed by **you** or at **your** direction, by others, which is intended to cause loss or damage. This exclusion will not apply to deny coverage to an innocent additional named insured who did not cooperate in or contribute to the creation of the loss, provided it is a **covered loss**, and the loss arose out of domestic violence. Such coverage will be provided only if the innocent additional named insured files a police report and completes a sworn affidavit indicating both:

**(1)** the cause of the loss; and

**(2)** a pledge to cooperate in any criminal prosecution of the person committing the act causing the loss.

**Our** payment for a **covered loss** to the innocent additional named insured is limited to that insured's insurable interest in the **covered property** as reduced by any payment to a mortgagee or other secured interest. However, **we** will not be required to make any subsequent payment for any loss for which the innocent additional named insured has received payment. In no event will **we** pay more than the applicable LIMIT OF LIABILITY.

**C.** Paragraph **b. (3)** of the LAND AND WATER CLEANUP, REMOVAL AND DISPOSAL provision of SECTION II – PROPERTY DAMAGE, **D.** PROPERTY DAMAGE COVERAGES AND LIMITATIONS is deleted and replaced by the following:

**(3)** If **you** fail to give **us** written notice within one hundred eighty (180) days after the loss, and such failure operates to prejudice **our** rights as per Missouri regulation 20CSR100-1.020.

**D.** Paragraphs **1.**, **2.** and **3.** of SECTION VI – LOSS CONDITIONS, **B.** APPRAISAL are replaced by the following:

**1.** If **you** and **we** fail to agree as to the **actual cash value** or the amount of loss, either party may make a written demand that the amount be submitted for appraisal. In this event, each party will select a competent and disinterested appraiser and notify the other of the identity of its appraiser within twenty (20) days of the written demand for appraisal.

**2.** The two (2) appraisers will promptly select a competent and disinterested umpire. If the appraisers are unable to agree on an umpire within fifteen (15) days, **you** or **we** may petition the judge of a court of record in the state and county (or city if the city is not within a county) where the **covered property** is located to select an umpire.

**3.** The appraisers will then appraise the loss, stating separately **actual cash value** and loss to each item. If the appraisers submit a written report of an agreement to **you** and **us**, the amount they agree on will be the

Case 4:22-cv-00285-BP   Document 42-3   Filed 05/02/23   Page 144 of 166
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

amount of **our** payment for the loss. If the appraisers fail to agree, they will submit their differences to the umpire. The umpire will make the award within thirty (30) days after the umpire receives the appraiser's submissions of their differences. Written agreement signed by any two of these three will set the amount of **actual cash value** and loss.

E. Paragraph **D.** COMPANY OPTION of SECTION VI – LOSS CONDITIONS is replaced by the following:

    **D.** COMPANY OPTION

        **1.** At **our** option, **we** will repair, rebuild or replace damaged **covered property** with other property of like kind and quality within a reasonable period of time.

        **2.** If **we** elect to repair or replace the **covered property**;

            **a.** **We** will notify **you** of that decision within fifteen (15) working days of **our** receipt of **your** proof of loss, that **we**:

                **(1)** Accept **your** claim;

                **(2)** Deny **your** claim; or

                **(3)** Need more time to determine whether **your** claim should be accepted or denied.

            If **we** deny **your** claim, such notice will be in writing, and will state any policy provision, condition or exclusion used as a basis for the denial.

            If **we** need more time to determine whether **your** claim should be accepted or denied, the written notice will state the reason why more time is required.

            **b.** If **we** have not completed **our** investigation, **we** will notify **you** again in writing, within forty-five (45) days after the date of the initial notice as provided in Item **2.a.(3)** above, and thereafter every forty-five (45) days. The written notice will state why more time is needed to investigate **your** claim and when **you** may expect **us** to reach a decision on **your** claim.

        **3.** **We** will, at **our** option, take title to all or any part of the damaged or destroyed property at the agreed or appraised value.

F. The first sentence of Paragraph **10.** of SECTION VI – LOSS CONDITIONS, **E.** DUTIES AFTER A LOSS is replaced by the following:

    **10.** Submit to **us**, within ninety (90) days of **our** request, unless **we** extend the time in writing, a signed, sworn Proof of Loss that states to the best of **your** knowledge and belief:

G. The following are added to SECTION VI – LOSS CONDITIONS, **H.** SUBROGATION:

    **3.** If **we** pay an additional named insured for loss arising out of an act of domestic violence by another insured, the rights of the additional named insured, who did not cooperate in or contribute to the creation of the loss, to recover damages from the perpetrator of domestic violence are transferred to **us** to the extent of **our** payment. Following the loss, the additional named insured who did not cooperate in or contribute to the loss may not waive such rights to recover against the perpetrator of domestic violence.

    **4.** In the event **you** die **your** rights and duties will be transferred as follows:

        **a.** For an individual who is a named insured, they will be transferred to **your** legal representative, but only while acting within the scope of those duties.

        If **you** do not have a legal representative appointed, anyone having proper temporary custody of **your** property will also have **your** rights and duties associated with that property.

Case 4:22-cv-00085-BSM Document 32 Filed 05/02/22 Page 145 of 166

**b.** If **you** have designated an individual as a grantee beneficiary in a beneficiary deed which has been properly recorded before **your** death for specific **real property**, that individual, at the time of **your** death, will assume **your** rights and duties related to the **real property** for the shortest of the following time periods:

**(1)** Thirty (30) consecutive days from the date of **your** death;

**(2)** The date that alternative coverage is obtained for the **real property**; or

**(3)** The end of the Policy period.

**H.** Paragraph I. SUIT AGAINST THE COMPANY of SECTION VI – LOSS CONDITIONS is replaced by the following:

**I.** SUIT AGAINST THE COMPANY

No suit or other legal proceeding shall be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within ten (10) years next after the inception of the loss.

**I.** The following is added to SECTION VI – LOSS CONDITIONS:

**J.** MISSOURI PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION COVERAGE LIMITATIONS

**1.** Subject to the provisions of the Missouri Property and Casualty Insurance Guaranty Association Act (in this endorsement referred to as the Act), if **we** are a member of the Missouri Property and Casualty Insurance Guaranty Association (in this endorsement referred to as the Association), the Association will pay claims covered under the Act if **we** become insolvent.

**2.** The Act contains various exclusions, conditions and limitations that govern **your** eligibility to collect payment from the Association and the amount of any payment. The following limitations apply subject to all other provisions of the Act:

**a.** If **we** become insolvent, claims covered by the Act do not include a claim by or against **you** if **you** have a net worth of more than $25 million on the later of the end of **your** most recent fiscal year or the December thirty-first of the year next preceding the date **we** become insolvent; provided that **your** net worth on such date is deemed to include **your** aggregate net worth and all of **your** affiliates as calculated on a consolidated basis.

**b.** The Association's obligation for each covered claim is only that amount of each claim which is less than $300,000.

However, the Association will not:

**a.** Pay more than the LIMIT OF LIABILITY of this Policy; or,

**b.** Return to **you** any unearned premium in excess of $25,000.

All other terms and conditions remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NEBRASKA CHANGES**

This endorsement applies only to **covered property** located in Nebraska and modifies insurance provided under the following:

PREMIER PROPERTY PRODUCT™

**A.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**C.** MISREPRESENTATION OR BREACH OF WARRANTY OR CONDITION

    **1.** No oral or written misrepresentation or warranty made in the negotiation of this policy by **you** or on **your** behalf will void this Policy unless:

        **a.** It is made with the intent to deceive;

        **b.** **We** rely on it to **our** injury.

    **2.** The breach of warranty or condition will void the Policy if such breach exists at the time of the loss and contributes to the loss.

**B.** The following is added to SECTION V – GENERAL POLICY CONDITIONS, **R.** VALUATION:

    **4.** If **real property** has a **covered loss** and is wholly destroyed by fire, tornado, windstorm, lightning or explosion, and there is no criminal fault on the part of **you** or **your** assignee, the LIMIT OF LIABILITY on such **real property** shall be taken conclusively to be the true value of the **covered property** and the true amount of loss and measure of damages.

    This VALUATION provision does not apply to any claim for total loss to any building which is insured as part of a blanket LIMIT OF LIABILITY applicable to two (2) or more buildings. Any claim for total loss to a building insured on a blanket basis will be settled at replacement cost or at **actual cash value**, depending on the Policy provisions applicable to the building sustaining the total loss.

**C.** Paragraph **1.** of SECTION VI – LOSS CONDITIONS, **B.** APPRAISAL is replaced by the following:

    **1.** If **you** fail to agree with **us** on the amount of a loss, either party may require that the amount be submitted for appraisal. Requests for appraisal will be made in writing. Both parties must agree to the appraisal. Each party will then choose a competent independent appraiser. Each party will notify the other of the identity of its appraiser within sixty (60) days of the written request for appraisal.

All other terms and conditions remain unchanged.

Case 4:20-cv-00386-BP Document 34-1 Filed 05/02/22 Page 147 of 166

Policy Number   YAC-L9L-471218-019
Issued by        Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NEVADA CHANGES**

This endorsement applies only to **covered property** located in Nevada and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

**We** will not pay for any loss or damage if **you** have willfully and with intent to defraud, concealed or misrepresented any material fact or circumstances concerning:

**1.** This Policy;

**2.** The **covered property**;

**3.** **Your** interest in the **covered property**; or

**4.** A claim under this Policy.

All other terms and conditions remain unchanged.

Case 4:22-cv-00286-BP   Document 31   Filed 05/02/22   Page 148 of 166

Policy Number  YAC-L9L-471218-019
Issued by        Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NEW JERSEY CHANGES**

This endorsement applies only to **covered property** located in New Jersey and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **k.** of SECTION II – PROPERTY DAMAGE, **C.2.** EXCLUSIONS is added:

**k.** Any act committed by **you** or at **your** direction, by others, which is intended to cause loss or damage. This exclusion will not apply to deny coverage to an innocent additional named insured who did not cooperate in or contribute to the creation of the loss, provided it is a **covered loss**, if the loss arose out of domestic violence.

**Our** payment for a **covered loss** to the innocent additional named insured is limited to that insured's insurable interest in the **covered property** as reduced by any payment to a mortgagee or other secured interest. In no event will **we** pay more than the applicable LIMIT OF LIABILITY.

**B.** Paragraph **3.** of SECTION VI – LOSS CONDITIONS, **H.** SUBROGATION is added:

**3.** If **we** pay an additional named insured for loss arising out of an act of domestic violence by another insured, the rights of the additional named insured, who did not cooperate in or contribute to the creation of the loss, to recover damages from the perpetrator of domestic violence are transferred to **us** to the extent of **our** payment. Following the loss, the additional named insured who did not cooperate in or contribute to the loss may not waive such rights to recover against the perpetrator of domestic violence.

All other terms and conditions remain unchanged.

Case 1:22-cv-00285-PTG-IDD Document 32 Filed 05/02/23 Page 149 of 166

Policy Number  YAC-L9L-471218-019
Issued by        Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NEW YORK CHANGES**

This endorsement applies only to **covered property** located in New York and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** The Mold, Mildew or Fungus Directly Resulting From a **Covered Loss** LIMIT OF LIABILITY in paragraph **K.** LIMITS OF LIABILITY TABLE – PART ONE OF SECTION I – DECLARATIONS is deleted.

**B.** Exclusion **2.a. (terrorism)** in paragraph **C.** EXCLUSIONS of SECTION II – PROPERTY DAMAGE is deleted.

**C.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V - GENERAL POLICY CONDITIONS is replaced by the following:

**C.**  CONCEALMENT, MISREPRESENTATION OR FRAUD

**We** will not pay for any loss or damage if **you** or anyone acting on **your** behalf have willfully and with intent to defraud, concealed or misrepresented any material fact or circumstances concerning:

**1.**  This Policy;

**2.**  The **covered property**;

**3.**  **Your** interest in the **covered property**; or

**4.**  A claim under this Policy.

**D.** Paragraph **B.** APPRAISAL of SECTION VI – LOSS CONDITIONS is replaced by the following:

**B.**  APPRAISAL

**1.**  If either **you** or **we** fail to agree on the amount or extent of loss or damage to **covered property**, or the value of the damaged **covered property**, either party may make a written demand that the disputed amount be submitted for appraisal.

If after a written demand has been made, either **you** or **we** fail to proceed with the appraisal, either party may then petition a judge of a court of record in the state where the **covered loss** happened to order the party that failed to proceed with the appraisal to comply with the demand.

Upon resolution of the demand, each party will then choose a competent and disinterested appraiser. Each party will notify the other of the identity of its appraiser within 20 days of the written demand for appraisal.

**2.**  The two appraisers will choose a competent and disinterested umpire. If the appraisers are unable to agree on an umpire within 15 days, either party may petition a judge of a court of record in the state where the **covered loss** happened to select an umpire.

**3.**  The appraisers will then determine the amount and the extent of the loss or damage. If the appraisers submit a written report of an agreement to **you** and **us**, the amount they agree on will be the amount of **our** payment for the loss or damage. If the appraisers fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will determine the amount of loss or damage.

Case 4:22-cv-00286-P   Document 1   Filed 05/02/22   Page 150 of 166
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

4. Each appraiser will be paid by the party that selects him or her. Other expenses of the appraisal and compensation of the umpire will be paid equally by **you** and **us**.

5. Appraisal described in **1.** through **4.** above shall not be used to determine whether the Policy actually provides coverage for any portion of the claimed loss or damage.

E. Paragraph **1.** of SECTION VI – LOSS CONDITIONS, **E.** DUTIES AFTER A LOSS, is replaced by the following:

1. Give **us** immediate written notice of the loss. Written notice, which adequately identifies **you**, given to **our** appointed producers in New York State:

   a. By a third party on **your** behalf; or

   b. By or on behalf of any claimant,

   will also be accepted as notice to **us**.

F. The following is added at the end of paragraph **G.** PAYMENT OF LOSS of SECTION VI – LOSS CONDITIONS:

However in the event of a payment for loss or damage to **your real property** (except **your** owner-occupied single family or owner-occupied two-family **real property**) caused by or resulting from fire, **we** will:

1. First, deduct from **your** payment any amounts claimed by a tax district as the result of a certificate of lien filed by them in accordance with the Insurance Law; and

2. Then, directly pay that amount to the tax district.

Once this amount is paid to the tax district, **we** are no longer obligated to pay that portion of **your** payment to **you**. If **our** payment to the tax district is made within 30 days of **our** receipt of the certificate of lien, the certificate of lien will be proof that payment of the claim was valid and proper.

G. The following are added to SECTION VI – LOSS CONDITIONS:

J. ESTIMATION OF CLAIMS

In the event an estimate of the damage to **your real property** which specifies all deductions made in the estimate of the **real property** is prepared by **us** or by others for **our** use, **we** will, at **your** request, supply **you** or **your** representative with a written copy of the estimate by the latter of:

1. 30 days from **your** request; or

2. The actual preparation date of the estimate.

K. Examination of **Your** Books and Records

1. In the event that **your** Policy contains an auditable coverage for which an advance or deposit premium was paid based on estimated exposure, **we** will conduct an audit to determine the final premium due or to be refunded within 180 days of:

   a. The expiration date of the Policy; or

   b. The anniversary date, if this is a continuous Policy or a Policy written for a term longer than one year.

Case Includes copyrighted material of Insurance Services Office, Inc., with its permission.

2. **We** may waive **our** right to audit for the following reasons:

   a. After a cursory review, **we** do not expect the premium adjustment to exceed $1,500.

   b. At time of audit, **we** have agreed with **you** not to make a premium adjustment due to minimal changes in values from those originally reported.

3. **We** do retain the right to examine and audit **your** books and records, as they relate to this Policy, at any time during the Policy period and up to three years afterward.

All other terms and conditions remain unchanged.

Case 4:22-cv-00286-BP Document 2 Filed 05/02/22 Page 152 of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NEW YORK CHANGES – CANCELLATION AND NONRENEWAL**

This endorsement modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** Paragraph **B.** CANCELLATION of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

**B. CANCELLATION**

    **1.** **You** may cancel this entire Policy by mailing or delivering to **us** advance written notice of cancellation.

    **2.** Cancellation of Policies In Effect

        **a.** Sixty (60) Days or Less

        **We** may cancel this Policy by mailing or delivering to **you** written notice of cancellation at least:

        **(1)** Thirty (30) days before the effective date of cancellation if **we** cancel for any reason not included in Paragraph **B.2.b.** below.

        **(2)** Fifteen (15) days before the effective date of cancellation if **we** cancel for any of the reasons included in Paragraph **B.2.b.** below.

        **b.** For More Than Sixty (60) Days

        If this Policy has been in effect for more than sixty (60) days, or if this Policy is a renewal or continuation of a Policy **we** issued, **we** may cancel only for any of the reasons listed below, provided **we** mail **you** written notice at least fifteen (15) days before the effective date of cancellation:

        **(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform **you** of the amount due;

        **(2)** Conviction of a crime arising out of acts increasing the hazard insured against;

        **(3)** Discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a claim;

        **(4)** After issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current Policy period;

        **(5)** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the Policy, which results in the property becoming uninsurable in accordance with **our** objective, uniformly applied underwriting standards in effect at the time the Policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed;

© 2016 Liberty Mutual Insurance
Case Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(6)** Required pursuant to a determination by the Superintendent of Financial Services that continuation of **our** present premium volume would jeopardize **our** solvency or be hazardous to the interest of **our** policyholders, **our** creditors or the public;

**(7)** A determination by the Superintendent of Financial Services that the continuation of the Policy would violate, or would place **us** in violation of, any provision of the Insurance Code; or

**(8)** Where **we** have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that **you** will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If **we** cancel for this reason, **you** may make a written request to the Department of Financial Services, within ten (10) days of receipt of this notice, to review **our** cancellation decision. Also, **we** will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

**3.** **We** will mail or deliver **our** notice, including the reason for cancellation, to **you** at the address shown in the Policy and to the authorized agent or broker.

**4.** **Our** written notice of cancellation will state the effective date of cancellation and the Policy period will end on that date.

**5.** If this Policy is cancelled, **we** will send **you** any premium refund due. If **we** cancel, the refund will be pro rata. If **you** cancel, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, **we** will be entitled to retain a minimum earned premium of 10% of the total Policy premium or $60, whichever is greater. The cancellation will be effective even if **we** have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**7.** If one of the reasons for cancellation in Paragraph **B.2.b.** above exists, **we** may cancel this entire Policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this Policy.

**B.** The NONRENEWAL provision of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

CONDITIONAL RENEWAL AND NONRENEWAL

**1.** Unless **you**, **your** insurance agent or broker, or another insurer of **yours** mails or delivers notice to **us** that the Policy has been replaced or is no longer desired, prior to the expiration date of this Policy **we** will provide **you** with one (1) of the following notifications:

**a.** Conditional Renewal

**(1)** In the event **we** decide to offer a renewal of this Policy but in **our** offer **we** propose to make any of the following types of changes to the existing program:

**(a)** A change in LIMITS OF LIABILITY;

**(b)** A change in type of coverage;

**(c)** A reduction of coverage;

 © 2016 Liberty Mutual Insurance

Case 4:22-cv-00286-P Document 1-4 Filed 05/02/22 Page 154 of 166

**(d)** An increased deductible;

**(e)** The addition of a new exclusion; or

**(f)** Increased premium in excess of 10%, exclusive of any premium increased due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, or audit;

**we** will mail or deliver a written conditional renewal notice to **you** at least sixty (60) but not more than one-hundred-twenty (120) days before the expiration or anniversary date of this Policy if written for more than one (1) year.

**(2)** The notice will be sent to **your** last mailing address known to **us**.

**(3)** Notice will include the specific reason(s) for conditional renewal and description of any other changes, including a reasonable estimate or the amount of any premium increase for conditional renewal.

**(4)** This notice will be delivered or sent by:

**(a)** Registered mail;

**(b)** Certified mail; or

**(c)** First-Class mail.

**(5)** If notice is mailed, proof of mailing will be sufficient evidence of notice.

**(6)** **Your** insurance agent or broker will receive the same notification of conditional renewal that **you** receive. This notification will be sent to their last mailing address known to **us**.

**b.** Nonrenewal

**(1)** If **we** decide not to renew this Policy, **we** will mail or deliver a written notice of nonrenewal to **you** at least sixty (60) but not more than one-hundred-twenty (120) days before the expiration or anniversary date of this policy if written for more than one (1) year.

**(2)** The notice will be sent to **your** last mailing address known to **us**.

**(3)** **We** will state the specific reasons for the nonrenewal.

**(4)** This notice will be delivered or sent by:

**(a)** Registered mail;

**(b)** Certified mail; or

**(c)** First-Class mail.

**(5)** If notice is mailed, proof of mailing will be sufficient evidence of notice.

**(6)** **Your** insurance agent or broker will receive the same notification of nonrenewal that **you** receive. This notification will be sent to their last mailing address known to **us**.

Case 4:22-cv-00205-P Document 1 Filed 05/02/22 Page 155 of 166

2. If **we** violate any of the provisions in **1. a.** or **1. b.** above by sending **you** an incomplete or late notice, coverage will remain in effect at the same terms and conditions of this Policy. In addition, if the incomplete or late notice is provided:

    a. Prior to the expiration date of this Policy, the lower of the current rates or the prior period's rates will apply until sixty (60) days after such notice is mailed or delivered by **us**, unless **you**, during this sixty (60) day period, have replaced **our** policy or elected to cancel it.

    b. On or after the expiration date of this policy, the lower of the current rates or the prior period's rates will apply for another Policy period unless **you**, during this additional Policy period, have replaced **our** Policy or elected to cancel it.

3. If **you** receive a late conditional renewal notice from **us** and decide to accept the renewal offer based on the terms, conditions and rates of the late notice, the new terms, conditions and rates will not apply until the:

    a. Sixty (60) day period in **2. a.** above has been met; or

    b. As of the original renewal date of the Policy if the late conditional renewal notice was sent at least thirty (30) days prior to the expiration or anniversary date of the Policy.

**C.** The following condition is added to this Policy:

<u>New York Department of Financial Services Insurance Regulation No. 96</u>

The following cancellation provisions supersede any contrary provisions in this Policy, including this endorsement.

1. When **real property** covered by this Policy is subject to completion of the Anti-arson Application in accordance with New York Department of Financial Services Insurance Regulation No. 96, **you** must do the following:

    a. For a new Policy, **you** will be furnished an anti-arson application, if applicable. **You** are required to return the completed, signed and affirmed anti-arson application to **us** or to the authorized insurance agent or broker within forty-five (45) days of the effective date of a new Policy.

    If **you** fail to do so, **we** will cancel the entire Policy by giving twenty (20) days written notice to **you** and to any mortgage holder, shown by endorsement elsewhere in this Policy.

    b. For a renewal of a Policy issued by **us**, either **you** or the authorized insurance agent or broker will be furnished an anti-arson application, if applicable, at least forty-five (45) days but not more than sixty (60) days in advance of the expiration date of the Policy. **You** are required to return the completed, signed and affirmed anti-arson application to **us** or the authorized insurance agent or broker prior to the expiration date of the Policy.

    If **you** fail to do so, **we** will cancel the entire Policy by giving at least fifteen (15) days written notice to **you** and to any mortgage holder, shown by endorsement elsewhere in this Policy.

2. The notice will be sent to **your** last mailing address known to **us**.

3. This notice will be delivered or sent by:

    a. Registered mail;

    b. Certified mail; or

    c. First-Class mail.

Case 1:22-cv-00286 Includes copyrighted material of Insurance Services Office, Filed 05/02/22 with its permission. Page 156 of 166

4.  If notice is mailed, proof of mailing will be sufficient evidence of notice.

5.  The authorized insurance agent or broker will receive the same notification of nonrenewal that **you** receive. This notification will be sent to their last mailing address known to **us**.

**D.**  The following are added to SECTION V – GENERAL POLICY CONDITIONS, **F.** LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS:

9.  If **we** decide not to renew this Policy, **we** will give written notice to the Lender or Mortgagee at least ten (10) days before the expiration date of this Policy.

10. If **you** decide not to renew this Policy, **we** will give written notice to the Lender or Mortgagee. With respect to the Lender's or Mortgagee's interest only, nonrenewal will become effective on the later of:

   a.  The expiration date of the Policy; or

   b.  Ten (10) days after **we** give notice to the Lender or Mortgagee.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Policy Number  YAC-L9L-471218-019
Issued by       Employers Insurance Company of Wausau

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**OHIO CHANGES**

This endorsement applies only to **covered property** located in Ohio and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

**A.** The following are added to SECTION V – GENERAL POLICY CONDITIONS, **R.** VALUATION and apply only to **real property** subject to valuation based on **actual cash value**:

**4.** If **real property** at a covered **location** is totally destroyed by fire or lightning, and there is no fraud on the part of **you** or **your** assignee and there is no change increasing the risk without **our** consent, the LIMIT OF LIABILITY on such **real property** shall be taken to be the true value of the **covered property** and the true amount of the loss.

**5.** If **real property** at a covered **location** is only partially destroyed by fire or lightning, the amount payable to **you** is the actual loss sustained, but no more than the applicable LIMIT OF LIABILITY.

All other terms and conditions remain unchanged.

Case Includes copyrighted material of Insurance Services Office, with its permission of 166

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**TEXAS CHANGES**

This endorsement applies only to **covered property** located in Texas and modifies insurance provided under the following:

PREMIER PROPERTY PROTECTOR™

For purposes of this endorsement, *business day* means a day other than Saturday, Sunday or holiday recognized by the state of Texas.

**A.** Paragraph **H.** JURISDICTION of SECTION I – DECLARATIONS is replaced by the following:

    **H.** JURISDICTION

        Any disputes arising hereunder will be exclusively subject to a State or Federal jurisdiction within the United States of America.

**B.** Paragraph **9.** DEFENSE FOR PERSONAL PROPERTY OF OTHERS of SECTION II – PROPERTY DAMAGE, **D.** PROPERTY DAMAGE COVERAGES AND LIMITATIONS is replaced by the following:

    **9.** DEFENSE FOR PERSONAL PROPERTY OF OTHERS

        **a.** **We** cover the cost to defend that part of any suit against **you** alleging direct physical loss or damage of the type insured by this Policy to personal property of others of the type insured by this Policy, in **your** custody, and while at a covered **location**. **We** may without prejudice undertake any investigation, negotiation or settlement of any such claim or suit as **we** deem appropriate.

        **b.** **We** do not cover the cost to defend any suit against **you** when **you** are acting as a warehouseman, bailee for hire, or carrier for hire.

        **c.** **We** will notify **you** in writing of any initial offer to settle a claim brought against **you** as described in **a.** above. **We** will give **you** the notice within ten (10) days after the date the offer is made.

        **d.** **We** will notify **you** in writing of any settlement of a claim brought against **you** as described in **a.** above. **We** will give **you** the notice within thirty (30) days after the settlement.

**C.** Paragraph **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD of SECTION V – GENERAL POLICY CONDITIONS is replaced by the following:

    **C.** CONCEALMENT, MISREPRESENTATION OR FRAUD

    In accordance with Texas §705.003 and §705.004, this entire Policy is void, if with the actual intent to deceive

    **1.** **You;**

    **2.** **Your** representatives; or

    **3.** Any insured;

Case 4:22-cv-00386-P Document 1-1 Filed 05/02/22 Page 159 of 166
Includes copyrighted material of Insurance Services Office, Inc. with its permission

commit fraud or conceal or misrepresent a fact or circumstance concerning:

    **a.** This Policy;

    **b.** The **covered property**;

    **c.** **Your** interest in the **covered property**; or

    **d.** A claim under this Policy.

**D.** Paragraphs **3.** and **10.** of SECTION VI – LOSS CONDITIONS, **E.** DUTIES AFTER A LOSS are replaced by the following:

    **3.** As soon as possible, give **us** a description of the property involved and how, when and where the loss happened. However, with respect to loss or damage in the State of Texas caused by wind or hail in the catastrophe area as defined by the Texas Insurance Code, any claim must be filed with **us** not later than one (1) year after the date of the loss or damage that is the subject of the claim, except that a claim may be filed after the first anniversary of the date of the loss or damage for good cause shown by the person filing the claim.

    **10.** Submit to **us**, within ninety-one (91) days from the date of loss, unless **we** extend the time in writing, a signed, sworn Proof of Loss that states to the best of **your** knowledge and belief:

        **a.** The time and cause of the loss;

        **b.** **Your** interest and the interest of all others in the property involved;

        **c.** Any other policies of insurance that may provide coverage for the loss;

        **d.** Any changes in title or occupancy of the property during the Policy period and;

        **e.** The amount of **your** claimed loss.

    **You** shall also submit with the Proof of Loss:

        **(1)** A complete inventory of the lost, damaged and destroyed property, showing in detail the quantity, and amount of loss claimed as specified in the valuation provision of the Policy;

        **(2)** An accurate record(s) of all repair costs and all bills, receipts and related documents that establish the amount of the loss;

        **(3)** Specifications for any damaged building; and

        **(4)** Detailed estimates and invoices for the repair of any damage.

**E.** Paragraph **G.** PAYMENT OF LOSS of SECTION VI – LOSS CONDITIONS is replaced by the following:

    **G.** PAYMENT OF LOSS

    **1.** Within fifteen (15) days after **we** receive **your** written notice of claim, **we** must:

        **a.** Acknowledge receipt of the claim. If **our** acknowledgement of the claim is not in writing, **we** will keep a record of the date, method and content of **our** acknowledgement;

        **b.** Begin any investigations of the claim;

Case 4:22-cv-00265 Document 34 Filed 05/02/23 in its original Page 160 of 166

    **c.** Specify the information **you** must provide in accordance with paragraph **SECTION VI – LOSS CONDITIONS, E. DUTIES AFTER A LOSS.**

**We** may request more information, if during the investigation of the claim such additional information is necessary.

**2.** After **we** receive the information **we** request, **we** must notify **you** in writing whether **your** claim will be paid or has been denied or whether more information is needed:

    **a.** Within fifteen (15) *business days*; or

    **b.** Within thirty (30) days if **we** have reason to believe the loss resulted from arson.

**3.** If **we** do not approve payment of **your** claim or need more time for processing **your** claim, **we** must:

    **a.** Give the reasons for denying **your** claim; or,

    **b.** Give the reasons **we** require more time to process **your** claim. But, **we** must either approve or deny **your** claim within forty-five (45) days after requesting more time.

**4.** If **we** notify **you** that **we** will pay **your** claim, or part of **your** claim, **we** must pay within five (5) *business days* after **we** notify **you**.

**5.** If payment of **your** claim or part of **your** claim requires the performance of an act by **you**, **we** must pay within five (5) *business days* after the date **you** perform the act.

**6.** Catastrophe Claims

If a claim results from a weather related *catastrophe or a major natural disaster*, the claim handling and claim payment deadlines described in paragraphs **G.1.** through **G.5.** above are extended for an additional fifteen (15) days.

*Catastrophe or a major natural disaster* means a weather related event which is:

    **a.** Declared a disaster under the Texas Disaster Act of 1975; or

    **b.** Determined to be a catastrophe by the Texas Department of Insurance.

**F.** Paragraph **I. SUIT AGAINST THE COMPANY** of **SECTION VI – LOSS CONDITIONS** is replaced by the following:

    **I.** SUIT AGAINST THE COMPANY

No suit or other legal proceeding shall be brought against **us** unless there has been full compliance with all the Policy terms and conditions. Any suit against **us** must be brought within two (2) years, one (1) day next after the inception of the loss.

With respect to loss or damage in the State of Texas caused by wind or hail in the catastrophe area as defined by the Texas Insurance Code, no one may bring a legal action against **us** under this Policy unless:

**1.** There has been full compliance with all the terms of this Policy; and

**2.** The action is brought within the earlier of the following:

    **a.** Two (2) years and one (1) day from the date **we** accept or reject the claim; or

    **b.** Three (3) years and one (1) day from the date of the loss or damage that is the subject of the claim.

Includes copyrighted material of Insurance Services Office, with its permission.

**G.** The following is added to SECTION VI – LOSS CONDITIONS:

**J.** TEXAS INSURANCE CODE SECTION 862.053. FIRE INSURANCE: TOTAL LOSS OF **REAL PROPERTY**

A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of the policy. This provision does not apply to **personal property**.

All other terms and conditions remain unchanged.

Includes copyrighted material of Insurance Services Office, with its permission.

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

THE ONE GROUP HOSPITALITY INC., )
)
*Plaintiff,* )
)
v. )
)
EMPLOYERS INSURANCE COMPANY )
OF WAUSAU, )
    Serve:  Registered Agent )
             CSC-Lawyers Incorporating Service )
             Company )
             221 Bolivar St. )
             Jefferson City, MO 65101 )
)
*Defendant.* )
)

Case No. _____

## MOTION FOR APPOINTMENT OF PRIVATE PROCESS SERVER

COMES NOW Plaintiff, by and through counsel, and pursuant to Local Rule 4.9 of Jackson County

Court Rules, hereby moves for the appointment of HPS Process Service & Investigations, Inc.:

| | | | |
|---|---|---|---|
| Will Acree | PPS22-0369 | Gary Burt | PPS22-0012 |
| Jan E. Adams | PPS22-0111 | Stephen C. Buskirk | PPS22-0121 |
| Roger Adams | PPS22-0112 | Peggy Butcher | PPS22-0379 |
| Kyle Adcock | PPS22-0370 | Steve Butcher | PPS22-0380 |
| Paul Aizel | PPS22-0371 | Naoshia Butler | PPS22-0479 |
| Bobby Ali | PPS22-0372 | Danny M. Callahan | PPS22-0123 |
| Sandra M. Allen | PPS22-0113 | Thomas D. Campbell | PPS22-0381 |
| Stacy M. Anderson | PPS22-0373 | Anna Canole | PPS22-0382 |
| John Arnold | PPS22-0374 | Esquiel Cantu | PPS22-0125 |
| Tonya Arruda | PPS22-0474 | William J. Caputo | PPS22-0126 |
| Teresa Bailly | PPS22-0114 | Andre Carnes, Jr. | PPS22-0265 |
| Joseph Baska | PPS22-0375 | Samantha Carpenter | PPS22-0383 |
| Richard Benito | PPS22-0115 | Charles Casey | PPS22-0127 |
| Keith Blanchard | PPS22-0376 | George L. Castillo | PPS22-0128 |
| Dianna J. Blea | PPS22-0116 | Carolyn S. Champlin | PPS22-0013 |
| Richard J. Blea | PPS22-0117 | Crystal Chapman | PPS22-0129 |
| Sheila P. Brooks | PPS22-0119 | Kathleen Clor | PPS22-0384 |
| Kathy Broom | PPS22-0120 | Pamela Coats | PPS22-0385 |
| Douglas Brower | PPS22-0477 | Randy G. Cobb | PPS22-0130 |
| Jesse Bruce, Jr. | PPS22-0377 | Chad Compton | PPS22-0132 |
| James Burke | PPS22-0378 | Kenneth Condrey | PPS22-0386 |

| | | | |
|---|---|---|---|
| Sharon Condrey | PPS22-0387 | Christy Hartline | PPS22-0149 |
| Theodore Cordasco | PPS22-0388 | Austen Hendrickson | PPS22-0487 |
| George Covert, II | PPS22-0389 | Jonathan Hennings | PPS22-0416 |
| Christine Crawford | PPS22-0390 | Jessie J. Hernandez | PPS22-0153 |
| Janet Darragh | PPS22-0391 | Justin J. Herndandez | PPS22-0154 |
| Bryce Dearborn | PPS22-0392 | Michael Hibler | PPS22-0155 |
| Robert Delacy, III | PPS22-0393 | Shelby Hibler | PPS22-0156 |
| Robert Delacy, Jr. | PPS22-0394 | Trinity Hibler | PPS22-0157 |
| Dominic DellaPorte | PPS22-0134 | James Hise | PPS22-0294 |
| Richard Dixson | PPS22-0395 | Bobbi Hohnholt | PPS22-0417 |
| Claudia Dohn | PPS22-0482 | Martin Hueckel | PPS22-0159 |
| Angela Donahue | PPS22-0396 | Michael Huffman | PPS22-0039 |
| Dale Dorning | PPS22-0135 | Pamela Huffman | PPS22-0040 |
| Cathrene Drake | PPS22-0483 | Anthony Iavarone | PPS22-0160 |
| John Dressler | PPS22-0397 | George Illidge | PPS22-0161 |
| Rebecca Dressler | PPS22-0398 | Glenn Jackson | PPS22-0163 |
| Alexander C. Duaine | PPS22-0136 | Frank H. James | PPS22-0418 |
| Thomas Elmore | PPS22-0399 | Matthew Jankowski | PPS22-0419 |
| Abel Emiru | PPS22-0137 | Betty A. Johnson | PPS22-0164 |
| Donald Eskra, Jr. | PPS22-0400 | Justin L. Johnson | PPS22-0165 |
| Sadie Estes | PPS22-0138 | Kenneth Kearney | PPS22-0168 |
| Cindy Ethridge | PPS22-0401 | Michael Keating | PPS22-0420 |
| Larry Evans | PPS22-0402 | Christopher Keilbart | PPS22-0421 |
| Robert Fairbanks | PPS22-0403 | Brent Kirkhart | PPS22-0046 |
| William F. Ferrell | PPS22-0022 | Janice Kirkhart | PPS22-0047 |
| Robert Finley | PPS22-0023 | Tyler Kirkhart | PPS22-0048 |
| Kim Fletcher | PPS22-0404 | Gerald Kirschner | PPS22-0422 |
| Ryan Fortune | PPS22-0405 | Michele L. Kriner | PPS22-0169 |
| John K. Frago | PPS22-0026 | Wyman T. Kroft | PPS22-0423 |
| Rhonda Frerichs | PPS22-0406 | Andrea Lambros | PPS22-0424 |
| Kelsey Garrett | PPS22-0407 | Cecile R. Landrum | PPS22-0170 |
| Joseph S. Gates | PPS22-0141 | James R. LaRiviere | PPS22-0171 |
| Natalie Gay | PPS22-0408 | Anthony Lazzara | PPS22-0425 |
| Patti Gay | PPS22-0409 | Bryan Liebhart | PPS22-0172 |
| Richard Gerber | PPS22-0410 | Charles Lindsay, Jr. | PPS22-0173 |
| Louis Gerrick | PPS22-0142 | Bert Lott | PPS22-0174 |
| Adam Golden | PPS22-0411 | Dawn Luce | PPS22-0426 |
| Brad Gordon | PPS22-0144 | Ellen MacFarland | PPS22-0427 |
| Tom Gorgone | PPS22-0145 | Robert Maliuuk | PPS22-0428 |
| Kimberly Greenway | PPS22-0146 | Winnonna Maliuuk | PPS22-0429 |
| Lynne Grimes | PPS22-0147 | Richard Markowitz | PPS22-0430 |
| Paul Grimes | PPS22-0485 | Michael Marra | PPS22-0179 |
| Charles R. Gunning | PPS22-0028 | Deborah J. Martin | PPS22-0175 |
| Leon Gustus | PPS22-0412 | Michael Martin | PPS22-0176 |
| David Hahn | PPS22-0413 | Thomas Matthews | PPS22-0180 |
| Eric Hahn | PPS22-0414 | Michael McCann | PPS22-0431 |
| Stefanie Hahn | PPS22-0415 | Michael J. McMahon | PPS22-0183 |
| Darnell E. Hamilton | PPS22-0029 | James R. Meadows | PPS22-0186 |
| James Hannah | PPS22-0030 | Nancy Measheaw | PPS22-0432 |

| | | | |
|---|---|---|---|
| Jerry Melber | PPS22-0187 | Mark A. Russell, Jr. | PPS22-0218 |
| Eric Mendenhall | PPS22-0434 | Ligno Sanchez | PPS22-0450 |
| Jenna Mendoza | PPS22-0188 | Brenda M. Schiwitz | PPS22-0094 |
| Matthew Millhollin | PPS22-0062 | Edward Schuch | PPS22-0451 |
| Amanda L. Mincheff | PPS22-0189 | Nathaniel Scott | PPS22-0219 |
| Vivian G. Mitchell | PPS22-0190 | Richard Shaver | PPS22-0221 |
| Carla Monegain | PPS22-0434 | Joe B. Sherrod | PPS22-0222 |
| Christopher Moore | PPS22-0435 | Katie Shiflett | PPS22-0452 |
| Michael Morrison | PPS22-0436 | Kenneth Short | PPS22-0453 |
| Zachary Mueller | PPS22-0437 | Jeannie M. Simon | PPS22-0223 |
| Linda M. Murphy | PPS22-0191 | Raymond Sinclair | PPS22-0454 |
| Kelly A. Murski | PPS22-0192 | Thomas H. Skinner | PPS22-0224 |
| Paul Nadarzzi | PPS22-0193 | Brian Smith | PPS22-0225 |
| Jeremy L. Nicholas | PPS22-0194 | Bryan Smith | PPS22-0501 |
| Jeffrey L. Nichols | PPS22-0195 | Gean Smith | PPS22-0226 |
| Michael Noble | PPS22-0196 | John K. Smith | PPS22-0502 |
| Michael Nolan | PPS22-0491 | Anthony Spada | PPS22-0228 |
| Colter Norris | PPS22-0197 | Melissa Spencer | PPS22-0503 |
| Dennis Norris | PPS22-0198 | Barbara Steil | PPS22-0455 |
| Kody Norris | PPS22-0199 | Randy Stone | PPS22-0229 |
| Daryl Oesterich | PPS22-0438 | Sonja R. Stone | PPS22-0230 |
| Elizabeth Ostman | PPS22-0439 | Steven Stosur | PPS22-0456 |
| Tory J. Owens | PPS22-0071 | Brittney Strozier | PPS22-0231 |
| Craig Palmer | PPS22-0440 | Kenneth Sullenberger | PPS22-0504 |
| Cynthia Paris | PPS22-0441 | Cody Swartz | PPS22-0457 |
| Orlando Parra-Alvarez | PPS22-0201 | Ramona Talvacchio | PPS22-0458 |
| Cody Patton | PPS22-0202 | Jeffrey Teitel | PPS22-0233 |
| James Perna | PPS22-0494 | Devon M. Thomas | PPS22-0459 |
| Vincent A. Piazza | PPS22-0204 | Jeffrey Thomas | PPS22-0460 |
| Brian Pierce | PPS22-0496 | LaVonda Martinez-Thompson | PPS22-0461 |
| Timothy Pinney | PPS22-0205 | | |
| Kenny Polizzi | PPS22-0497 | Michelle Tomlin | PPS22-0462 |
| Evelyn L. Porter | PPS22-0206 | Sean Updegrave | PPS22-0463 |
| Nancy Porter | PPS22-0442 | Harold Vantassel | PPS22-0512 |
| Benjamin Purser | PPS22-0498 | Margarita Vasquez | PPS22-0235 |
| Richard Ramirez | PPS22-0443 | Robert E. Vick, II | PPS22-0238 |
| Charles Reardon | PPS22-0444 | Bradley Votaw | PPS22-0239 |
| Christopher Reed | PPS22-0210 | Beth Wachowski | PPS22-0464 |
| Edward Reed | PPS22-0445 | Joseph Wachowski | PPS22-0465 |
| Gavin Rees | PPS22-0446 | Ambiko Wallace | PPS22-0240 |
| Craig Reynolds | PPS22-0447 | Vance M. Warren, Sr. | PPS22-0241 |
| Betty G. Rice | PPS22-0448 | Stephan R. Waters | PPS22-0242 |
| Karen L. Rice | PPS22-0449 | Barbara West | PPS22-0466 |
| Terri Richards | PPS22-0212 | Jane Weston | PPS22-0467 |
| Cheryl Richey | PPS22-0213 | Roger White | PPS22-0468 |
| Richard C. Ross | PPS22-0215 | Sheri Williams | PPS22-0469 |
| David M. Roberts | PPS22-0086 | Gregory Willing | PPS22-0105 |
| Patricia J. Roberts | PPS22-0087 | Conni Wilson | PPS22-0107 |
| Edna L. Russell | PPS22-0093 | Deborah A. Wilson | PPS22-0470 |

| Mitch Wirth | PPS22-0245 |
|---|---|
| Robert Yates | PPS22-0513 |

| Michele A. Zera | PPS22-0471 |
|---|---|

as private process servers in the above-captioned matter. In support of said motion, Plaintiff/Petitioner

states that the above-named individuals are on the Court's list of approved process servers and the

information contained in their applications and affidavits on file is current and still correct.

Dated: March 21, 2022

Respectfully submitted,

BOULWARE LAW LLC

By: /s/ Jeremy M. Suhr
Jeremy M. Suhr          MO # 60075
1600 Genessee Street, Suite 416
Kansas City, MO 64102
Tele: (816) 492-2826
jeremy@boulware-law.com

David M. Cummings (*pro hac vice* forthcoming)
**REED SMITH LLP**
10 S. Wacker Dr., 40th Floor
Chicago, IL 60606
T: (312) 207-1000
F: (312) 207-6400
dcummings@reedsmith.com

*ATTORNEYS FOR THE ONE GROUP*
*HOSPITALITY INC.*

## ORDER FOR APPOINTMENT OF PRIVATE PROCESS SERVER

It is hereby ordered that Plaintiff's Motion for Appointment of Private Process Server is sustained

and the above named individuals are hereby appointed to serve process in the above captioned matter.

DATE: 01-Apr-2022

DEPUTY COURT ADMINISTRATOR